IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIE JAMES PYE | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 3:13-CV-119-TCB |
| | ) | |
| BRUCE CHATMAN, Warden, | ) | Capital Habeas Corpus |
| Georgia Diagnostic Prison, | ) | |
| Respondent. | ) | |
| _____ | ) | |

## PETITIONER'S FIRST AMENDED PETITION FOR
## WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Gretchen M. Stork
Ga. Bar No. 685555
gretchen_stork@fd.org

S. Jill Benton
Ga. Bar No. 053659
jill_benton@fd.org

FEDERAL DEFENDER PROGRAM, INC.
Centennial Tower, Suite 1500
101 Marietta St NW
Atlanta, Georgia 30303
T. 404-688-7530
F. 404-688-0768

**COUNSEL FOR PETITIONER**

Petitioner, Willie James Pye ("Petitioner"), by and through undersigned counsel, invokes this Court's jurisdiction pursuant to 28 U.S.C. § 2254.

The allegations in this Petition are in the form dictated by Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in the United States District Courts.  Petitioner seeks this Court's protection and intercession because the Georgia state courts have violated, and unreasonably and arbitrarily refused to correct violations of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, resulting in Petitioner's unconstitutional sentence of death.  Petitioner requests that this Court afford him all protections promised by the federal habeas corpus statutes, the Rules Governing § 2254 Cases in the United States District Courts, the Criminal Justice Act, the Anti-Drug Abuse Act of 1988 and all other pertinent statutes, court rules and case law.  Petitioner seeks discovery and an evidentiary hearing in order to present the necessary evidence in support of his claims.  Petitioner respectfully requests that this Court issue an Order granting his Petition for Habeas Corpus.

## I.   <u>INTRODUCTION</u>

Petitioner presented the state courts of Georgia with extensive testimony and voluminous documentary evidence demonstrating, *inter alia,* that the state suppressed

material evidence prior to and during his 1996 capital murder trial, that Petitioner suffers from mental retardation and the psychological effects of a childhood of trauma and deprivation, and that his trial counsel, burdened by an untenable caseload and conflicts of interest, failed to perform a reasonable investigation for exculpatory and mitigating evidence.  Yet Petitioner, a mentally retarded man whose crime does not fall within that "small number of extreme cases" for which the death penalty is reserved, *see Gregg v. Georgia,* 428 U.S. 153, 182 (1976), now faces execution because the Georgia courts have failed to intercede despite the overwhelming evidence in support of his claims.  Consequently, Petitioner seeks this Court's protection from his unconstitutional convictions and sentence of death.

## II.   **HISTORY OF PRIOR PROCEEDINGS**

On November 17, 1993, the body of Petitioner's former girlfriend, Alicia Lynn Yarbrough, was discovered in Spalding County, Georgia.  Petitioner and two codefendants, Chester Adams and Anthony Freeman, were arrested the following day. All three men gave statements indicating they were with Ms. Yarbrough the evening prior, but both Mr. Pye and Mr. Adams denied any knowledge of her death.  Mr. Freeman, who was fifteen years old at the time of the crime, gave a statement implicating Mr. Pye, Mr. Adams and himself.

Shortly after his arrest, Spalding County contract defender Johnny Mostiler

was appointed to represent Mr. Pye.  On February 7, 1994, Petitioner was indicated for malice murder, felony murder, kidnaping with bodily injury, armed robbery, rape, aggravated sodomy, and burglary.  On April 19th of that year, the State filed Notice of Intent to Seek the Death Penalty against Mr. Pye and Mr. Adams.  Anthony Freeman entered a negotiated plea agreement and was the primary witness against Mr. Pye at his capital trial in late May/early June 1996.  On June 4, 1996, Petitioner was convicted of all charges with the exception of aggravated sodomy.  After a penalty phase lasting only a few hours, Petitioner was sentenced to death by the jury. The trial court imposed consecutive life sentences on the kidnaping, armed robbery and rape counts and a 20 year term of imprisonment for burglary.

Petitioner appealed to the Georgia Supreme Court, which affirmed his convictions and sentence of death on September 21, 1998.  *Pye v. State,* 269 Ga. 779 (1998).  He then filed a Petition for Writ of Certiorari, which the United States Supreme Court denied on May 17, 1999.  *Pye v. Georgia*, 526 U.S. 1118, *rehearing denied,* 527 U.S. 1054 (1999).

On January 28, 2000, the Superior Court of Spalding County signed an order setting Mr. Pye's execution for the week beginning February 8 and ending February 15, 2000.  On January 31, 2000, Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia ("state habeas court").  The petition

was amended on November 17, 2006 and the state habeas court held a three-day evidentiary hearing on the petition as amended in May of 2009 and the parties thereafter filed post-hearing briefs.   On January 30, 2012, rather than independently analyzing and resolving the issues presented, the state habeas court abdicated its role as neutral arbiter and simply adopted *verbatim* the proposed order drafted and submitted by a partisan advocate.   In adopting word-for-word Respondent's proposed order (hereinafter "Respondent's Order"), the state habeas court accepted conclusions that unreasonably applied and were contrary to clearly established and controlling federal law, and entered findings of fact that were plainly unreasonable in light of the record before it.

On May 29, 2012, Petitioner filed a timely Application for Certificate of Probable Cause to Appeal the denial of his state habeas corpus petition in the Georgia Supreme Court.   On April 15, 2013, the Georgia Supreme Court issued a single-page order summarily denying the Application without opinion.

Petitioner now files the instant petition in order to preserve his rights to federal review of his convictions and sentence of death and to compel this Court to intercede on his behalf and correct numerous federal constitutional violations which the state courts of Georgia have failed to redress.

## III.   LEGAL STANDARDS GOVERNING THE PETITION

This Court's power to grant Petitioner relief from his unconstitutional convictions and sentence of death is defined in part by the provisions of the Anti-Terrorism and Effective Death Penalty Act as codified in 28 U.S.C. §§ 2254(d) and (e).  Pursuant to those provisions, this Court must first determine whether a habeas corpus petitioner has demonstrated a constitutional violation.

If the Court is satisfied that a habeas petitioner's claim has merit, the Court then looks to the state court decision to determine whether the state court addressed the merits of the federal constitutional claim, adjudicated the merits on a complete record, and issued a reasoned opinion with respect to the merits.  If these criteria are met, then this Court next determines whether the facts were found in a reasonable manner.  If not, then 2254(d) does not apply and this Court must adjudicate the claim *de novo*.   *Cooper v. Sec'y, DOC,* 646 F.3d 1328, 1353 (11th Cir. 2011)("'When a state court's adjudication of a habeas claim results in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably found facts or to the legal conclusions that flow from them.'").

If the Court concludes that the facts were reasonably determined by the state court, the Court may nevertheless grant relief under 28 U.S.C. § 2254(d)(1) if the

state court decision was contrary to or manifested an unreasonable application of clearly established federal constitutional law.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 384 (2000).  A state court decision can be contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.  A state court decision unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  A state court's application of federal law is unreasonable when it is "objectively unreasonable," and not simply incorrect or erroneous.  *Id.* at 411; *Wiggins*, 539 U.S. at 520-21.  "Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  *See also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

On the other hand, because by its own terms § 2254(d) only provides a limitation on relief with respect to "any claim that was adjudicated on the merits in state court proceedings," this Court reviews *de novo* other types of state court determinations or resolutions, including a state court determination that a given claim

is barred by procedural default rules.   Where the state court resolution of a claim

hinges upon a finding of default, this Court must make an independent finding that

the claim was procedurally barred.  *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[T]he

adequacy of state procedural bars to the assertion of federal questions…is not within

the State's prerogative finally to decide; rather, adequacy is itself a federal question.")

(internal citations omitted).  That determination is made *de novo.  Macklin v.

Singletary*, 24 F.3d 1307 (11th Cir. 1994).

   With respect to each and all of the claims pled herein, Petitioner maintains that

his capital trial violated his constitutional rights and resulted in unconstitutional

convictions and an unconstitutional sentence of death.  In some instances, the state

courts have failed to address the merits of Petitioner's constitutional claims despite

their timely presentation.  Petitioner seeks this Court's *de novo* review of those

claims.  In other instances, the state habeas court's incorrect adjudication of

Petitioner's claims was premised upon an unreasonable determination of the facts in

light of the record evidence, or that adjudication was contrary to or unreasonably

applied clearly established federal law.  Thus, this Court is unconstrained by 28

U.S.C. § 2254 and may review those claims and grant relief.

   However, in the instant case, the state habeas court, which entered the order

that is the focus of this Court's review for the majority of the claims contained herein,

7

improperly adopted verbatim the proposed findings of fact and conclusions of law submitted by the Respondent.  This wholesale adoption of Respondent's advocacy-laden Order provides no indication that the state habeas court independently considered the complex issues involved in this case.  Petitioner therefore contends that it provides no legitimate basis for application of the provisions of 2254(d) to the conclusions set forth in that Order.  *See Davis v. Sec'y, DOC*, 341 F.3d 1310, 1313 (11th Cir. 2003) (no deference afforded to state court ruling that is not an adjudication on the merits of habeas petitioner's claims).

The Supreme Court (and many other courts) has repeatedly criticized the practice of verbatim judicial adoption of facts and legal conclusions prepared wholly by an advocate for one party.  *See, e.g.*, *Jefferson v. Upton*, 130 S. Ct. 2217, 2222 (2010)(remanding a verbatim habeas order in a capital case for further consideration); *Anderson v. City of Bessemer*, 470 U. S. 564, 572 (1985).  Likewise, the Eleventh Circuit Court of Appeals and other appellate courts "have repeatedly condemned the ghost writing of judicial orders by litigants."  *In Re Colony Square Co.*, 819 F.2d 272, 274 (11th Cir. 1987).  "The cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997).

For an advocate, "the temptation to overreach and exaggerate is overwhelming." *Id.* As the Court of Appeals noted in *Colony Square*:

> [t]he quality of judicial decision-making suffers when a judge delegates the drafting of orders to a party; the writing process **requires a judge to wrestle with the difficult issues** before him [or her] and thereby leads to stronger, sounder judicial rulings.

819 F.2d at 275 (emphasis added); *see also Porter*, 558 U.S. 30, 44 (2009)(criticizing the state court's "failure to engage" with the evidence). As the Fifth Circuit wrote in *Keystone Plastics v. C&P Plastics* (a binding pre-1981 decision), the reasons for criticism are "self-evident":

> The reviewing court [and the capital defendant] deserved the assurance that the trial court has come to grips with apparently irreconcilable conflicts in the evidence . . . and has distilled therefrom true facts in the crucible of his conscience.

506 F.2d 960, 962 (5th Cir. 1975).

The courts have only upheld such orders where there is some indication that the judge did not "abdicate his adjudication role." *Colony Square*, 819 F.2d at 276. Thus in *Colony Square*, the judge had indicated his "firm, final decisions" before asking for a draft order, and had asked the party's lawyer to "draft orders which reached a particular result and discussed specific points." *Id.* at 276-277. There is no such record here. Similarly, in *CBS, Inc. v. Prime Time 24 T.V.*, 9 F.Supp. 2d 1333, 1347

9

(S.D. Fla. 1998), the court upheld a state court order where the record showed the judge had "incorporate[ed] <u>alterations</u> that included several of [the <u>other</u> party's] proposed findings of fact." *Cf. Flying J.V. v. Comdata Network, Inc.*, 405 F.3d 821, 829 n.2 (10th Cir. 2005). As the Supreme Court noted in *Anderson*, adopting a proposed order verbatim may be acceptable when the judge "does not appear to have uncritically accepted findings prepared without judicial guidance by the prevailing party." 405 U.S. at 572.[1] But "uncritical acceptance" is what happened here. Because the state court here adopted verbatim an error ridden order prepared by a partisan advocate, without any sign of independent judicial consideration, this Court should not be bound to apply the statutory prerequisites for relief contained in 2254(d) and should conduct a *de novo* review of Petitioner's claims.

---

[1]Thus the *Anderson* Court did not hold that verbatim adoption of proposed orders is fine in all circumstances. *Compare Rhode v. Hall*, 582 F.3d 1273, 1282 n.5 (11th Cir. 2009). Indeed, the Supreme Court's decision in *Jefferson* indicates to the contrary.

## IV.   CLAIMS FOR RELIEF

### CLAIM I

**THE PROSECUTION TEAM SUPPRESSED MATERIAL EXCULPATORY AND MITIGATING EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83 (1963).**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The prosecution suppressed exculpatory, impeachment and mitigation evidence that was material to the defense at trial in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.  As Petitioner demonstrated before the state courts, the prosecution failed to disclose to the defense, *inter alia,* copies of prior exculpatory and mitigating statements made by Petitioner's codefendant Anthony Freeman, the State's key witness at trial.  These prior statements were material to both guilt and to punishment.

In the state habeas court, Petitioner conclusively proved all three components of a *Brady* violation: that the evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *see also Banks v. Dretke*, 540 U.S.668, 691 (2004).

Yet the state habeas court erroneously failed to reach Petitioner's *Brady* claims, holding that they were barred by procedural default.  In so holding, Respondent's Order engaged in a flawed analysis of both cause and prejudice and wrongly concluded that neither exists to overcome default.  As outlined *supra*, state court findings of default are not subject to the provisions of 28 U.S.C. § 2254(d); this Court must determine *de novo w*hether there exists an independent and adequate state court basis for barring a claim.  *Macklin v. Singletary,* 24 F. 3d 1307 (11th Cir. 1994) (default is a *de novo* determination).  In this case, there is adequate cause and prejudice to overcome any default, and Petitioner is entitled to relief.

## A.   The Evidence Was Favorable to the Defense

The undisclosed statements of codefendant Anthony Freeman would have aided the defense at trial in substantial and material ways.  Not only do the statements cast doubt upon and undermine the trial testimony given by Mr. Freeman, but they would have changed the picture both the State and defense were able to paint of Mr. Pye's role in the murder of Ms. Yarbrough.

12

### 1.   Trial Testimony of Anthony Freeman

Shortly after the crime, Anthony Freeman made statements implicating

himself in Ms. Yarbrough's death.  He agreed to speak with investigators and at

least some portion of these conversations were recorded on videotape.  The State

provided a copy of Freeman's initial statement to Petitioner's trial attorney,

Johnny Mostiler, during pre-trial discovery.  Resp. Ex. No. 1B at 190-193[2] (served

on trial counsel March 2, 1995); Resp. Ex. No. 110B at 5355-5360 (same

document in trial counsel's file).  According to his statement, Freeman

accompanied Petitioner and Adams to the home the victim shared with her new

boyfriend, Charles Puckett.  Resp. Ex. No. 1B at 190-192; Resp. Ex. No. 1B, 1C at

---

[2]References to the state court record are in the format dictated by this
Court's Order of September 12, 2013.  Doc. 21 at 2.

In several instances, documents which were a single evidentiary submission
in the state court proceedings have been divided across multiple volumes of the
Respondent's Exhibits by the filing/uploading process, thus making it appear as
though Petitioner is citing to multiple sources when in fact he is citing to just one.
For instance, the transcript of the statement provided by Petitioner's cooperating
codefendant, Anthony Freeman, in 1995 was submitted as Petitioner's Exhibit 105
at the state habeas corpus evidentiary hearing.  That single statement now spans
two separate exhibits in these proceedings:  Resp. Ex. No. 125C and Resp. Ex. No.
125D.

Conversely, many smaller exhibits from the state court record were
combined into a single exhibit by Respondent's filing, e.g., Petitioner's Exhibits 40
through 69 from the state court evidentiary hearing are all now found in Resp. Ex.
No. 108.

220-223.  They took Ms. Yarbrough to a motel for sex and, according to Freeman,

when Petitioner was no longer confident that Ms. Yarbrough would not "tell"

about the night's events, Petitioner shot her.  Resp. Ex. No. 1B, 1C at 220-223.

At Petitioner's capital trial in May and June 1996, the State's entire case

against Petitioner hinged on Freeman's testimony.  District Attorney William

McBroom first warned jurors that Freeman was "somewhat limited in his mental

ability."  Resp. Ex. No. 11A at 900.  With that explanation in place, Mr. McBroom

led Freeman in his testimony.

Freeman testified that on the afternoon prior to the crime, he, Adams and

Petitioner drove Adams's car from rural Butts County (where all three resided) to

Griffin to commit a robbery.  Adams had a small .22 caliber handgun which

Adams and Freeman had been shooting together earlier in the day.  Resp. Ex. No.

11A at 931-933.  While en route to Griffin, Petitioner mentioned that Lynn

Yarbrough and her current boyfriend, Charles Puckett, had recently received a

settlement from a lawsuit, and the three were going to rob Yarbrough and Puckett

once in Griffin.  *Id.* at 935.

According to Freeman's testimony, when they arrived in Griffin, the three

went together to a place where Petitioner purchased another a gun, this one a

distinctive long-barreled .22 revolver, before attending a birthday gathering at the

14

home of people named Ted and Paula. Resp. Ex. No. 11A at 934-938.  After the

party, he and Adams and Petitioner went to the house Yarbrough shared with

Charles Puckett.  *Id.* at 940-942.

Freeman told jurors that Mr. Pye made them don ski masks before

approaching the house.  Freeman claimed that he first saw the masks that

afternoon when Mr. Pye got into Adams's car.  Resp. Ex. No. 11A at 943.  Once

they were near the house on foot, they observed the house from an abandoned

property next door to see if Puckett was at home.  *Id.* at 944.  Mr. Pye then kicked

in the door and Freeman and Adams began removing Puckett's stereo equipment;

these items were later recovered in the bushes near the door.  *Id.* at 948-949.  Mr.

Pye gave Freeman a small herring bone necklace and rings he had taken from the

victim.  *Id.* at 957-958.  Though he was not yet old enough to drive, Freeman

retrieved the car.  *Id.* at 949.  According to Freeman's trial testimony, Petitioner

forced Yarbrough into the car at gunpoint, directed Freeman to a motel, and then

forced the victim to have sex with the three of them at gunpoint.  *Id.* at 950-956.

He and Adams both used condoms; Petitioner did not.  *Id.* at 960.  They then

wiped the room down and left to search for Charles Puckett.[3]  *Id.* at 962.  Despite

actually observing Puckett driving around looking for Yarbrough, the four

_____

[3]According to Freeman, Petitioner was angry because Puckett had signed
Yarbrough's child's birth certificate.  Resp. Ex. No. 11A at 956.

returned to the motel nevertheless because Adams wanted to have sex again.  *Id.* at 963.  Freeman testified that once back at the hotel room, Yarbrough was again raped at gunpoint.  *Id.* at 965-965.

According to Freeman, upon leaving the motel room for a second time, they set out driving east to return home.  Resp. Ex. No. 11A at 966.  As the four rode toward Jackson, Petitioner whispered to Adams, who was driving.  *Id.* at 967.  When Adams pulled the car over on a dirt road, Petitioner forced Yarbrough to get out and shot her with the long-barreled .22 revolver.  *Id.* at 967-968.  On the remaining drive to Jackson, Petitioner tossed the gun and ski masks out of the car window.  *Id.* at 970-971.

On cross-examination, Freeman revised his earlier testimony, claiming he wasn't aware that they were going to commit a robbery until they arrived in Griffin.  Resp. Ex. No. 11A at 981-982.  He also maintained he didn't know they were going to rob Yarbrough and Puckett until they went to their house, at which point Petitioner told him they were going "to rob Puckett because they got a lawsuit back."  *Id.* at 982, 1019.

Defense counsel confronted Freeman with a number of inconsistencies between his trial testimony and his initial post-arrest statement to investigators in November 1993.  The three key discrepancies defense counsel highlighted were

16

(1) Freeman's initial claim that Petitioner showed him a large *.22 revolver* on the way to Griffin, not that Adams showed him a small .22 pistol (his initial statement made no mention of the smaller .22, nor of the clandestine purchase of the revolver on the night of the crime), (2) Freeman's initial statement that the three of them purchased the masks and gloves the prior week at the Dollar Store in Griffin and (3) Freeman's indication that as the four of them drove from Griffin toward Jackson after leaving the motel the final time, Petitioner asked the victim "if she would tell."  Resp. Ex. No. 11A at 1013-1015.

Petitioner was the only defense witness to appear at trial.  He testified that after drinking at the birthday party, he asked Adams and Freeman to drive him to a motel from which he sold crack cocaine.  *Id.* After dropping him off there, Freeman and Adams returned to the hotel room with Yarbrough.  Resp. Ex. No. 13A at 1355-1356.  Contrary to Freeman's testimony, Petitioner claimed that Yarbrough came to the room voluntarily in order to trade sex for drugs.  *Id.* at 1356.  She had sex with all three of them and smoked crack cocaine in the room. *Id.* at 1357-1358.  No one held a gun on her and she didn't appear to be upset at any point.  Petitioner testified that when Yarbrough, Freeman and Adams left, he fell asleep in the room and was awakened when Adams and Freeman returned without her.  *Id.* at 1359-1360.

17

Physical evidence linked Petitioner to the victim and to Adams's car.  *See e.g.* Resp. Ex. No. 12B at 1287, 1290-1291 (Petitioner's fingerprint found on Adams' car); Resp. Ex. No. 12B at 1318 (spermatozoa collected from Ms. Yarbrough's body during the autopsy matched Petitioner's DNA); Resp. Ex. No. 12B at 1249-1250 (fibers from the ski masks were consistent with fibers found in Adams's car and Petitioner's home).  Investigators were also able to place Adams's car at the crime scene by matching the tires and wheel base to tire tread impressions found near the victim's body.  *Id.* at 1301.  However, none of the evidence directly established that Petitioner committed any crime, save for the testimony of Anthony Freeman.  Without Freeman's testimony, the State could point to no evidence that Petitioner burglarized or shot Ms. Yarbrough.  Furthermore, without Freeman's testimony, the State would have had no evidence that the crimes of kidnaping, rape or armed robbery were even committed at all, as these crimes each require proof that the act was committed with force or against the will of the victim.  O.C.G.A. § 16-5-40(a) (kidnaping defined); O.C.G.A. § 16-6-1(a)(1) (rape defined); O.C.G.A § 16-8-41(a) (armed robbery defined).

## 2.    The Undisclosed Freeman Statements

Unbeknownst to trial counsel, the State had memorialized not one, but a total of three prior statements by Anthony Freeman.  In addition to the initial

November 1993 statement recorded at the time of his arrest and provided to trial

counsel during discovery, Freeman gave two other accounts of Ms. Yarbrough's

death: one during a December 1993 mental health evaluation by Central State

Hospital psychiatrist Donald Gibson, and the second during a September 1995

interview by lead investigator Ted Godard.  Resp. Ex. No. 118B at 7196-7197,

Resp. Ex. No. 119A at 7289-7293; Resp. Ex. No. 125C, 125D at 8973-9003.  Both

statements were discovered when state habeas counsel obtained access to various

Spalding County District Attorney's files through a request pursuant to the

Georgia Open Records Act.  O.C.G.A. § 50-18-70, *et seq.*.  Both undisclosed

accounts differ in crucial respects from Freeman's trial testimony and both

constitute *Brady* material.

### a.     The December 3, 1993 Statement to Dr. Gibson

Following Freeman's arrest, the State moved that his case be transferred

from juvenile court to Superior Court so that he could be sentenced as an adult

offender.  In response, his attorney moved for a mental health evaluation to

determine his competency and related issues.  Freeman was admitted to Central

State Hospital and examined by a staff psychiatrist, Donald Gibson.  Resp. Ex. No.

119A at 7289.  Dr. Gibson recorded his findings in a report provided to the

juvenile court on December 30, 1993 and copied to the District Attorney and to Freeman's counsel.  *Id.*

Contrary to the District Attorney's assertions at trial, the evaluation revealed that Freeman was not mentally impaired.  *Id.* at 7292-7293.  Dr. Gibson found that Freeman had "a good memory of the events of the evening that the alleged crime was committed" and there was "no evidence of an organic dysfunction or other malady."  *Id.* at 7290-7291.

During this evaluation, Freeman told Dr. Gibson that he and his cousin, Chester Adams, ran into Mr. Pye the evening of the crime and Mr. Pye asked them to give him a ride to another town nearby.  Later that evening, Mr. Pye asked them "to drive him to his girlfriend's house," after which the following occurred:

> They picked up Willie Pye's girlfriend and took her to a hotel.  The defendant [Freeman] reports that Willie Pye had some cocaine in his possession which he supplied to his girlfriend.  The girlfriend reportedly ingested the cocaine and had sex with Willie Pye at the hotel.  Willie Pye then promised her more cocaine if she had sex with the defendant and his cousin.

Resp. Ex. No. 119A at 7291.

Freeman's statement refers to Ms. Yarbrough as Mr. Pye's current girlfriend and makes no mention of force being used against her.   Freeman's December

1993 statement to Dr. Gibson shares more similarities with *Petitioner's* trial

testimony than his own later testimony.

### b.   The September 7, 1995 Statement to Investigator Godard

Lead Spalding County case investigator, Ted Godard, conducted a second

interrogation of Freeman on September 7, 1995.  Resp. Ex. No. 118B (video of the

interview); Resp. Ex. No. 125C at 8974-9000, 125C at 9001-9003.[4]  Once again,

Freeman's statement differs in material respects from the testimony he later

offered at trial.  *Compare e.g.* Resp. Ex. No. 125C at 8980 to Resp. Ex. No. 11A at

948.

In this version, Freeman made no mention of purchasing a gun as they rode

around Griffin on the evening of the crime.  On the contrary, he states that Mr. Pye

brought "the gun" with him from Jackson when the trio left that afternoon and that

he didn't see Mr. Pye with any gun in Griffin until after they had attended the

birthday party.  Resp. Ex. No. 125C at 8990-8991.

---

[4]The original videotape provided to state habeas counsel by the Spalding
County District Attorney's office was tendered at the state court evidentiary
hearing as Petitioner's Exhibit 85.  *See e.g.* Resp. Ex. No. 118B at 7196-7197
(photocopy of front and back of VHS tape).  State habeas counsel had the contents
of the videotape transcribed by a certified court reporter and that transcript was
tendered as Petitioner's State Court Exhibit 105 (Resp. Ex. No. 125C, 125D).  For
ease in referring to the record, citations to the content of the videotape will be
made to the transcript rather than the video itself.

Once again, he did not use language suggesting that Yarbrough was abducted or forced into the car.  He told Investigator Godard simply that Mr. Pye "came out [of the house] with Lynn." *Id.* at 8980. Later that night, Ms. Yarbrough had an opportunity to alert Charles Puckett that she was being abducted, but instead she ***hid***:

> While we were going back to the motel [after riding around town in the car] we seen Lynn's husband....and then so, you know, she seen her husband and she ducked. She laid down in the seat.  And then [Petitioner] asked, "why'd you lay down?" And she said she didn't want her husband to see her.

*Id.* at 8982-8983.

Freeman also told investigators that Mr. Pye initially attempted to let Ms. Yarbrough out of the car in Griffin before leaving for Jackson, and she refused to get out of the car**.**  Resp. Ex. No. 125C at 8993.  It was only then that Petitioner decided to take the victim back to Jackson in Adams's car.  *Id.*  Again, Freeman's statement is not the account he offered at trial.

The combined impact of the two undisclosed statements is exculpatory and impeaching.  The State's lead investigator testified under oath that Anthony Freeman's testimony was the only evidence tying Petitioner to a crime:

> Q (by trial counsel):      If for some reason it were determined that the two of them [Adams and Freeman]

were lying about Willie Pye's involvement, would there be any other evidence to connect Willie Pye to this murder?

A (by Investigator Godard):     Not that I'm aware of, no.

...

Q:     How do you know that Ms. Yarbrough was not willing to go with Mr. Pye?

A:     Based on the statements of Mr. Freeman and Mr. Adams.[5]

Resp. Ex. No. 3 at 29, 35.  These statements satisfy the first prong of *Brady*.

### 3.     Impeachment of Witness Paula Lawrence

Petitioner, Adams and Freeman attended a birthday gathering for Paula Lawrence before seeing Ms. Yarbrough.  Ms. Lawrence testified at trial that just prior to Ms. Yarbrough's disappearance, Petitioner was in possession of a gun consistent with the one the State alleged was the murder weapon –  a long barrel .22 revolver.  According to Ms. Lawrence, Petitioner at some point looked at the clock and said "it's time, let's do it" and left just prior to the time of Ms. Yarbrough's purported abduction.  Resp. Ex. No. 11B at 1098.   This was prejudicial testimony.

---

[5]Mr. Adams did not testify at Petitioner's trial.  The reference is to a post-arrest statement given by Mr. Adams.

In September of 1994, nearly two years prior to her testimony in Petitioner's case, Lawrence was arrested and charged with insurance fraud in Spalding County. Resp. Ex. No. 123A at 8233-8234.  At Petitioner's trial, the District Attorney elicited the fraud charge during his examination of Ms. Lawrence but had her confirm that she had not been promised a benefit or deal as a result of her testimony against Petitioner.  Resp. Ex. No. 11B at 1103.  Her charges were not resolved until December 6, 1996 – six months after her testimony in Petitioner's case – when she received a sentence of probation pursuant to a negotiated plea. Resp. Ex. No. 123A at 8229; Resp. Ex. No. 123B at 8302.

Ms. Lawrence's prosecution was delayed at the direction of Spalding County District Attorney William T. McBroom, who personally handled the prosecution of Petitioner's case.  The District Attorney's office's file on Lawrence contains a note which reads "5/14/96 Hold per WTM."  Resp. Ex. No. 123A at 8236.  Just two weeks prior to her testimony in Petitioner's case, the District Attorney directed his A.D.A. to delay further proceedings against Lawrence.

Had jurors known, they likely would have concluded that the District Attorney delayed resolution of her case so that Lawrence would not have a conviction for a crime of dishonesty at the time of Petitioner's trial, or so that he could later resolve her case with a favorable plea if her testimony was strong.

24

Lawrence's testimony would have been impeached by evidence that the District Attorney held out the hope of a future benefit to Lawrence. This is material. *Alderman v. Zant*, 22 F.3d 1541, 1554 (11th Cir. 1994) (an understanding between the parties constitutes a deal that must be revealed). *See also Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir. 1983). "The thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . " The Eleventh Circuit has made clear that the lack of the existence of a specific *quid pro quo* can even enhance a cooperating witness's motivation to please the government. *United States v. Curtis*, 380 F.3d 1311 (11th Cir. 2004).

### B.    The State Suppressed Freeman's Prior Statements and Lawrence's Favorable Treatment

The two Freeman statements and Lawrence's prospective deal were not disclosed to trial counsel. They do not appear in trial counsel's files and were not included in any Notice of Discovery filed by the State prior to trial. It makes no difference to Petitioner's *Brady* claim whether they were omitted from discovery inadvertently or in bad faith, they were not disclosed just the same. *Stripling v. Head*, 277 Ga. 403, 408-409, 509 S.E.2d 122, 127 (2003).

Respondent's Order found that "Petitioner failed to show that the factual basis for the claim was not reasonably available to counsel prior to the motion for

new trial," and that he therefore had not demonstrated cause to overcome the

default.  Resp. Ex. No. 161 at 8.  This finding – essentially a finding that Petitioner

failed to prove suppression –  is undercut by the evidence and inconsistent with

the law.  Respondent's Order concludes that:

> Trial counsel was deceased at the time of the evidentiary hearing, thus
> firsthand information as to whether trial counsel saw these statements
> during his reviews of the State's file is unavailable.  Moreover, this
> Court finds that trial counsel had ample notice of additional
> statements made by Mr. Freeman as evidenced through the testimony
> of State Witness, Investigator [] Godard. (TT. 1192-1195).

*Id.* at 8.

The state habeas record reflects that trial counsel had never seen the

statements.  Dewey Yarbrough was the only investigator trial counsel, Johnny

Mostiler, employed.  Though Mostiler was deceased, Yarbrough testified that he

had no knowledge of the statements.  Resp. Ex. No. 90 at 63-66.  Furthermore, Mr.

Mostiler was an experienced trial lawyer, adept at cross-examination.  *Id.* at 66-67.

Had he been presented with prior inconsistent statements or other impeachment of

a key witness, he undoubtedly would have utilized it in cross-examination.  *Id.*  In

fact, the record of Petitioner's trial reflects that Mr. Mostiler cross-examined

Freeman on each of the inconsistencies between his November 1993 statement to

investigators and his direct testimony.  Resp. Ex. No. 11A at 1013-1019.  Had trial

counsel had access to the even more disparate accounts contained in Freeman's

two subsequent statements, trial counsel would have performed a sifting cross-examination utilizing those statements as well. The record evidence shows that Mr. Mostiler had no knowledge that the subsequent statements existed, let alone that they contained statements so at odds with Freeman's testimony.

Respondent's Order further suggests that the State's *Brady* obligation was discharged when lead detective Godard testified at trial that he spoke with Freeman on multiple occasions. Resp. Ex. No. 161 at 8. That finding is contrary to law. *Brady* is not satisfied by a mere suggestion that additional witness interviews exist. *Strickler,* 527 U.S. at 285 ("Although it is true that petitioner's lawyers...must have known that [the key witness to the victim's abduction] had had multiple interviews with police, it by no means follows that they would have known that records pertaining to those interviews...existed and had been suppressed."). Neither defense counsel nor jurors were given any indication that additional questioning resulted in exculpatory information, let alone informed that two prior statements supported the defense. Godard's testimony suggests instead that Freeman never veered from the story he told jurors. *See, e.g.,* Resp. Ex. No. 12A at 1195. Petitioner proved to the state habeas court that the evidence was suppressed.

Because *Brady*'s second prong –that the evidence was suppressed – is satisfied; so too did Petitioner demonstrate cause sufficient to overcome any default of his claim. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). The procedural bar imposed by the state court does not preclude relief.

### C.    The Suppressed Statements Were Material

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also Kyles*, 514 U.S. at 434. The determination of materiality is made based on the "suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436-437.

Freeman's suppressed statements call into question his veracity. During closing argument, defense counsel attempted to argue that Freeman's testimony was not sufficient to meet the State's burden of proving Petitioner's guilt beyond a reasonable doubt. Evidence that he offered two other accounts with myriad discrepancies going to the heart of the State's theory would have supported that argument. There is a reasonable probability jurors would have concluded that Freeman's testimony could not be relied upon as proof of anything.

28

Indeed, more than simply calling into question the testimony of the State's star witness, the evidence suppressed here places the entire case in a different light. *Kyles*, 514 U.S. at 435. First, the suppressed evidence corroborates Petitioner's only defense at trial. Petitioner testified that the victim came to his hotel room voluntarily and had sex with him of her own accord, in an effort to obtain drugs. The suppressed statements are powerful indicators that this was true. *Cone v. Bell*, 129 S.Ct.1769, 1786 (2009) (Cone's primary sentencing phase argument was that at the time of the crime he was impaired by his severe drug addiction; therefore suppressed evidence that Cone looked "drunk or high," "appeared wild-eyed" and "acted real weird" around the time of the crime was material in the sentencing phase).

In addition, when the other evidence surrounding Ms. Yarbrough's death is considered together with the suppressed statements, Petitioner's trial defense becomes all the more credible. Ms. Yarbrough's neighbor and friend Linda Lyons remembers Ms. Yarbrough using the phone from her house to arrange a ride to a motel. Resp. Ex. No. 108A at 4693. Yarbrough waited until Puckett left home, then used Lyons's phone to call a motel room. Yarbrough asked the person on the other end to come pick her up, adding "she would walk if she had to." *Id.*

29

Freeman's earlier statements that they "picked up" Petitioner's girlfriend, and that Petitioner "came out with Lynn" take on new significance in light of this evidence.

Freeman's statement to Dr. Gibson that Petitioner "had some cocaine in his possession which he provided to his girlfriend," who used the cocaine and had sex with him, takes on added significance in light of the other available evidence of the victim's cocaine use.  Yarbrough was widely known to have a crack cocaine habit and the autopsy revealed she had cocaine in her system at the time of her death.  Resp. Ex. No. 1B at 203-204; Resp. Ex. No. 1D at 350, 363-364; Resp. Ex. No. 11A at 906 (evidence of victim's long-standing addiction); Resp. Ex. No. 1B at 162; Resp. Ex. No. 109C at 5132 (autopsy/toxicology report reflecting presence of cocaine).  At trial, Petitioner maintained that he and the victim exchanged crack cocaine for sex, but Freeman specifically denied that any drugs were used in the motel room and there was no evidence to corroborate Petitioner's account.  Resp. Ex. No. 11A at 1006.   Had jurors heard evidence of the victim's cocaine use together with Freeman's statement to Dr. Gibson, it is reasonably probable they would have credited Petitioner's testimony, or at least been unsatisfied of his guilt.

The suppression of Freeman's exculpatory statements were material to the outcome of both phases of trial.  When the statements are included in the calculus, there is a reasonable probability that jurors would have acquitted Petitioner of

30

kidnaping, rape, armed robbery and burglary.  Evidence that the victim voluntarily left home to have sex and use drugs at the motel precludes convictions for rape and kidnaping, and seriously undermines the convictions for burglary and armed robbery; jurors would have been reluctant to conclude that Yarbrough chose to spend the evening with Petitioner and his co-defendants if it were true they had burglarized her and robbed her of her jewelry.[6]

The exculpatory statements would have also precluded the application of the death penalty in the sentencing phase.  During the sentencing phase, jurors found the existence of four aggravating circumstances defined in O.C.G.A. § 17-10-30(b)(2): that the offense of murder was committed while the offender was engaged in the commission of kidnaping with bodily injury, that the offense of murder was committed while the offender was engaged in the commission of rape, that the offense of murder was committed while the offender was engaged in the commission of armed robbery, and that the offense of murder was committed while the offender was engaged in the commission of burglary.  Resp. Ex. No. 2A at 525-530; Resp. Ex. No. 2B at 596.  Freeman's suppressed statements undermine the jurors' conclusion that the State proved these four factors beyond a reasonable

---

[6]As will be described in Claim IV, *infra,* there is additional evidence from which jurors could have concluded that Ms. Yarbrough participated in making it look as though her home was burglarized and then took her own belongings to trade for drugs to support her addiction.

doubt.  Without a finding of at least one aggravating circumstance, Petitioner

would not have been eligible to receive the death penalty under Georgia law.

O.C.G.A. § 17-10-30.

Therefore, contrary to the ruling in Respondent's Order, there is sufficient

prejudice to overcome any default.  *Strickler,* 527 U.S. at 282.  The *Brady*

evidence here places the entire case against Willie Pye "in such a different light as

to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435

(1995).

Respondent's Order finds that Petitioner cannot demonstrate prejudice

because, even if Freeman were impeached, Freeman was not the only witness

directly implicating Mr. Pye.  Resp. Ex. No. 161 at 9.  This assertion is belied by

the record.  The only witnesses who implicated Mr. Pye were Freeman and the

officers who regurgitated his November 1993 statement.  The Order attempts to

prop up Freeman's trial testimony with Adams' unsworn post-arrest statement, but

that statement was not admitted at trial.[7]

Respondent's Order also dismissed Freeman's 1993 statement to Dr. Gibson

(exculpating Petitioner) as "self-serving," unreliable hearsay.  *Id.* at 11, 14.

However, Freeman's 1995 statement to Dr. Gibson was given just *one month* after

---

[7]The statement also does not corroborate Freeman's testimony in the manner
the Order suggests.

his arrest and without prompting by law enforcement, and it echoes Mr. Pye's trial testimony that the victim willingly left home and had consensual sex with the three men in exchange for cocaine.

Respondent's Order ultimately concludes that there is insufficient prejudice to overcome the default because "the 'material' [sic] aspects of the crimes recounted by Co-defendant Freeman in his statements to authorities are consistent." *Id.* at 12.  Yet the Order rehashes only the similarities the statements share, without addressing any of the key differences, an incorrect analysis that would defeat nearly any *Brady* claim.  When the *differences* between Freeman's prior statements and his trial testimony are considered together with the other evidence, it is clear that the State's presentation of his false testimony affected the jurors' judgement at both phases of Petitioner's trial.  *De novo* review by this Court will demonstrate that Petitioner has demonstrated prejudice sufficient to overcome the default and to prevail on his claim.

Therefore, "because the net effect of the state-suppressed evidence favoring Petitioner raises a reasonable probability that its disclosure would have produced a different result at trial, the conviction cannot stand, and [Petitioner] is entitled to a new trial." *Kyles*, 514 U.S. at 419.  The State's suppression of Freeman's prior

statements undermined confidence in both phases of Petitioner's capital trial. *Bagley,* 473 U.S. at 682, *Kyles*, 514 U.S. at 434.  Relief is required.

## CLAIM II

### THE STATE KNOWINGLY PRESENTED FALSE TESTIMONY IN VIOLATION OF *GIGLIO V. UNITED STATES,* 405 U.S. 150 (1972) AND *NAPUE V. ILLINOIS,* 360 U.S. 264 (1959).

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The prosecution violated Petitioner's constitutional rights when it introduced and elicited false testimony and allowed false testimony to stand uncorrected in violation of *Giglio v. United States*, 405 U.S. 150, 154 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959).  The obligation of the prosecution team to refrain from allowing false evidence to be submitted to the court extends to any member of the "prosecution team," irrespective of whether that prosecution team member is the prosecuting attorney eliciting the false testimony.  *Giglio*, 405 U.S. at 154.  Petitioner is entitled to relief if he can show "that the prosecution's case includes perjured testimony and that the prosecution knew, *or should have known*, of the perjury," and that "there is any reasonable likelihood that the false

34

testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Kyles v. Whitley*, 514 U.S. a419, 441 (1995).

Petitioner met his burden before the state habeas court by establishing that 1) material portions of the testimony of Anthony Freeman was false; 2) that the prosecution team knew or should have known that it was false; and 3) that there is a reasonable possibility that the information could have affected the outcome of the proceedings. *Giglio*, 405 U.S. at 154, citing *Napue* 360 U.S. at 271.  It is significant to note that the prejudice that petitioner must show to prevail under *Giglio* is substantially lower than the showing of materiality required under *Brady*.

### A.    Freeman's Testimony Was False

Freeman testified via affidavit before the state habeas court that law enforcement officers coached and manipulated him into telling a version of the crime which they espoused.  Resp. Ex. No. 108A at 4679.  In that affidavit, Freeman testified that his trial testimony was *not* true and was molded to the wishes of state investigators, who promised him a seven-year sentence in exchange for his cooperation.  Resp. Ex. No. 108A at 4679.  Freeman's affidavit also reaffirmed the truth of his undisclosed statement to Godard in September 1995:  Ms. Yarbrough was not abducted and Petitioner attempted to get her to stay behind in Griffin.  *Id.*   He also affirmed that other crucial exculpatory aspects of

his prior undisclosed statements are true:  First, as Adams, Freeman, Yarbrough

and Pye drove around town and encountered Charles Puckett also driving around,

presumably looking for Yarbrough, the victim laid down across the backseat so

that she wouldn't be seen.  *Id.* at 4680.  According to Freeman, she hid herself

from view of her own accord.  *Id.*  Freeman's affidavit testimony confirmed that

the threesome's plans did not include harming Yarbrough.  *Id.*  After leaving the

motel, Petitioner first tried to persuade her to get out the car and stay behind in

Griffin.  *Id.*  Finally, Freeman's affidavit confirms that all three men were

intoxicated by the time Ms. Yarbrough was shot, and that Petitioner was "really

drunk." *Id.* at 4681.

Freeman's testimony also included a differing account of Ms. Yarbrough's

death, one that implicated all three codefendants, not Petitioner alone.  Freeman

indicates that *all three* men got out of the car and that both he and Adams fired a

shot.  Resp. Ex. No. 108A at 4679.  Contrary to the State's argument at trial,

Petitioner was not the ring-leader and only triggerman; Adams and Freeman

shared just as much culpability for Ms. Yarbrough's murder.  In fact, they were

perhaps more culpable:  Petitioner initially wanted Ms Yarbrough to stay behind in

Griffin unharmed.  The finding contained in Respondent's Order that Petitioner

had not demonstrated prejudice sufficient to overcome the default of his *Giglio*

claim because Freeman's trial testimony was true is unsupported by the record. There is sufficient prejudice to overcome the default and Petitioner is entitled to relief.

**B.   The State Knew That Freeman Was Lying**

Freeman told investigators how the crime actually played out, but was dissuaded from sharing this information with anyone else with promises of a seven-year-long life sentence.  Resp. Ex. No. 108A at 4679.  "From the very beginning of the case, the police and prosecutor made it clear that Willie Pye was the person they were after."  *Id.*   Yet in spite of investigators' coaching, Freeman had difficulty keeping the truth separate from the "official" story, resulting in the numerous inconsistencies described in Claim IV.  The only account of the crime Freeman provided without investigators present, that given to Dr. Gibson, differs wildly from the video-taped statements given with investigators' help, and is far more exculpatory to Mr. Pye.

Law enforcement officers investigating Ms. Yarbrough's death worked closely with the District Attorney in collecting the evidence used at trial and were members of the prosecution team.  *Stripling v. Head*, 277 Ga. 403, 408, 590 S.E.2d 122, 127 (2003).  As such, their knowledge is imputed to the District Attorney.

*Giglio*, 405 U.S. at 154.  Investigators knew Freeman's trial testimony was a lie. Resp. Ex. No. 108A at 4679.

Moreover, the prosecutor *himself* knew or should have known that Freeman was not being truthful: the District Attorney possessed Freeman's prior statements contradicting his trial testimony,[8] and Freeman swore in his affidavit that the District Attorney personally was involved in coercing him into testifying falsely. Resp. Ex. No. 108A at 4679.  The District Attorney actively attempted to conceal the false nature of the testimony by explaining away its many discrepancies and inconsistencies as the product of Freeman being "somewhat limited mentally." Resp. Ex. No. 11A at 900.  The District Attorney knew this too to be false; he had in his possession Dr. Gibson's mental evaluation finding just the opposite to be true.

### C.    Freeman's False Testimony Affected the Judgement of the Jury

There is a reasonable likelihood Freeman's false testimony implicating Petitioner in crimes which he did not commit affected the jurors' judgement at both phases of Petitioner's trial. *U.S. v. Agurs*, 427 U.S. 97, 103 (1976); *Kyles*,

---

[8]It appears that the District Attorney obtained yet additional information from Freeman that is not revealed in his statements nor stated in his affidavit. Handwritten notes appear in the District Attorney's copy of the trial transcript in the margins next to Freeman's testimony.  These notes contain information not revealed elsewhere, including that the gun was purchased in Spalding Heights from "Robert LNU."  Resp. Ex. No. 119A at 7205-7232.

514 U.S. at 441. Again, the prejudice that a petitioner must show to prevail under *Giglio* is substantially lower than the showing of materiality required under *Brady* described in Claim I. Given the centrality of the false testimony to the State's case, the *Giglio* violation here easily clears this bar.

As described above, Freeman's testimony was the only evidence establishing that a kidnaping, rape, burglary or armed robbery occurred at all, and the only evidence directly tying Petitioner to murder. There is simply no way that the false testimony could *not* have affected the judgement of the jurors; it was the **only** evidence sufficient to establish guilt. Furthermore, without Freeman's testimony, jurors would not have had evidence sufficient to establish the statutory aggravating circumstances found to support a death sentence: that the murder was committed during the commission of a burglary, during the commission of a kidnaping with bodily injury, during the commission of a rape, and during the commission of an armed robbery. Without satisfying jurors that at least one of these four circumstances existed, the State could not have obtained a death sentence. O.C.G.A. § 17-10-30. It is impossible to say that this was harmless beyond a reasonable doubt, or that there is "no reasonable possibility" that the false evidence contributed to the verdicts in this case. "[T]he very fact of [a] witness's untruthfulness is itself relevant to an analysis of prejudice." *Shih Wei Su*

*v. Filion*, 335 F.3d 119 (2d. Cir. 2003) (granting relief based on *Napue* without "decid[ing] whether an analysis of prejudice should include how devastating to the state's case it might have been had the jury learned that the prosecutor knowingly (or recklessly) elicited the false testimony.").

The false testimony presented by the State "**could have affected** the judgment of the jury" in both phases of the trial. *Agurs*, 427 U.S. at 103 (emphasis added). There is therefore sufficient cause and prejudice to overcome any default of Petitioner's *Giglio* claim, and the State's knowing presentation of false testimony requires that Petitioner's conviction and death sentenced be vacated.

## CLAIM III

### THE PROSECUTOR'S INFLAMMATORY AND IMPROPER COMMENTS, ARGUMENTS AND MISCONDUCT, WHICH OCCURRED IN ALL STAGES OF THE PROCEEDINGS, RENDERED PETITIONER'S TRIAL FUNDAMENTALLY UNFAIR AND HIS SENTENCE UNRELIABLE.

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The prosecutor amplified the prejudicial impact of co-defendant Anthony Freeman's false testimony and the suppression of his prior statements by

advancing a number of improper arguments in both phases of trial.  In the guilt-innocence phase, he touted the reliability of Freeman's testimony and argued that any weaknesses jurors found in that testimony were attributable to Freeman's mental impairment.  The prosecutor knew both premises were false, yet vehemently argued them nonetheless.  In the penalty phase, he added arguments that were not supported by the evidence.  Finally, he personally vouched for the strength of the State's case for both guilt and death and he interjected improper considerations into the jurors' sentencing decision.  These improper arguments, together with other misconduct by the prosecutor so infected Petitioner's trial that they rendered his trial and sentencing proceeding fundamentally unfair, and Petitioner's conviction and death sentence must be vacated.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 644-47 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181 (1985).

### A.      The District Attorney Argued Evidence He Knew Was False

The "force of a prosecutor's argument can enhance immeasurably the impact of false or inadmissable evidence."  *Brown v. Borg*, 851 F.2d 1011, 1017 (9th Cir. 1991), *citing Miller v. Pate*, 386 U.S. 1, 6, (1967) (noting that "improprieties in closing arguments can, themselves, violate due process").  Here, the prosecutor's summation "plainly sharpened the prejudice resulting from the

use of [Freeman's] untruthful testimony." *Jenkins v. Artuz*, 294 F.2d 284, 293

(2nd Cir. 2002).

The District Attorney argued the truth of Freeman's account voraciously.  In

fact, he devoted fifteen pages of his twenty-page guilt-phase closing argument to

arguing that Freeman's testimony was reliable and truthful.  Resp. Ex. No. 13A at

1421-1429; Resp. Ex. No. 13A, 13B at 1433-1439.  He vilified Petitioner as a liar

who had not been candid with police while portraying Freeman as a defendant

who had confessed the truth from the beginning.  *Id.*  Freeman, he claimed, had

implicated himself in a serious crime and had no motive to falsify the story he told

jurors.

The prosecutor also offered jurors a basis for resolving any inconsistencies

in Freeman's false testimony that he also knew was false.  He told jurors that

Freeman was "limited in his mental ability" and "failed a couple of grades and was

in special education classes."  Resp. Ex. No. 11A at 900.  He told jurors he had

learned from his own personal experience with Freeman "to ask him specific

questions and he will tell me the specific answer. But [Mr. McBroom] had to talk

to him a couple of times before [he] knew what the right questions to ask were."

*Id*.  Not only was there no evidence that Freeman was limited in his ability to

recall events and describe them accurately, but the prosecutor had in his

42

possession the evaluation by Dr. Gibson specifically disproving that notion.  The

District Attorney foreclosed any possibility that jurors might suspect on the basis

of Freeman's inconsistent accounts that he was being untruthful by offering them

an alternate explanation for those inconsistencies, an explanation **that was itself**

**false.**

By arguing that Freeman's false testimony was in fact credible, and by

vouching for his credibility, the District Attorney violated "[his] duty not to

exploit false testimony by prosecutorial argument affirmatively urging to the jury

the truth of what it knows to be false."  *Miller v. Pate*, 386 U.S. 1 (1967);  *Brown*

*v. Wainwright,* 785 F.2d 1457, 1464 (11th Cir. 1986), s*ee also U.S. v. Sanfilippo*,

564 F.2d 176, 179 (5th Cir. 1977) (defendant's conviction reversed because "[t]he

Government not only permitted false testimony of one of its witnesses to go to the

jury, but argued it as a relevant matter for the jury to consider").

As with Petitioner's *Giglio* claim, the state habeas court held that

Petitioner's improper prosecutorial argument claim was procedurally defaulted as

a result of his failure to raise the claim at trial, and that Petitioner had not

demonstrated cause and prejudice sufficient to overcome the default.  However, as

outlined in Claim I, supra, that the State concealed the false nature of the

testimony is cause sufficient to overcome any default.  *Strickler v. Greene,* 527

US. 263 (1999).  Furthermore, because Petitioner can prevail on this portion of his

prosecutorial argument claim, there also exists sufficient prejudice to overcome

the default.  *Id.*

### B.    The District Attorney Made Arguments Not Supported by the Record

The District Attorney also argued that the jury should sentence Petitioner to

death for reasons that were wholly without evidentiary support.  During his

penalty phase closing argument, he repeatedly commented on what he portrayed as

Petitioner's desire to kill.  He argued that Petitioner was "very sorry he didn't kill

Anthony Freeman," and would have been willing to kill his own lawyer.  Resp.

Ex. No. 14 at 1578.  He argued that a death sentence was the only sentence

adequate to incapacitate Petitioner because he would pose a danger to prison

guards while incarcerated, saying that "he'll for sure kill a prison guard to get

out...He is going to be a danger to everybody around him until the day he is

executed."  *Id.* at 1580.

While courts give great latitude to counsel in their arguments, that latitude

does not extend beyond the evidence at trial.  *U.S. v. McElroy*, 697 F.2d 459, 463

(2nd Cir. 1982) (condemning "potentially misleading characterization[s]" by the

prosecutor that deceived defense counsel).   The only basis from which Mr.

McBroom could argue Petitioner's propensity for violence toward others was

Petitioner's violence toward the victim, his former girlfriend.  This is simply insufficient to support the argument.  As then-presiding Justice Fletcher observed in his concurrence to Petitioner's direct appeal, "[t]hat Pye had been convicted in this case of the murder, rape, and kidnaping of his former girlfriend does not make the murder of a prison guard 'probable future behavior.'" *Pye v. State*, 269 Ga. 779, 790, 505 S.E.2d 4 (1998), *quoting Ross v. Georgia*, 254 Ga. 22, 34 (7), 326 S.E.2d 194 (1985). "[T]he prosecutor's argument that Pye would kill a prison guard was ***not*** a reasonable inference from any evidence in the record."[9]  269 Ga. at 790.

The danger inherent in a closing argument not based in the evidence is that the argument is not accurate; in actuality, there may be evidence refuting the baseless argument that the defendant did not have an opportunity to present in rebuttal.  That danger was realized here.  As described fully in Claim IV, *supra*, the evidence from Petitioner's prior period of incarceration reflects that he was a non-violent inmate who respected the guards and that he was not likely to be a danger in the future.  Resp. Ex. No. 98A, 98B at 1972-2048; Resp. Ex. No. 108A at 4676-4677, 4697-4698, 4729-4730.  The prosecutor's arguments about

---

[9]Justice Fletcher concurred in the denial of Petitioner's appeal because trial counsel failed to raise a contemporaneous objection to the District Attorney's argument. *Pye*, 269 Ga. at 790.  Counsel's failure to do so was constitutionally ineffective and Petitioner was prejudiced thereby.

Petitioner's future dangerousness and inclination to kill were wholly invented, were inaccurate and prejudicial, and deprived Petitioner of a fair trial.

To the extent that both the Georgia Supreme Court and the state habeas court found this claim was defaulted by virtue of trial counsel's failure to interpose an objection, cause and prejudice exist to overcome the default. This claim was neither waived nor barred because the failure of Petitioner's trial counsel in failing to raise a timely objection is sufficient cause to excuse a procedural default. *McCleskey v. Zant,* 499 U.S. 467, 494 (1991). Further, the Supreme Court has indicated that where the merits of a claim are proven, the concomitant prejudice finding is sufficient cause to excuse the procedural default.

Furthermore, Petitioner did complain of the improper argument on direct appeal. However, the Georgia Supreme Court evaluated Petitioner's claims under a less favorable standard as a direct result of trial counsel's ineffective assistance. Trial and appellate counsel's failure to properly preserve meritorious issues in the record constitutes deficient performance. *Orazio v. Duggar*, 876 F.2d 1508, 1513 (11th Cir. 1989). In Petitioner's case, trial counsel sat silent while the District Attorney offered his wildly prejudicial argument regarding Petitioner's future dangerousness and lack of remorse. Trial counsel's failure to object was ineffective. As a direct result of counsel's deficiency, the Georgia Supreme Court

ruled that no relief could be granted upon Petitioner's claim because "there was no reasonable probability that the argument, even if improper, changed the result of the sentencing phase." *Pye v. State,* 269 Ga. 779, 789, 505 S.E.2d 4, 14 (1998). Thus, but for trial counsel's deficiency, the Georgia Supreme Court would have granted relief on Petitioner's claim.

Finally, to the extent that this claim was adjudicated on the merits by the Georgia Supreme Court, that Court rendered a decision that was both contrary to and unreasonably applied federal law. 28 U.S.C. §2254(d); *see also, e.g., Donnelly v. DeChristoforo,* 416 U.s. 637 (1974), *Darden v. Wainwright,* 477 U.S. 168 (1986); *Skipper v. South Carolina,* 476 U.S. 1 (1986). Relief should be granted.

### C. The District Attorney Vouched for the Strength of the State's Evidence and Improperly Remarked on Defense Counsel's Arguments in Other Capital Cases

The District Attorney also argued that the evidence in Petitioner's case was stronger than in most, and that jurors had more direct evidence linking him to the crime. Resp. Ex. No. 13A at 1425; Resp. Ex. No. 14 at 1578-1579. He maintained that Willie Pye's case had more evidentiary proof than any other death case he had ever tried. *Id.* He told jurors that defense counsel, Mr. Mostiler, used the same arguments to defend his all clients regardless of the evidence in the case,

and then commented on the relative weakness of Mr. Mostiler's arguments in Petitioner's case as compared to other cases in which he had represented capital defendants. Resp. Ex. No. 13A at 1425-1427. This was improper.

A District Attorney is not permitted to argue matters on which the record is silent. The prosecution did not present anything to the jury regarding other death penalty case decisions, and it would have been improper to do so. *Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985). Therefore, jurors had no basis to gauge the accuracy of what Mr. McBroom alleged.

More importantly, it is improper and prejudicial for the prosecutor to offer his "personal impressions" of the evidence. "The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused. . .can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *U.S. v. Young,* 470 U.S. 1, 18 (1985). The danger of prejudicing a jury with unsupported argument is even greater in the case of a prosecutor because juries are inclined to trust that prosecutors will speak the truth and carry out their obligations to the State appropriately. *Id.*; *Berger v. U.S.*, 295 U.S. 78, 88 (1934).

48

Together, the improper arguments made by Mr. McBroom so infected Petitioner's trial that the trial was rendered fundamentally unfair. *Donnelly*, 416 U.S. at 637. The United States Supreme Court long ago held that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger*, 295 U.S. at 88. In failing to disclose exculpatory evidence, in presenting evidence he knew to be false, and in making prejudicial and misleading arguments throughout the trial, the District Attorney violated his duty to do justice and "corrupted the truth-seeking function of the process." *Bagley*, 473 U.S. at 680.

### D. Other Instances of Misconduct by the District Attorney Violated Petitioner's Rights to Due Process and a Fair Trial

Other instances of misconduct by the prosecutor during Mr. Pye's trial included, but were not limited to:

- using his peremptory challenges in a racially and gender discriminatory manner, Resp. Ex. No. 10B at 868-870;

- improperly introducing Petitioner's prior convictions into evidence in the guilt phase, Resp. Ex. No. 13A at 1392-1393;

- introducing the results of a polygraph test to bolster the testimony of a state witness, Resp. Ex. No. 11B at 1082, Resp. Ex. No. 12A at 1144;

- introducing irrelevant, prejudicial and inflammatory evidence and argument, Resp. Ex. No. 14C at 1575, 1578, 1580-81, 1583;

- commenting upon Mr. Pye's right to remain silent and right to counsel, Resp. Ex. No. 13A at 1381-1387, 1396-1397, 1436;

- invoking his experience in other death penalty cases and comparing the strength of the evidence in those cases to the evidence in Mr. Pye's case, *Id.* at 1425-1426;

- improperly cross-examining a mitigation witness regarding the criminal history of other members of the Pye family, Resp. Ex. No. 14 at 1565-1569;

- making irrelevant, prejudicial and inflammatory comments upon the testimony of the mitigation witnesses, Resp. Ex. No. 14 at 1529, 1537, 1539;  and

-  commenting upon his relationship with defense counsel and defense counsel's motivations, *Id.* at 1577.

The sum of prosecutorial misconduct in his case changed the entire picture of the case against Mr. Pye, and undermines confidence in the verdict.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).   These instances of prosecutorial misconduct, both standing alone and cumulatively, are sufficient to warrant reversal of Petitioner's sentence of death.  The prosecutor's inflammatory, emotional and thoroughly improper comment and argument to the jury rendered Petitioner's death sentence fundamentally unfair and unreliable in violation of the Sixth, Eighth and Fourteenth Amendments, and the analogous provisions of the Georgia Constitution.  This Court must reach Petitioner's claim of prosecutorial misconduct and issue the requested relief.

## CLAIM IV

**PETITIONER WAS PROVIDED CONSTITU-
TIONALLY INEFFECTIVE ASSISTANCE OF
COUNSEL AT ALL STAGES OF HIS CAPITAL
TRIAL AND DIRECT APPEAL.**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The State of Georgia deprived Petitioner of his right to counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963).  "That a person who happens to be a lawyer is present at trial alongside the accused...is not enough to satisfy the constitutional command."  *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Petitioner made the requisite two-pronged showing before the state habeas court: first, that his trial counsel's performance was deficient; and second, that his counsel's deficiencies were so serious as to deprive him of a fair trial, that is a trial whose result is reliable.  *Strickland*, 466 U.S. at  686.  With respect to the first prong, Petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness," defined as "reasonableness under prevailing professional norms."  *Id.* at 688, *see also, Wiggins v. Smith*, 539 U.S. 510, 521

51

(2003) ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms").

With respect to the second prong, prejudice to the outcome of Petitioner's trial, the test is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Williams v. Taylor*, 529 U.S. 362, 391 (2000). With regard to ineffectiveness in the penalty phase of a capital case in a state like Georgia, where non-unanimity on a death verdict results in a life sentence, the question becomes whether there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.  In five seminal cases, the United States Supreme Court applied these basic *Strickland* principles to explain the duty of counsel in a capital case to thoroughly investigate both the defendant's crime and his background.  *Williams v. Taylor*, 529 U.S. 362 (2002); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 130 S.Ct. 447 (2009); *Sears v. Upton*, 130 S.Ct. 3259 (2010).

While the state court – via Respondent's Order – correctly identified *Strickland* as the governing legal standard, the court repeatedly failed to acknowledge, much less reasonably apply, these capital case ineffectiveness

decisions.[10]  Any one of them standing alone would compel relief.  Only in ignoring an entire body of law was Respondent's Order able to reach the parallel conclusions that trial counsel performed adequately and that Petitioner was not prejudiced by his counsel's omissions.  To the extent that the state court applied the clearly established law of *Strickland* at all, it did so in a patently unreasonable way.  In addition, the conclusions contained in Respondent's Order flowed from multiple unreasonable determinations of the facts in light of the evidence that the state court had before it.  Therefore, 28 U.S.C. § 2254 empowers this Court to grant relief from Mr. Pye's convictions and sentence of death.   Each of his convictions and his sentence were procured in violation of his right to counsel and this Court must intercede.

### A.   Trial Counsel's Performance Was Deficient at All Stages of the Proceedings

Johnny Mostiler, Mr. Pye's counsel at his 1996 capital trial, performed deficiently.  Mr. Mostiler's investigation into most aspects of Petitioner's case was substantially lacking and he failed entirely to broach certain crucial aspects of Petitioner's case, including Mr. Pye's mental retardation and his other cognitive and emotional impairments.  At the time of his appointment in December of 1993,

---

[10]The Order cites *Wiggins v. Smith* once, in initially identifying the *Strickland* two-prong litmus.  The Order thereafter makes no mention of *any* of the seminal Supreme Court capital case ineffective assistance of counsel decisions.

Mr. Mostiler was responsible for the representation for all of Spalding County's indigent criminal defendants pursuant to a lump-sum contract he was awarded as the low bidder. Resp. Ex. No. 117C at 6983. In 1994, the year following Mr. Mostiler's appointment to Mr. Pye's case, Spalding County brought more than 800 cases against indigent criminal defendants. Resp. Ex. No.118A at 7076; Resp. Ex. No. 117C at 7015. In addition to his responsibilities as the contract public defender, Mr. Mostiler maintained a robust private practice, one that included the representation of civil and domestic litigants and non-indigent criminal defendants. Resp. Ex. No. 118A at 7139-7140. He was assisted in this practice by just one associate attorney, one paralegal and one investigator. Resp. Ex. No. 117D at 7009.

Mr. Mostiler did not seek (and the Court did not appoint) co-counsel in Mr. Pye's case. Mr. Mostiler was assisted only by an investigator, Dewey Yarbrough. Mr. Yarbrough was the investigator employed by Mr. Mostiler for the contract criminal cases he handled. Mr. Yarbrough was a career law enforcement officer and his training to be Mr. Mostiler's investigator consisted of seminars "at different law enforcement facilities." Resp. Ex. No. 90 at 81. He was not trained in the collection of mitigating evidence and had no specialized training in death penalty cases. Resp. Ex. No. 90 at 57-58.

Capital cases were not covered by the county's contract for indigent

defense.  Resp. Ex. No. 117C at 7006.  Death penalty cases such as Mr. Pye's were

appointed to Mr. Mostiler by the presiding judge and billed independently of the

contract at a rate of fifty dollars per hour. *See e.g.* Resp. Ex. No. 117A at 6732.

Mr. Mostiler's billing statements reflect that he invested just 211 hours in the

entire case over the course of its two-and-a-half-year pendency.[11]  Resp. Ex. No.

117A at 6730-6732.  Of those 211 hours, more than 110 were spent either in court

or in meetings with Mr. Pye and Mr. Yarbrough.  *Id.*  Thus, Mr. Mostiler, acting

without co-counsel, devoted just over 100 hours in toto to preparing Mr. Pye's

case for trial, just one-tenth the time typically spent by counsel in a capital case

when assisted by co-counsel (which  Mostiler lacked).  Resp. Ex. No. 117A at

6730-6732.

Throughout the proceedings in the trial court, Mr. Pye voiced his

dissatisfaction with trial counsel's lack of attention to the case, including at the

---

[11]Mr. Mostiler passed away in April of 2000.  Resp. Ex. No. 90 at 59.
Because he was not available to testify regarding his preparation and decision-
making in Mr. Pye's case, his file and his itemized billing records – submitted
periodically to the county over the course of his representation of Mr. Pye – are
now the best available sources of information regarding the work he performed in
Mr. Pye's case.  These records appear in the state court record as Petitioner's
Exhibit 70 (trial counsel's file reproduced in its entirety), contained in Resp. Ex.
Nos. 109A through 116B, and Petitioner's Exhibit 71 (trial counsel's billing
records), contained in Resp. Ex. No. 17A of the state habeas record.

very first Unified Appeal hearing conducted in February 1995, where he explained

his frustration with counsel to the trial court. Resp. Ex. No. 4 at 6.  However, the

trial court refused Mr. Pye's request for another attorney, finding "no reason to go

outside the established rules of indigency representation in this case and bring in

another attorney." *Id.* at 7-8.  Mr. Pye later complained about Mr. Mostiler to both

the State Bar of Georgia and the Georgia Supreme Court.

Mr. Pye's complaints regarding trial counsel's inaction were well-founded.

The record before the state court revealed vast deficiencies, including that Mr.

Mostiler failed to:

(1)     investigate evidence that plainly supported Petitioner's guilt-phase
        testimony and his only defense, including statements by witness
        Linda Lyons that immediately prior to the crime, the victim called a
        motel room, asked to be picked up, and then voluntarily left her
        home; and evidence that the victim had a crack cocaine addiction so
        severe that she sometimes traded sex and stole from loved ones to
        support it,

(2)     re-proffer and attempt to have admitted evidence of the victim's
        cocaine abuse after its relevance had been demonstrated through
        presentation of the defense case,

(3)     examine Mr. Pye's background to discover his childhood of
        tremendous neglect, poverty, abuse and rejection,

(4)     commission a mental health evaluation of Petitioner or make any
        other effort to compile evidence of his mental retardation, brain
        damage and psychiatric impairment,

(5)     obtain the assistance of appropriate expert witnesses to conduct appropriate tests, evaluate the State's forensic evidence, and evaluate Petitioner's mental health to assist in confronting the state's case and to assist in the presentation of a defense at the guilt/innocence and sentencing phases,

(6)     make any effort to investigate and rebut the State's evidence in aggravation,

(7)     anticipate and rebut the prosecutor's stock closing argument – which counsel was well-familiar with – that Petitioner's execution was necessary to prevent him from killing while in prison in the future,

(8)     conduct an adequate examination of potential jurors to ensure that Petitioner received a fair and impartial jury, including failing to ascertain whether jurors would consider mitigating circumstances and failing to ascertain whether jurors were "life-qualified" under *Morgan v. Illinois,* 504 U.S. 719 (1992) or would automatically vote to impose a death sentence if Petitioner were to be convicted of murder,

(9)     object to the sitting of several venirepersons who could not impartially determine Petitioner's guilt or the appropriate punishment in this case, or object to the sitting of an alternate juror related to the victim or to the trial court's inadequate investigation conducted in this regard.  This alternate juror improperly influenced the verdict,

(10)    adequately respond to the trial court's unconstitutional limits on voir dire,

(11)    adequately challenge the District Attorney's discriminatory use of peremptory strikes on the basis of gender and race, adequately respond to the District Attorney's proffer of pretextual and non-race neutral reasons for his strikes, and adequately demonstrate the discriminatory pattern of strikes through comparative analysis with white jurors not struck by the District Attorney,

(12)    object to the trial court's improper excusal of jurors for alleged hardship.  Counsel further failed to protect the record regarding these excusals at trial, on motion for new trial and on appeal.  Counsel

failed to object to the trial court's off the record discussions with jurors regarding their qualifications, Petitioner's case and the death penalty outside the presence of counsel and outside the presence of Petitioner,

(13)   adequately advise or to prepare Petitioner to testify,

(14)   conduct a thorough and probing cross-examination of prosecution witnesses, nor did counsel investigate and present to the jury impeaching information regarding the State's witnesses,

(15)   adequately object and argue in opposition to the admission of several items of evidence, including the impermissible introduction of polygraph evidence, introduction of a photograph purported to be of the victim which did not depict the victim, and impermissible character evidence and prior convictions offered by the State during the guilt phase of trial.  Timely objections would have insured that improper evidence was not received and considered by the jury, and/or that such error was corrected on appeal,

(16)   move for a mistrial following the improper introduction of prior convictions at the guilt phase, instead having Petitioner testify to explain the prior convictions,

(17)   appropriately object to improper comments by the prosecutor, including comments on Petitioner's right to remain silent and right to counsel, to improper to bolstering of witnesses testimony, and to the improper closing argument of the prosecution at the conclusion of each phase of trial.

(18)   give closing argument at the conclusion of the guilt phase which adequately exposed the shortcomings of the State's case against Petitioner,

(19)   failed to raise the proper objections to improper charges given by the trial court to the jury at the conclusion of the guilt phase of trial,

(20)   failed to object properly to items of improper evidence offered by the State in aggravation at the penalty phase of trial, or to counter such evidence with the testimony of defense witnesses.  Counsel failed to object to hearsay testimony regarding Petitioner's prior convictions, character and reputation,

(21)   object to misleading and improper arguments, including improper speculations not grounded in the evidence, made by the prosecution during its penalty phase summation to the jury.  Counsel also failed to rebut these improper and misleading arguments.

(22)   object to improper and incorrect portions of the trial court's sentencing phase jury charge.   Counsel affirmatively requested improper and incorrect jury charges, and failed to object to an improper and misleading verdict form, and

(23)   litigate effectively numerous Constitutional errors that occurred both during the guilt/innocence and penalty phases of trial at Petitioner's motion for new trial and on direct appeal.

Each and all of these omissions by trial counsel "fell below an objective standard of reasonableness" defined simply as "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688; *Wiggins,* 539 U.S. at 521. However, perhaps trial counsel's most stunning failures were his near abject failure to independently locate and interview any witness and his near-total failure to investigate Mr. Pye's background and mental health or to enlist the assistance of necessary expert witnesses.  For instance, during the thirteen months between March 2, 1995, the date of the District Attorney's most extensive discovery production, and April 1996, the month before Mr. Pye's trial began, Mr. Mostiler

and Mr. Yarbrough's time records reflect that they interviewed just *one* potential

witness.  Resp. Ex. No. 117A at 6731, 6736.  Also according to his billing records,

in the weeks immediately prior to trial, trial counsel "reviewed" and "studied" the

case file yet did not independently pursue a single lead provided by Mr. Pye or by

the State's discovery.  Resp. Ex. No. 117A at 6732, 6736.  And it was not until

five days before the scheduled start of jury selection that trial counsel began

attempting to identify mitigation witnesses.  Resp. Ex. No. 117A at 6739.  Mr.

Mostiler and Mr. Yarbrough spent an hour discussing the endeavor, and Mr.

Yarbrough then went to Flovilla, Georgia to attempt contact with Mr. Pye's family

members.  Resp. Ex. No. at 6736.  Mr. Pye's sister Pam recalls that Mr. Yarbrough

asked her to collect witnesses who would be willing to speak to Mr. Pye's

character during the sentencing phase:

> A week or two before the trial started, his lawyer's
> investigator, Dewey, came and talked to me. He said if
> Will got convicted, the jury could hear from some of
> Will's relatives or friends before they decided whether to
> give him the death penalty or not.  He asked me to think
> of people who would be good character witnesses to
> stand up on Willie James's behalf and testify**.**  It was
> short notice but I tried**.**

Resp. Ex. No. 108A at 4665, *accord*  Resp. Ex. No. 108A at 4705 (Mr. Pye's niece

testifying that her mother Pam "had to find the people who would testify that

Willie shouldn't get the death penalty"); Resp. Ex. No. 108A at 4726 (Mr. Pye's

brother testifying that Pam told him they needed "as many people as possible" to testify on Mr. Pye's behalf); Resp. Ex. No. 108A at 4736 (Mr. Pye's sister Sandy testifying that their sister Pam called her and said that they needed witnesses to ask the jury for mercy).

Even in the short time Mr. Yarbrough spent on the mitigation inquiry, it was obvious that Mr. Pye's family life was difficult and impoverished.  In his testimony before the state habeas court, Mr. Yarbrough recalled that the Pye home had no heat or running water, and that the family fell very low on the spectrum of poverty.  Resp. Ex. No. 90 at 69-71.  A contemporaneous memo of his observations corroborates this memory:

> Willie Pye grew up in a small, crowded house with seven brothers and two sisters (one full sister and one half sister).  The house his parents live in now is painted two colors from failure to complete the job and it appears that purple paint must have been going cheap, both inside and out are painted in it.  The furniture is junk and the doors are missing and hung with sheets or curtains.  Full ashtrays are everywhere.

Resp. Ex. No. 111C at 5633.  Yet trial counsel did nothing to followup on the extent or impact of the Pye family's impoverished background on Petitioner.  Similarly, when Mr. Pye's school records – received, at the earliest, in the midst of trial – revealed a history of academic struggle and familial problems in Mr. Pye's

childhood, neither trial counsel not Mr. Yarbrough pursued any investigation in response.  None of Petitioner's school teachers were contacted prior to trial.

In reaching the untenable conclusion that trial counsel's investigation was adequate, Respondent's Order both unreasonably determined the facts as reflected in the record before it, and unreasonably applied *Strickland* and its progeny.  The state habeas court, through Respondent's Order, relied primarily on the testimony of trial counsel's investigator, Dewey Yarbrough, to determine that Mostiler must have spent more time on the case than he billed and conducted more investigation than reflected in the file or the trial presentation.  Resp. Ex. No. 161 at 44.  This Court has recently criticized this approach of blind reliance upon Mr. Yarbrough's testimony, particularly where it is unsupported by other record evidence, in another of Mr. Mostiler's former capital cases to come before the Court on federal habeas review.  *See Whatley v. Upton,* Case No. 3:09-cv-0074-WSD, Docket 51, Opinion and Order, April 4, 2013, n.15.

More to the point, the record here repeatedly undercuts Yarbrough's inflated account of Mostiler's preparation.  Mr. Mostiler's file, replicated in its entirety in the state court record, contains no memos, to-do lists, interview summaries or other evidence of investigation beyond that reflected on the time-keeping records. In addition, the Order credits Yarbrough's assertion that Mostiler typically spent a

62

week in Florida preparing a case immediately prior to trial.  Resp. Ex. No. 161 at

44.  However, Mostiler's time records for that week show meetings with the D.A.

and Yarbrough, making it unlikely he was out of town.

In resolving Petitioner's guilt-phase ineffectiveness claims, Respondent's

Order made numerous other factual determinations that are based upon Mr.

Yarbrough's thin speculation yet rebutted by the documentary record, and yet

other factual determinations which find no record support at all and in fact, are

squarely rebutted by the record.  *See e.g.* Resp. Ex. No. 161 at 59, This is

unreasonable, and 2254(d)(2) directs relief.

There is a similar dearth of evidence that counsel conducted an appropriate

penalty phase investigation. The Order finds that the defense "continued to try and

pursue any and all leads and potential witnesses, including seeking support from

Petitioner's neighbors and friends," and that Mostiler "looked to family members"

and Mr. Pye for help unearthing "the facts and circumstances of his upbringing."

Resp. Ex. No. 161 at 59.  No authority for these assertions exists except

Yarbrough's equivocating deposition testimony.  According to that testimony,

Yarbrough spoke with only four of Mr. Pye's **eleven** nuclear family members prior

to the sentencing phase.[12]  He did not interview **any** of Mr. Pye's former teachers,

---

[12]Mr. Yarbrough spoke with Mr. Pye's parents, one brother, and one sister.
He recalled that Mr. Pye has three siblings when in fact he has nine.  Resp. Ex.

social workers, neighbors, corrections officers, extended family or friends.  He did

not seek any background records besides the late-obtained school records.

Neither Mostiler's file nor the evidence adduced at the sentencing phase

reflect that Mostiler fulfilled his duty to "conduct a thorough investigation of the

defendant's background" for "all reasonably available mitigating evidence."

*Wiggins*, 539 U.S. at 522, 524.  Yarbrough conducted a haphazard search of Mr.

Pye's neighborhood for witnesses "willing to come in and say something good and

wholesome" about Mr. Pye.  Resp. Ex. No. 117A at 6736, 6739, 6758.  Mostiler

did not discuss potential mitigating evidence with the available witnesses until the

day before the penalty phase began.  Resp. Ex. No. 117A at 6732.  Put succinctly,

trial counsel "acquired only a rudimentary knowledge of [Mr. Pye's] history from

a narrow set of sources."  *Wiggins*, 539 U.S. at 523-526.

A reasonable application of the relevant Supreme Court law reveals that the

penalty phase efforts identified in Respondent's Order are simply inadequate to

discharge counsel's duty to Petitioner.  *See* Resp. Ex. No. 161 at 59 (citing to (1)

Vol. 37, HT 9096, (Resp. Ex. No. 126A at 9096) a 1.5 page memo containing

conclusory statements that Mr. Pye had no military history, no psychiatric history,

and no serious illness or major trauma; (2) Vol 37, HT 9098-9099, (Resp. Ex. No.

_____

No. 90 at 71.

126A at 9098-9099) counsel's eleventh-hour request for school records; and (3) Vol 37, HT 9082, (Resp. Ex. No. 126A at 9082)  Mostiler's 1.5-hour discussion with mitigation witnesses the day before the sentencing phase and one hour of discussion with them on the day of the sentencing proceeding).

The Order goes to great lengths to inflate these minimal efforts to a constitutionally acceptable level.  This is not a reasonable application of *Strickland*.  The Order attempts to excuse counsel's failures by finding that Mr. Pye and his family did not cooperate with counsel nor "put forth any effort." Resp. Ex. No. 161 at 46. This is contradicted by the record and a blatantly unreasonable application of Supreme Court precedent.  The law is clear: trial counsel's duty to investigate mitigating evidence extends beyond the client and his immediate family.  *Rompilla*, 545 U.S. at 388 (counsel's consultation with five members of Rompilla's family "in a detailed manner" and their consultation with three mental health experts did not excuse their failure to look further for mitigating evidence).

Moreover, Yarbrough testified that Mr. Pye **did** cooperate by providing information throughout the process, as did his family. Resp. Ex. No. 90 at 68; *see also* Resp. Ex. No. 109A at 4954-4955, 4958, 4961-4965; Resp. Ex. No. 109B at4966-4967, 4989-4992, 4995;  Resp. Ex. No. 111A at 5460, 5463-5465. Petitioner's younger brother contacted counsel and offered to help locate

witnesses.  Resp. Ex. No. 111C at 5585.  Mr. Pye's father accompanied Yarbrough on visits to potential mitigation witnesses.  Resp. Ex. No. 108A at 4736; Resp. Ex. No. 110B at 5353.  Mr. Pye's sister not only willingly sat with Yarbrough for an interview, but she ultimately assumed responsibility for recruiting mitigation witnesses at Yarbrough's request.  Resp. Ex. No. 108A at 4665, *accord* Resp. Ex. No. 108A at 4705, 4726, 4736.  The state habeas record further reflects that Mr. Pye repeatedly wrote to counsel and provided the names of potential witnesses. *See e.g.* Resp. Ex. No. 110B at 5353-5354.;  Resp. Ex. No. 111A at 5451-5454, 5458-5463, 5473, 5483-84.  This is but one of the multiple unreasonable factual determinations contained in Respondent's Order.

In sum, despite Respondent's Order's focus on the half-hearted and superficial investigative tasks counsel did complete, these steps do not excuse counsel's failure to investigate.  The Order is perhaps most deeply flawed in what it fails to address:  trial counsel's striking omissions.  Yarbrough testified that Mostiler commissioned a mental health evaluation on all capital defendants, yet none of the motions filed in Mr. Pye's case asserted the need for a defense psychologist or other mental health practitioner.[13]  Resp. Ex. No. 90 at 72, 84.  Mr.

_____

[13]The Order points to the fact that trial counsel sought and received funding for independent analysis of the DNA evidence. This seems an odd priority given that Mr. Pye testified that he had unprotected sex with the victim prior to her death.

Pye was not evaluated prior to trial.  The Respondent-drafted Order makes no mention of this failure.

The evidence before trial counsel, viewed from counsel's perspective at the time, indicated that additional investigation into *many* areas of Petitioner's case would bear fruit.  *Strickland*, 466 U.S. at 691 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation.").  *See also Williams*, 529 U.S. at 396.  Mostiler "uncovered nothing in [his] limited inquiry into [Petitioner's] background to suggest that further investigation would have been fruitless." *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008). The state habeas court unreasonably failed to analyze even *one* of these "red flags."

It is clear that counsel fell below any reasonable standard of performance. Prevailing professional norms required far more investigation than the few hours trial counsel spent soliciting willing witnesses. *Porter,* 130 S.Ct. at 453.  Trial counsel's performance was deficient, and the state habeas court's finding to the contrary does not preclude relief under 2254(d).

**B.     Trial Counsel's Numerous Deficiencies, Both Individually and Collectively, Resulted in Prejudice to the Outcome of Petitioner's Capital Trial.**

Trial counsel's unreasonable omissions and acts, separately and cumulatively, were prejudicial to Petitioner.  But for the errors described above, there is a reasonable probability that Mr. Pye would have been acquitted of all or some of the charges against him, or that he would have received a sentence less than death.  Had Mr. Mostiler conducted a properly thorough investigation into the facts of the crime, he could have readily established a reasonable doubt with respect to Mr. Pye's guilt.  Further, had Mr. Mostiler conducted any investigation into Mr. Pye's limitations, there is similarly a reasonable probability that jurors would have concluded that he suffers from mental retardation.  Finally, had Mr. Mostiler presented jurors with the abundant evidence of Mr. Pye's childhood of neglect, deprivation and violence, together with the evidence of his developmental disability and the less aggravated nature of his crime, there is little question that at least one juror would have applied "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantage background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse."  *Penry v. Lynbaugh*, 492 U.S. 302, 319 (1989). "Under Georgia's death penalty laws, which provide for an automatic

sentence less than death if the jury is unable to reach a unanimous sentencing verdict, a reasonable probability of a different outcome in the sentencing phase exists where 'there is a reasonable probability that at least one juror would have struck a different balance' in his or her final vote regarding sentencing following extensive deliberation among the jurors." *Humphrey v. Morrow,* 717 S.E.2d 168, 173 (2001).

Petitioner presented to the state habeas court evidence sufficient to demonstrate a "reasonable probability of a different outcome" absent the errors described above sufficient to satisfy the prejudice prong and obtain relief on each of his ineffectiveness claims. *Strickland,* 466 U.S. at 693-694.

### 1.    The unpresented guilt phase evidence.

Had Mr. Mostiler performed effectively in investigating, preparing and presenting a guilt-phase defense to the charges, there is a reasonable probability that Petitioner would not have been convicted of the charges.  Had Mr. Mostiler followed up on the leads contained in the State's discovery, he could have presented the jury with evidence suggesting the victim conspired with Petitioner and his two codefendants to rob her boyfriend, Charles Puckett, and then had consensual sex with her co-conspirators in exchange for cocaine.  As detailed *supra*, the State suppressed codefendant statements which support this theory.

However, trial counsel neglected to present other readily available evidence that would have further established this version of events.

Codefendant Freeman claimed in his first statement (which counsel *did* possess) that Charles Puckett was their intended target, not Lynn Yarbrough. Resp. Ex. No. 1B at 190-193; Resp. Ex. No. 110B at 5355-5360.  He also said the masks and gloves they wore to enter the Puckett-Yarbrough home were "purchased the previous week." Resp. Ex. No. 1B at 191.  Had trial counsel conducted a proper investigation, he could have located another witness, Leon Berry, who would have testified that Pye, Adams, Freeman *and Yarbrough* together attempted to purchase a gun from him the week prior to the crime.  Resp. Ex. No. 108A at 4651.

More crucially, Linda Lyons, Yarbrough's neighbor and friend, could have testified that Yarbrough left home *voluntarily* on the night of the crime. Yarbrough made a call from Lyons's phone (and in Lyons's presence) to alert someone that Puckett had left. Resp. Ex. No. 108A at 4693.  She asked the person on the other end of the phone to pick her up and Lyons presumed she was speaking with Mr. Pye.  *Id*.[14]  Both Berry and Lyons were named in the State's

---

[14] Lyons related the same thing to police when interviewed the day following the crime.  Resp. Ex. No. 2D at 776-778.  Lyons's mother also recalled that Ms. Yarbrough came to Lyons's house that night.  Resp. Ex. No. 1D at 346. Charles Puckett also corroborated this, telling police that Lyons told him that she

discovery and in Petitioner's letters to trial counsel, and were available to testify but trial counsel did not contact them.  Resp. Ex. No. 108A at 4652, 4694.

There was also available evidence of Yarbrough's long-standing cocaine addiction.  Several witnesses told police her addiction led her to steal from Puckett in the past.  *See e.g.* Resp. Ex. No. 1C at 300, Resp. Ex. No. 1D at 347, 348, 349, Resp. Ex. No. 2D at 776-778.  Puckett's initial thought upon finding Ms. Yarbrough and his belongings missing was that she had taken his things to sell for cocaine.  Resp. Ex. No. 1D 363, 349-350.  When Puckett discovered her missing, he looked for her at a local drug motel before alerting police.  Resp. Ex. No. 1B at 203-204, Resp. Ex. No. 1D at 350.  When Petitioner himself still resided with Yarbrough, they were the victims of a home invasion robbery by three men wearing masks. Mr. Pye told the responding officers he thought Yarbrough was behind the robbery.  Resp. Ex. No. 1D at 423; Resp. Ex. No. 123B at 8345-8356. Trial counsel did not elicit *any* of this information.

Yarbrough had been repeatedly arrested for drug possession offenses.  Resp. Ex. No. 123B at 8394-8396.  The first officer on the crime scene when Yarbrough's body was discovered recognized her from narcotics arrests.  Resp. Ex. No. 11A at 906.  Trial counsel attempted to elicit this during cross of the

_____

had called Willie Pye to come pick her up.  Resp. Ex. No. 1D at 364.

officer but was precluded because he had not demonstrated its relevance.  Trial counsel made no attempt to re-introduce this evidence after Mr. Pye's testimony made the victim's drug use a central factor in his defense.  Finally, the jury was also unaware that the autopsy showed Yarbrough ingested cocaine just prior to her death, and that a strikingly similar home-invasion robbery was committed against Mr. Pye and Ms. Yarbrough by area cocaine dealers when Mr. Pye and Ms. Yarbrough shared a home, and that Mr. Pye reported to police in the robbery's aftermath that he suspected Ms. Yarbrough's involvement in setting up the robbery.  Resp. Ex. No. 123B at 8345-8356.

 Absent his deficient investigation of the crime, trial counsel could have used this evidence together with the information he elicited during the cross-examination of Anthony Freeman. *Porter*, 130 S.Ct. at 453-454, *citing Williams*, U.S. at 397-398 (to determine prejudice, court "must 'consider the totality of the available ...evidence – both that adduced at trial and that adduced in the habeas proceeding – and reweigh it against the evidence in aggravation.").[15]  With the

---

[15]When the combined impact of counsel's deficient performance and the prejudice flowing from the State's unconstitutional suppression of Freeman's two other pre-trial statements are considered together, the picuture of Petitoiner's crime is a far cry from the aggravated sequence of events alleged by the prosecution at trial.  *Cargle v. Mullin*, 317 F.3d 1196, 1206-07 (10th Cir. 2003) (assessing cumulative prejudice from constitutional claims of ineffective assistance of counsel and prosecutorial misconduct).  *See also Mello v. DiPaulo*, 295 F.3d 137 (1st Cir. 2002); *U.S. v. Rahman*, 189 F.3d 88 (2d Cir. 1999);

addition of the unpresented evidence, the points elicited by Mr. Mostiler during

the cross-examination of Freeman would have taken on a considerably greater

significance.  For example, though he was unable to explain its precise relevance

at trial, Mr. Mostiler was able to draw jurors' attention to Freeman's intial

statement that the three men had purchased the masks and gloves the prior week,

and that Freeman knew from the outset of their venture they were targeting

Charles Puckett because he had recently received the settlement from a lawsuit.

Resp. Ex. No. 11A at 1013-1014.

Finally, had trial counsel retained a qualified medical examiner, that expert

could have refuted the State's prejudicial arguments regarding the victim's

suffering and impeached the testimony of both Freeman and police regarding her

manner of death.

---

*Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002); *Fisher v. Angelone*, 163 F.3d
835 (4th Cir. 1998); *Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002); *Alvarez v.
Boyd*, 225 F.3d 820 (7th Cir. 2000); *Davis v. Zant*, 26 F.3d 1588 (11th Cir. 1994)
As outlined in Part I, *supra*, in prior undisclosed statements Freeman explicitly
stated that Ms. Yarbrough voluntarily left her home and had sex with Mr. Pye,
stating: "They picked up Willie Pye's girlfriend and took her to a hotel. [Freeman]
reports that Willie Pye had some cocaine in his possession which he provided to
his girlfriend.  The girlfriend reportedly ingested the cocaine and had sex with
Willie Pye at the hotel.  Willie Pye then promised her more cocaine if she had sex
with [Freeman] and his cousin [Adams]."  Resp. Ex. No. 119A at 7291.  He also
recalled that while riding around town with the three men, the victim "ducked
down" so that she would not be seen by Puckett, and indicated that Mr. Pye asked
the victim to get out of the car before they left the city of Griffin and she refused.
Resp. Ex. No. 125C at 8983, 8993.

But for these and the other guilt-phase errors, there is a reasonable probability that Mr. Pye would not have been convicted of each of the charges. *See Goodman v. Bertrand*, 467 F.3d 1022, 1030 (6th Cir. 2006) (Rather than evaluating each error in isolation ...the pattern of counsel's deficiencies must be considered in their totality."). The combined impact of the unpresented evidence is compelling. Together, these facts suggest that the victim may not have been taken against her will, raped and robbed of her jewelry. Had counsel performed reasonably, the evidence would have established, at a minimum, a reasonable doubt that Mr. Pye's committed burglary, kidnaping, armed robbery and rape.

There is therefore also a reasonable probability that had trial counsel presented the ready rebuttal to the prosecution's guilt phase evidence, jurors would not have been able to find the existence of any aggravating factor beyond a reasonable doubt, Because the statutory aggravating circumstances supporting the death sentence would not have been present if counsel had performed an adequate investigation, jurors would have been precluded by law from considering death as a sentencing option. The prosecutor alleged, and the jurors found beyond a reasonable doubt, the existence of four aggravating circumstances defined in O.C.G.A. § 17-10-30(b)(2): that the offense of murder was committed while the offender was engaged kidnaping with bodily injury, while engaged in the

74

commission of rape, while engaged in armed robbery, and while engaged in burglary.  Resp. Ex. No. 2A at 525-530, Resp. Ex. No. 2B at 596.  As related above, the unpresented defense evidence of the victim's voluntary involvement in the events of the evening would have precluded a finding beyond a reasonable doubt that Mr. Pye committed rape, kidnaping, armed robbery or burglary. Without a finding of at least one aggravating circumstance, Mr. Pye would not have been eligible to receive the death penalty under Georgia law.  O.C.G.A. § 17-10-30.  Therefore, there is a reasonable probability that had counsel provided constitutionally adequate assistance in the guilt-innocence phase, the death penalty would not have been available in the penalty phase.

### 2.      Unpresented rebuttal to the aggravating evidence.

An adequate defense presentation also would have neutralized the District Attorney's contention that Mr. Pye was too violent to be incarcerated safely.  This argument was the centerpiece of the District Attorney's arguments for death.  Mr. Pye was entitled to an opportunity to rebut it.  *Skipper*, 476 U.S. at 10-11.  Indeed, when the propriety of the District Attorney's argument was raised in Mr. Pye's direct appeal to the Georgia Supreme Court, Justice Fletcher found that the argument was improper because the record was silent as to Mr. Pye's proclivity for

prison violence.[16]  *Pye*, 269 Ga. at 790 ("the prosecutor's argument that Pye would

kill a prison guard was not a reasonable inference from the record."); *see also,*

*Porter,* 558 U.S. at 37-38 (prior divided vote by a state appellate court on whether

evidence was properly admitted weighed in the calculus when determining

prejudice resulting from the failure to present defense evidence in rebuttal).   Since

the time of Petitioner's appeal, the Georgia Supreme Court has clarified that "it is

improper for the State to argue that a defendant will kill in prison simply because

he killed while free." *Arrington v. State*, 2009 WL 3712028, 13 (Ga. Nov. 9,

2009), citing to *Henry v. State*, 278 Ga. 617, 619-620(1), 604 S.E. 2d 826 (2004).

Here, the harm inherent in the District Attorney's improper argument was

compounded when trial counsel sat mute in response.  The evidence establishes

that during his prior incarceration, Mr. Pye was a compliant and non-violent

inmate who "was far less danger [sic] than most of the inmates."  Resp. Ex. No.

108A at 4676, 4698.  Contrary to the prosecutor's assertions, former corrections

officers recalled Mr. Pye as a peace-maker and "one of the reasons [his] unit didn't

have the constant trouble some of the others did." *Id.*   The officers recollections

---

[16]Justice Fletcher nevertheless concurred in the denial of Petitioner's appeal
because trial counsel failed to raise a contemporaneous objection to the District
Attorney's argument. *Pye*, 269 Ga. at 790. In failing to object to many improper
and unconstitutional aspects of the District Attorney's arguments, trial counsel
was ineffective.  As reflected in Petitioner's direct appeal, counsel's repeated
failure to object resulted in prejudice to the outcome of his trial and appeal.

are corroborated by the contemporaneous records of Mr. Pye's incarceration in Alto.[17]  Resp. Ex. No. 98A at 1972-2026; Resp. Ex. No. 98B at 2027-2049.  The District Attorney would have been hard-pressed to dismiss testimony from corrections officers with years of experience dealing directly with Mr. Pye.

Evidence of Mr. Pye's mental retardation would have further bolstered the likelihood that he would be a non-violent inmate.  Jurors would have learned that the behavior of mentally retarded persons tends to improve in an institutional setting because there are fewer opportunities to exercise judgement and discretion. With the addition of the unpresented evidence of Mr. Pye's prior incarceration *and* his mental retardation, at least one juror would have questioned whether there was a genuine risk that Mr. Pye would harm a prison guard in the future.

The State also presented evidence of Petitioner's violent relationship with the victim.  Resp. Ex. No. 14 at 1516-1518.  Had trial counsel conducted a properly thorough investigation into Mr. Pye's past, this evidence could have been placed in context.  The evidence reflects that Mr. Pye's interpersonal, communication and problem-solving skills were impaired as a result of his mental

---

[17]Mr. Pye was released from his prior period of incarceration less than four years prior to Mr. Mostiler's appointment.  If habeas counsel was able to locate two guards who clearly recalled Mr. Pye more than a dozen years after they supervised him, its is likely that trial counsel could have readily located even more guards willing to testify on Mr. Pye's behalf.

retardation.  The evidence also reflects that Mr. Pye was raised in a home where violence and acrimony between family members were the norm.  In the face of the mitigating and mental health evidence, it would have been wholly *incredible* if Mr. Pye's relationship with the victim was without difficulty.  Moreover, jurors were not told that both Mr. Pye and the victim were troubled young people who abused alcohol and drugs.  These factors doubtless contributed to the chaotic nature of their relationship.  *See e.g.* Resp. Ex. No. 1D at 410 (police report indicating the victim called police worried because "when Willie drinks he gets crazy"); Resp. Ex. No. 1D at 412 (police called to Mr. Pye and Ms. Yarbrough's home because both were intoxicated and causing a disturbance).

Thus, with the addition of the unpresented mitigating evidence, Mr. Pye's prior difficulties with the victim would not have had the same aggravating sting. Jurors could have concluded that Mr. Pye wanted a loving relationship with the victim, but had no ability to achieve that goal.  *Porter,* 130 S.Ct. at 455 (evidence of an abusive and chaotic childhood is the type of mitigation that "may have particular salience for a jury evaluating [a defendant's] behavior in his relationship with [his girlfriend].").

So too would the aggravating evidence of Mr. Pye's prior conviction for burglary – which was introduced before the jury – have been placed in a different

light.  Some jurors may have concluded that Mr. Pye's limited problem-solving ability, his difficulty with impulse control and his inability to accurately predict consequences contributed to his participation in an opportunistic and ill-conceived crime. *Atkins*, 536 U.S. at 318 (mentally retarded offenders "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses and to understand the reactions of others...in a group settings they are leaders rather than followers.").  Mr. Pye's former burglary codefendant testified before the state habeas court that when he and Mr. Pye were questioned by police, they admitted they had burglarized the victim but unwittingly implicated themselves in later, more aggravated behavior committed by their remaining co-defendants.  Resp. Ex. No. 108A at 4657; *Atkins*, 536 U.S. at 320 (mentally retarded offenders are more likely to be coerced into false confessions and less able to provide meaningful assistance to their counsel in refuting the allegations against them.).  Jurors therefore could have concluded that Mr. Pye was punished particularly harshly for his prior crime, and that his experiences in a violent prison impacted him negatively.  Resp. Ex. No. 108A 55 at 4697; Resp. Ex. No. 108A at 4729-4730.  Instead, jurors heard only that Mr. Pye burglarized his elderly employer.

3.      **Evidence of Petitioner's mental retardation**.

As discussed in Claim VII, *infra*, Petitioner meets the mental retardation

criteria in O.C.G.A. § 17-7-131(a)(3).  An adequate investigation would have

uncovered that evidence.  Thus, had counsel represented Petitioner effectively,

there is a reasonable probability that jurors would have returned a verdict of Guilty

but Mentally Retarded, a verdict which precludes the death penalty.  And even if

this evidence were insufficient to convince jurors that Mr. Pye suffers from mental

retardation beyond a reasonable doubt, it is sufficient to have swayed at least one

juror to vote for a sentence less than death.   *Brownlee v. Haley*, 306 F.3d 1043,

1074 (11th Cir. 2002).

4.      **Available evidence in mitigation**.

The mitigating evidence which trial counsel failed to discover would have

been compelling support for a life sentence.  There is no question that had jurors

been given an opportunity to consider Mr. Pye's mental retardation, his brain

damage and his difficult childhood, they would have viewed his behavior in a

different light.  There is a reasonable probability the mitigating evidence would

have swayed at least one juror to exercise mercy.  *Wiggins*, 539 U.S. at 537.

Petitioner was severely neglected from birth and raised in poverty:  he and

his nine siblings were raised in a home without indoor plumbing and insufficient

food, clothing and shoes.  It was typical for his family members to abuse alcohol and engage in drunken violence.  His father was physically and verbally abusive and openly expressed resentment of Mr. Pye.

*Prenatal Risk.*  Petitioner's mother's circumstances placed him at risk for impairment from conception.  Resp. Ex. No. 91B at 321-322.  At the time she became pregnant with Petitioner, his mother Lolla was solely responsible for his six older siblings while his putative father served a five-year prison term.  She worked long days of manual labor but was unable to provide adequate food and shelter.  She had no prenatal care or nutritional diet, and she reported "problems with [her] nerves" caused by the stress of raising six children.  Resp. Ex. No. 91B at 321-323; Resp. Ex. No. 108A at 4717-4718.  Unrefuted evidence establishes that she drank alcohol throughout her pregnancy.  Resp. Ex. No. 108A at 4734; Resp. Ex. No. 108B at 4750-51; Resp. Ex. No. 93C at 666;  Resp. Ex. No. 90 at 34; Resp. Ex. No. 108A at 4683.[18]

*Early neglect.*  In the years preceding his father's release from prison, Mr. Pye's mother left early each morning to seek work, typically leaving the children

---

[18]Arthur Lawson did not recall observing Lolla drink alcohol while pregnant, but he did recall her behaving as though she was intoxicated on many visits, including when pregnant. Resp. Ex. No. 108A at 4688.  Mrs. Pye directly informed Dr. Pettis and Dr. Swanson that she consumed alcohol during her pregnancy with Petitioner, a fact corroborated by Petitioner's sister.  Resp. Ex. No. 108A at 4734.

alone for ten to twelve hours.  Resp. Ex. No. 104A at 3697-3698, 3702-3703;

Resp. Ex. No. 108A at 4653, 4718, 4733-4734, 4745.  Petitioner's ten-year old

brother did not attend school so that he could stay with his siblings, including two

toddlers and Petitioner, who was an infant.  Resp. Ex. No. 108B at 4750-51; Resp.

Ex. No. 108A at 4745; *accord,* Resp. Ex. No. 108A at 4659.  Dr. Pettis, a well-

credentialed psychiatrist, testified that during the time when the human brain is

developing most rapidly, Mr. Pye was lacking the food, shelter and interaction

with an adult caregiver necessary for normal cognitive development.  *Id.*

This pattern of neglect continued after Mr. Pye's father completed his prison

term.  Resp. Ex. No. 93D at 664; Resp. Ex. No. 108A at 4665; Resp. Ex. No. 108A

at 4700; Resp. Ex. No. 108B at 4746.  Petitioner's father left for work before dawn

and spent his evenings drinking in bootlegging houses.  Resp. Ex. No. 108A at

4735; Resp. Ex. No. 108B at 4746.  Petitioner's mother increasingly was

physically and emotionally unable to care for the children.  Resp. Ex. No. 108A at

4665;  4726-27; 4740; Resp. Ex. No. 96D at 1640.

Social worker Arthur Lawson testified in the state habeas court that the

children were "not monitored at all."  Resp. Ex. No. 108A at 4686.  Mr. Lawson's

work with the Pye family spanned years.  *Id.*  During his frequent home visits,

Lolla Pye would have an infant nearby but "toddlers and preschoolers were just

sitting or wandering around the house, porch or yard.  Resp. Ex. No. 108A at

4687.  The older children did as they pleased; there was no discipline and the

children were not required to go to school.[19]  Resp. Ex. No. 96B at 1403; Resp. Ex.

No. 104A at 3742; Resp. Ex. No. 104A at 3750-3751; Resp. Ex. No. 104C at

3927, 3930-3931; Resp. Ex. No. 105A at 3956, 3958; Resp. Ex. No. 105A at

4006, 4010; Resp. Ex. No. 105B at 4056-4057; Resp. Ex. No. 108A at 4687;

4688-4689; 4709.

The state habeas evidence also powerfully established the family's extreme

poverty.  At the time of his birth, Mr. Pye's family occupied a dirt-floor shack with

no kitchen or bathroom and little furniture.  Resp. Ex. No. 93C at 664; Resp. Ex.

No. 108A at 4734; 4659; 4734; 4744.  His mother was rarely able to pay rent and

the children ate bread and gravy and drank watered-down milk.

Petitioner's father began work following his release from prison but the

birth of three more children and his increasing alcohol use drained the additional

income.  Resp. Ex. No. 108A at 4720; 4734; 4745.  The family moved to yet

another home with no indoor plumbing, no bathroom and no traditional kitchen.

---

[19]Lawson testified that the children skipped school out of embarrassment
over their poor school performance and lack of appropriate clothing and
grooming, and that they sometimes stayed in bed on winter mornings because the
home had no heat.  Resp. Ex. No. 108A at 4690-4691.

Resp. Ex. No. 108A at 4734.   The house was "divided up into tiny rooms using boards and sheets." Resp. Ex. No. 108A at 4683.

Petitioner and his siblings' school records reflect that they missed school because they did not have shoes, and classmates remember that they dressed in only T-shirts in the winter. Resp. Ex. No. 104C at 3930; Resp. Ex. No. 96B at 1413; Resp. Ex. No. 108A at 4653; 4656; *accord* Resp. Ex. No. 90 at 45 (teacher testifying that the principal once purchased shoes for one of the children after he arrived without any).   The children were taunted because their clothing was tattered and ill-fitting.  Resp. Ex. No. 108A at 4656; Resp. Ex. No. 108B at 4748. Food was sparse.  Resp. Ex. No. 108A at 4683, 4689.

Arthur Lawson tried unsuccessfully to prompt other agencies to intervene on the family's behalf.  He testified that:

> The condition of the house itself was deplorable...The family had food, but it was primarily fatback, bread and canned meat such as sardines.  The children had no health care and were frequently behind on their vaccinations. The house was never clean, piles of filth, scraps and garbage were strewn everywhere...Everything was filthy, the small children had not been bathed and there was spoiled food sitting around.

Resp. Ex. No. 108A at 4689, *see also* Resp. Ex. No. 108C at 4649 (police officer who responded to domestic violence calls describing the house as "a shambles," "filthy" and in disarray);  Resp. Ex. No. 108A at 4653; 4740.  Medical care was

limited, dental care non-existent.  Resp. Ex. No. 91B at 328; Resp. Ex. No. 93C at 665; Resp. Ex. No. 108A at 4664, 4721; Resp. Ex. No. 108A at 4688.

Petitioner's father was consistently described as a malicious and violent alcoholic.  Resp. Ex. No.108C at 4849; 108A at 4653, 4662; 4682-4684;  4688; 4699; 4610; 4727; 4735; Resp. Ex. No. 108B at 4746-4747; Resp. Ex. No. 108A at  4739; Resp. Ex. No. 108B at 4754.  While his mother was not as "flagrant" with her alcohol use, she also drank habitually.  Resp. Ex. No. 108A at 4649; 4688; Resp. Ex. No. 108B at 4746.  Petitioner's father sent his children out for more beer when he became too drunk to go himself, and he purchased alcohol in lieu of paying for necessities.  Resp. Ex. No. 108A at 4648; Resp. Ex. No. 108A at 4710;  4663-64;  4727; Resp. Ex. No. 108B at 4746.

Petitioner's father was verbally and physically abusive when drinking. Resp. Ex. No. 108 at 4682, 4610; Resp. Ex. No. 108B at 4746-4747.  He made wild accusations and went into "rages, cursing and screaming insults at everyone." Resp. Ex. No. 108A at 4653, 4735; Resp. Ex. No. 108B at 4746.  When Lolla drank as well, it led to screaming confrontations, sometimes over Ernest's paycheck.  Resp. Ex. No. 108A at 4688, 4727; Resp. Ex. No. 108B at 4747, 4753. "One of them would get mad enough that all the fussing turned to punching," Resp. Ex. No. 108B at 4746-4747, while "screaming and carrying on."  Resp. Ex.

No. 108A at 4735, 4727. Petitioner's parents often struck each other with whatever was available. Resp. Ex. No. 108A at 4662-4663 ("I remember my father picking up a knife once and coming at my mother. That night was really scary...Another time, he hit my mother over the head with a bottle. There was blood from her head everywhere and we all freaked out.")

Mr. Pye's father was violent toward the children as well. Resp. Ex. No. 108A at 4700. "Whoever was around would get it." Resp. Ex. No. 108A at 4735, *see also*, Resp. Ex. No. 108A at 4653. Mr. Pye was singled out because of his uncertain paternity. Resp. Ex. No. 108A at 4653, 4662, 4647. His father would tell him that he was "too stupid to be his kid," Resp. Ex. No. 108A at 4653, and beat him. *Id*. at 4647. His father openly expressed his resentment and disgust and would tell the other children to ignore him because he was not related to them. *Id.*

The older children instigated drunken fights. Resp. Ex. No. 108A at 4656, 4663, 4610; Resp. Ex. No. 108B at 4754-4755. Mr. Lawson recalled that: "Hitting, kicking, shouting and throwing things were a normal occurrence." Resp. Ex. No. 108A at 4688-4689. The police were called regularly. Deputy Bennett, an officer who often responded, testified that he typically saw "several family members cussing, screaming or rolling around on the ground beating on each other." Resp. Ex. No. 108B at 4647. Ernest was sometimes too intoxicated to

speak intelligibly and the Deputy would find the smaller children hiding from the violence.  *Id.* at 4649.

Ernest's drunken behavior was notorious in the community.  Resp. Ex. No. 108A at 4653, 4656, 4682-4684, 4700.  Donna Potts, who owned a nearby convenience store for more than thirty years, testified that Ernest was an angry and difficult drunk who provoked fights; he was banned from her store because of his abusive behavior.  Resp. Ex. No. 108A at 4699.

### 5.   Available mental health evidence.

Mental health evidence was equally available at the time of trial but not explored by trial counsel.  Dr. Roderick Pettis, a physician board-certified in psychiatry, concluded that factors with negative impacts on child development – poverty, abuse and exposure to domestic violence –  were present in very severe form in Mr. Pye's medical and social history and "came together in a horrendously negative way."  Resp. Ex. No. 90 at 321-326;  Resp. Ex. No. 93A at 449. Petitioner's long-term exposure to violence made him vulnerable to developmental problems, affected his stability, and made him fearful and anxious.  *Id.*

Dr. Hyman Eisenstein, a well-credentialed neuropsychologist, conducted extensive testing and examined Petitioner's history as reflected in extensive documents in preparation for the state habeas evidentiary hearing.  He interviewed

Petitioner's parents, sister and brother at their home.  Resp. Ex. No. 91A at 225.

He concluded Mr. Pye is mentally retarded and brain damaged, and that alcohol

use would compound these deficits.  Resp. Ex. No. 91A at 227.  His testing

revealed profound deficits in judgment, decision-making and functions controlled

by the frontal lobes.  Resp. Ex. No. 91A at 229.  Petitioner has an impaired ability

to plan, to control impulses, to weigh alternatives, to foresee consequences and to

identify plausible alternative strategies.  Resp. Ex. No. 91A at 229.

In sum, there was voluminous evidence that Petitioner was reared in

privation and violence, and suffered profound cognitive and emotional problems.

"Because [trial counsel] failed to conduct an adequate mitigation investigation,

*none* of this evidence was known to [Pye's] trial counsel."  *Sears v. Upton,* 130

S.Ct. 3259, 3264 (2010).

The finding that Petitioner was not prejudiced by the absence of this

information contained in Respondent's Order is both contrary to, and an

unreasonable application of, *Strickland* and its progeny.  For instance, the Order

performed a prejudice analysis directly condemned by the precedents of the

Supreme Court by engaging in a piecemeal critique of the evidence.  *See e.g.*

*Porter v. McCollum,* 558 U.S. at 42-44 (2009).  Not only are these critiques

unfounded, but the law is clear that Petitioner need not adduce perfect proof, but

must adduce only sufficient evidence to establish a reasonable probability that it would have persuaded one juror to vote for a life sentence. *Id.*

The Supreme Court has also rejected the notion that no prejudice can ensue when "there is little, if any, connection between Petitioner's impoverished background and the premeditated and horrendous crimes." *See* state habeas order at 66.[20] *Williams*, 529 U.S. at 398 (though Williams was convicted of beating a man to death with a mattock, court concluded "the graphic description of [the defendant]'s childhood, filled with abuse and privation...might well have influenced the jury's appraisal of his moral culpability.")

Finally, Respondent Order's completely fails to address the cumulative prejudice to the outcome of the penalty phase.  The unpresented evidence of the victim's involvement would have precluded a finding of any of the four statutory aggravating circumstances beyond a reasonable doubt.  And the unpresented background and mental health evidence would have undercut every one of the State's arguments in aggravation.  The proper assessment is an examination of the combined prejudice flowing from **all of counsel's failures**. *Williams,* 529 U.S. at

---

[20]Petitioner disputes the Order's conclusion that there is no connection. Petitioner was raised in a home where violence between family members occurred daily, and where there were no healthy adult relationships to model.  These factors played a tragic role in Mr. Pye's relationship with the victim, a woman whom by all accounts, he loved.

397-398 (to determine prejudice, court "must 'consider the totality of the available...evidence' – both that adduced at trial and that adduced in the habeas proceeding – and reweigh it against the evidence in aggravation."). Considering the evidence of a less aggravated crime, together with evidence of Mr. Pye's mental retardation, his "nightmarish" childhood and his record of prison non-violence, it is difficult to imagine that at least **one juror** would not have been persuaded to exercise mercy. *Williams*, 529 U.S. at 362; *Wiggins*, 539 U.S. at 510; *Rompilla*, 545 U.S. at 393. The prejudice adjudication contained in Respondent's Order flows from multiple unreasonable factual determinations, and is both contrary to and an unreasonable application of the clear Supreme Court precedent. Relief should follow.

## CLAIM V

### PETITIONER WAS DENIED THE RIGHT TO CONFLICT-FREE COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

Petitioner's right to counsel as guaranteed by the Sixth Amendment also included the "right to representation that is free from conflicts of interest." *Wood*

*v. Georgia*, 450 U.S. 261 (1981); *see also Holloway v. Arkansas*, 435 U.S. 475, 489 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980).  When burdened by a conflict of interest, counsel "breaches the duty of loyalty, perhaps the most basic of counsel's duties," and thereby fails to provide effective assistance of counsel. *Atley v. Ault*, 191 F.3d 865, 869 (8th Cir. 1999), *quoting Strickland*, 466 U.S. at 692.

Petitioner's trial counsel, Mr. Mostiler, labored under multiple conflicts of interest throughout his trial and direct appeal.  First, a conflict of interest resulted from Mr. Pye's complaints about Mr. Mostiler's representation.  In response to Mr. Pye's complaints, Mr. Mostiler openly expressed interests at odds with Mr. Pye's interests and publicly questioned Mr. Pye's credibility.  Second, Mr. Mostiler's crushing caseload resulted in *per se* conflicts of interest between each of his many clients, who numbered far too many for all of their respective interests to be adequately represented by a single attorney.  Finally, trial counsel had conflicts arising from his previous representation of two key persons in Mr. Pye's case:  the victim Lynn Yarbrough, and key prosecution witness Charles Puckett, who according to the State's arguments was also an intended victim of Mr. Pye's crimes.  Each of these conflicts resulted in a further denial of Mr. Pye's right to counsel.

### A.  Trial Counsel Had a Conflict of Interest after Petitioner Publicly Expressed Dissatisfaction with His Representation

A habeas petitioner may establish a Sixth Amendment violation on the basis of his trial counsel's conflict of interest in two ways.  If the trial judge knew or should have known of the conflict and did not inquire further into the diverging interests between counsel and client, the verdict resulting from the proceedings must be vacated.  *Cuyler*, 446 U.S. at 348.  In a situation where the trial court has no reason to know of the conflict and the defendant does not object, a petitioner must demonstrate "that an actual conflict of interest adversely affected his lawyer's performance."  *Id.*

Here, there is no question that the trial court was aware of the facts giving rise to the conflict between Mr. Mostiler and Mr. Pye.  Because the trial court was on notice of a potential conflict of interest, the court had an obligation to inquire further.  *Id.*  "Where, as here, there is both a timely objection and the trial court does not appoint separate counsel or inquire adequately into the possible conflict, reversal is automatic."[21]  *Hamilton v. Ford*, 969 F.2d 1006 (11th Cir. 1992); *Mickens v. Taylor*, 535 U.S. 162 (2002) (*Holloway* is the appropriate standard in

---

[21]A *Holloway* violation is not a trial error subject to harmless error review, but rather a constitutional defect that entitles petitioner to habeas relief.  *Atley v. Ault, supra*, 191 F.2d at 874.

cases where defense objects); *McConico v. Alabama*, 919 F.2d 1543 (11th Cir.

1990).

The trial court witnessed the facts giving rise to the conflict between Mr.

Mostiler and Mr. Pye.  At the first Unified Appeal hearing[22] held in Mr. Pye's case

in February 1995, the court inquired – pursuant to the mandates of the UAP – if

Mr. Pye had any objection to Mr. Mostiler serving as his attorney.  Resp. Ex. No. 4

at 6.  In response, Mr. Pye told the trial court that he was frustrated with trial

counsel's lack of attention to his case.  Resp. Ex. No. 4 at 6.  Mr. Pye informed the

court that Mr. Mostiler had not interviewed witnesses, including those Mr. Pye

had identified as potentially important, had rarely met with him at the jail and had

"nodded off" during the preliminary hearing.  *Id.* at 6-7.  The Court did not ask

any questions regarding Mr. Pye's allegations except to confirm that Mr. Pye was

not financially able to retain private counsel.  The Court refused Mr. Pye's request

for another attorney, finding "no reason to go outside the established rules of

indigency representation in this case and bring in another attorney."  *Id.* at 7-8.

---

[22]Georgia's Unified Appeal Procedure ("UAP") governs the conduct of all death penalty cases in Georgia and requires, *inter alia*, a number of hearings on specific matters prior to trial.  O.C.G.A. §17-10-36.  The statute directs the Court to periodically inquire into matters such as defense strategy, the waiver of certain rights and the defendant's satisfaction with his counsel's performance.  Petitioner maintains that this procedure was violative of his rights to silence, counsel, due process and equal protection.  *See* Claim XIII herein.

The Griffin Daily News printed Mr. Pye's complaints about Mr. Mostiler's handling of the case the following day.  Resp. Ex. No. 111A at 5438.

When Mr. Pye was formally arraigned three days later, Mr. Mostiler asked "for the Court's indulgence to make something a part of the record." Resp. Ex. No. 5 at 3.  Mr. Mostiler complained that the paper had reported Mr. Pye's negative remarks about his representation without including a response from Mr. Mostiler. *Id*.  On the record in open court, trial counsel stated that Mr. Pye had not been truthful.  He listed several dates on which he and Mr. Yarbrough purportedly had met with Mr. Pye at the jail and gave a lengthy justification for why his office had not been able to contact a particular witness prior to that witness's death.[23]  *Id.* at 3-4.  Trial counsel asserted that contrary to Mr. Pye's claim that he had not interviewed witnesses, he had twice had been to Flovilla, Georgia to interview witnesses, apparently referencing the two consecutive days in March 1994 when he and Mr. Yarbrough interviewed Mr. Pye's brother and other witnesses with respect to the codefendant's possession of a gun. *Id.* at 4.

The trial court apparently recognized that Mr. Mostiler had directly attacked his own client's credibility; he asked a reporter present in the courtroom not to

---

[23]Mr. Pye told the court that because of counsel's lack of vigilance in contacting witnesses, one potentially important witness had died before being interviewed in connection with the case.  Resp. Ex. No. 4 at 6.

print trial counsel's comments.  *Id*. at 5.  However, he did not inquire into the obvious conflict between trial counsel and his client.

Two months later, Mr. Pye wrote to the State Bar of Georgia, once again complaining that trial counsel had not interviewed witnesses nor spent time discussing the case with him.  Resp. Ex. No. 117C at 6976-6969.  Mr. Mostiler responded to the Bar complaint by submitting the portion of the arraignment transcript in which he had addressed Mr. Pye's complaints, observing that "I suppose it is my word against his."  Resp. Ex. No. 117C at 6969-6973.  Satisfied with this response, the Bar informed Mr. Pye that his grievance did not "fall within the disciplinary jurisdiction of the State Bar" and advised him that matters of ineffective assistance of counsel were to be taken up elsewhere.  *Id*. at 6967.

 The trial court violated its constitutional duty under *Holloway* to conduct an adequate inquiry.  The trial court listened while Mr. Mostiler publicly remarked that his client was not being truthful, and pitted his word against his client's.  "Under *Holloway*, the purpose of the inquiry is to 'ascertain whether the risk [of a conflict is] too remote to warrant [new] counsel.'" *Atley v. Ault, supra*, 191 F.3d 865, *citing Holloway*, 435 U.S. at 484.  Here the conflict was obvious.  In defending his own interest, trial counsel publicly attempted to impeach a current client.  Instead of hearing from Mr. Pye or conducting an independent inquiry in

95

order to evaluate whether Mr. Mostiler's diverging interests could be eliminated, the court advised Mr. Pye that he had no choice but to abide with Mr. Mostiler as his lawyer.  The court thus passed on its duty to eliminate or resolve a conflict when one emerged.  *Holloway*, 446 U.S. at 490.

In finding that trial counsel did not labor under a conflict of interest as a result of expressing interests at odds with his client's, the state habeas court performed an analysis that was both contrary to, and an unreasonable application of, the relevant federal law.  Respondent's Order failed to identify and apply the correct legal standards as announced in *Holloway,* 446 U.S. at 348, and *Cuyler,* 446 U.S. at 348, and rendered a decision which was both contrary to those authorities, and which unreasonably applied the principles announced in *Mickens,* 535 U.S. at 162.   Resp. Ex. No. 161 at 67-68.  The obvious, inherent conflict is a *per se* violation of Petitioner's Sixth Amendment right to counsel and this Court should vacate his unconstitutional conviction's and sentence under 2254(d).

### B.    Trial Counsel's Enormous Caseload Created a Conflict of Interest

Petitioner's right to counsel free of conflicts was also violated by the "deeply flawed system for the provision of indigent defense in Spalding County." Resp. Ex. No. 118A at 7143.  At the time he represented Mr. Pye, trial counsel was the contract public defender for Spalding County.  Every two years, Mr. Mostiler

96

secured this role by submitting the low-bid for the provision of indigent defense services to *all* of Spalding County's indigent defendants. *See generally*, Resp. Ex. No. 117C at 6982-7063; Resp. Ex. No. 117D at 7064-7072; Resp. Ex. No. 118A at 7074-7134. Mr. Mostiler subcontracted out the representation of juvenile and misdemeanor cases, but remained personally responsible for nearly all of Spalding County's indigent felony cases. Resp. Ex. No. 117C at 6984-6985, 7007-7008, 7035. In 1994, the year following Mr. Pye's arrest, the contract provided $291,000 to Mr. Mostiler to provide these services, including the subcontracting of non-felony cases. *Id.* at 7016. There was no separate provision for funds for items such as litigation expenses, expert witness fees and investigator salaries, and thus Mr. Mostiler was responsible for paying for these items out of the monies he received pursuant to the contract. Resp. Ex. No. 118A at 7139.

Mr. Mostiler was responsible for the representation of far more clients than any single attorney could realistically handle. In 1994, Spalding County brought more than 800 cases against indigent criminal defendants. Resp. Ex. No. 118A at 7076; Resp. Ex. No. 117C at 7015. According to Mr. Mostiler's own contract bid proposals, more than 1700 new indigent felony cases were opened between 1994 and 1996, the crucial years during which Mr. Pye's pre-trial investigation and trial preparation should have occurred. Resp. Ex. No. 117C at 7035. As noted by

97

Dean Norman Lefstein, a leading legal expert on professional responsibility, even if Mr. Mostiler's associate attorney was handling fully half of all the felony cases, he still would have remained counsel on *more than 570 felony cases* in any given year when his case opening and closing rates are considered. Resp. Ex. No. 118A at 7140. This is in addition to Mr. Mostiler's privately accepted criminal and civil cases. *Id.* During the time that he represented Mr. Pye, Mr. Mostiler filed 174 new civil cases and represented a total of four other capital defendants. *Id.* at 7140; *see also* Resp. Ex. No. 118A at 7145, 7146. Capital cases were covered by the contract, but appointed to Mr. Mostiler by the trial judge and billed separately at a rate of $50 per hour. During the time that he represented Mr. Pye, Mr. Mostiler handled an additional four death penalty cases.

Given the limited amount of time in a day, Mr. Mostiler was necessarily forced to choose between defending the rights of Mr. Pye and the rights of the many other clients to which he was appointed. Any work he chose to perform on other cases was necessarily at the expense of Mr. Pye's case. Thus, trial counsel failed to satisfy his duty of loyalty to Mr. Pye. The excessive demands on his time and resources created an actual conflict and violated the Sixth Amendment right to counsel and the rule of *Holloway v. Arkansas*, 435 U.S. 475 (1978) and *Cuyler v. Sullivan,* 446 U.S. 335 (1980).

98

In *Holloway*, the Court recognized that in a case of conflicting interests, the defendant is as likely to be prejudiced by what counsel failed to do as what counsel actually did. 435 U.S. at 490.  As outlined in Claim IV above, tremendous prejudice flowed to Petitioner as a result of trial counsel's many investigative failures.  However, because it is difficult to fully measure the corrupting effect of counsel's conflicting interests, "it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

The conflict of interest in this case is apparent.  Trial counsel had a duty of loyalty to Mr. Pye.  To fulfill this duty, authorities anticipate that an attorney would have spent 1000 to 2000 hours preparing the case for trial.  Instead, counsel spent barely 200 hours on the entire case, including those hours spent during the trial of the case itself.  Mr. Mostiler's truncated investigation and preparation of the case was the inevitable result of his overwhelming caseload.  Because Mr. Mostiler had to sacrifice Mr. Pye's needs for the needs of other clients, there was an inherent conflict of interest of constitutional dimension.

The trial court in Mr. Pye's case was plainly on notice of the conflict.  Judge Whalen was among the persons who reviewed and approved Mr. Mostiler's contract renewal proposals.  Resp. Ex. No. 117 at 7004, 7028-7031 (Order putting

into place terms of contract proposed by Mostiler at Resp. Ex. No. 117 at 7027-7042).  Mr. Mostiler's contract proposals spelled out the number of indigent defendants who would require representation.  Mr. Mostiler would have practiced before Judge Whalen on a daily basis, the Court also would have been well aware of how many death penalty cases were on-going in Spalding County.  Once again, because the trial court either knew, or should have known of the conflict, and failed to take remedial action, Mr. Pye is entitled to a presumption of prejudice. *Holloway*, 435 U.S. at 489.  Respondent's Order failed to apply *Holloway*'s presumption of prejudice, *see* Resp. Ex. No. 161 at 69, and rendered a decision that was both contrary to and an unreasonable application of the relevant Supreme Court law.  This Court must correct the Sixth Amendment violation.

### C.     Trial Counsel's Prior Representation of the Victim and a Witness Resulted in An Actual Conflict of Interest

Mr. Mostiler's loyalties to Mr. Pye were even further divided by his representation of two key individuals in Mr. Pye's case.  As part of his responsibilities as contract defender, Mr. Mostiler had previously represented both the victim and Charles Puckett, a key prosecution witness who was also an intended victim.

Because the trial court was not on plain notice of these conflicts,[24] Petitioner must demonstrate "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. at 348.[25]   The rule of *Cuyler* applies in both simultaneous and successive representation cases, and therefore applies here. *McConico v. State of Alabama*, 919 F.2d 1514, 1546 (11th Cir. 1990).

To demonstrate the requisite adverse effect, Petitioner "must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence that favors an interest in competition with that of the defendant." *Buenoano v. Singletary*, 74 F.3d 1078, 1086 (11th Cir. 1996), *quoting Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987).  However, petitioner "does not have to produce direct evidence, such as the lawyer's testimony, that the lawyer chose to do one thing rather than another in order to accommodate another

---

[24]Petitioner's trial judge Andrew Whalen  also presided over a prior criminal prosecution of the victim, Alicia Lynn Yarbrough, in which Mr. Mostiler served as her appointed counsel the year prior to her death.  Thus the trial court knew or should have known of Mr. Mostiler's conflict in this regard and had a duty to raise the issue.

[25]"Actual conflict" and "adverse affect" are not two separate inquiries.  An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance. *Mickens v. Taylor*, 535 U.S. 162 (2002).

client's interests.  Causation can be proved circumstantially, through evidence that the lawyer did something detrimental or failed to do something advantageous to one client that protected another client's interests." *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004) (granting relief under *Cuyler* and *Holloway* claims).   An adverse affect can be shown from an attorney's "failure to take actions that are clearly suggested from the circumstances." *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991).

Mr. Mostiler's prior representation of Lynn Yarbrough and Charles Puckett created an actual conflict of interest that had an adverse effect on Mr. Pye's representation at trial, yet there is no indication he disclosed this conflict to the Court nor to Mr. Pye.  As related above, Mr. Pye and Ms. Yarbrough had an ongoing romantic relationship.  In January 1992, when Mr. Pye and Ms. Yarbrough shared a home, they were arrested together and charged with cocaine possession.  Resp. Ex. No. 98B at 2069.  Mr. Mostiler represented both Mr. Pye *and* Ms. Yarbrough in the resulting criminal proceedings.  Mr. Pye's charges were nolle prossed when Ms. Yarbrough claimed ownership of the drugs.[26] *Id.* at 2071.

---

[26]The court file contains no indication that Judge Whalen inquired into the obvious conflict inherent in Mr. Mostiler's simultaneous representation of codefendants in a case in which the primary question to be resolved was which defendant actually possessed the drugs.

Ms. Yarbrough entered a guilty plea and Judge Whalen sentenced her to thirty days in jail and five years probation. Resp. Ex. No. 98B at 2073.

Charles Puckett had a number of prior convictions and Mr. Mostiler had represented him on two prior occasions, in connection with a 1990 arrest for burglary and a 1991 arrest for theft by taking. Both cases resulted in convictions and periods of incarceration. Resp. Ex. No. 118A at 7147-7186. Mr. Puckett testified at Mr. Pye's trial that Ms. Yarbrough continued her relationship with Mr. Pye even after she and Puckett had moved in together. Resp. Ex. No. 11B at 1070-1071. Puckett was the first person to discover that the victim was missing on the night of the crime and was initially a suspect in her death. Resp. Ex. No. 1B at 156, 197. He was the first witness to observe the condition of their home and his belongings upon discovering Ms Yarbrough missing and he had unfettered time alone there before police were contacted and investigators processed the home as a crime scene.

As outlined extensively in Claim IV, *supra*, the obvious defense available to Mr. Pye at trial was that Ms. Yarbrough participated in stealing Puckett's things so that she could obtain drugs, and that she was actually neither abducted nor burglarized. However, trial counsel asked limited questions of Puckett on cross-examination and pursued no line of questioning centered around this specific

103

possibility.  Trial counsel failed to ask about inconsistencies in Puckett's inventory of his missing possessions, and was unable to elicit that Puckett suspected the victim's involvement, both on the night of the crime and in previous "burglaries" of his home.  And though Mr. Mostiler knew that his former client had multiple arrests for burglary, he did not ask whether the victim had participated in any prior burglaries committed by Puckett himself.  Finally, he failed to impeach Puckett's credibility by eliciting that he had previously been convicted of crimes involving dishonesty, in particular, the burglary and theft charges upon which Mr. Mostiler represented him.

Trial counsel similarly failed to present evidence reflecting negatively on Ms. Yarbrough herself.  He did not make a proffer adequate to have admitted evidence that the victim abused crack cocaine and had a pattern of trading sex and stolen belongings to obtain the drug.  Trial counsel certainly was aware of facts supporting Mr. Pye's defense as a result of his prior representation of the victim on a cocaine possession charge.

In failing to cross-examine Puckett sufficiently and failing to present evidence of the victim's cocaine addiction as a part of Mr. Pye's only viable defense, trial counsel "did something detrimental or failed to do something advantageous to [Petitioner] that protected another client's interests."  *McFarland*

*v. Yukins*, *supra*, 356 F.3d at 706. Because Mr. Mostiler previously took Mr. Puckett's burglary charge to trial, it is yet more likely that he learned confidential information concerning Puckett's past behavior and proclivities. Resp. Ex. No. 118B at 7171-7172. Similarly, because he previously represented Ms. Yarbrough on a drug possession charge, it is likely that he learned confidential information regarding the consequences of her drug addiction.

"[B]oth taking action and failing to take actions that are clearly suggested by the circumstances can indicate an adverse effect." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001)(en banc), aff'd 535 U.S. 162 (2002). "[I]n a case of joint representation of conflicting interests the evil . . . is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." *Holloway*, 435 U.S. at 490. Had trial counsel not previously represented Charles Puckett and Lynn Yarbrough, he would have been free to fully pursue the only available defense to Petitioner's crimes.

Respondent's Order wholly failed to identify and apply the governing legal standard, and entered a decision that is both contrary to and an unreasonable application of governing Supreme Court law and is premised upon an unreasonable determination of the facts in light of the evidence. This Court must

undertake review and grant relief on each of Petitioner's Sixth Amendment

conflict of interest claims pursuant to the provisions of 28 U.S.C. § 2254.

## CLAIM VI

**COUNSEL'S REPRESENTATION VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEEN- TH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE ANALOGOUS PRO- VISIONS OF THE GEORGIA CONSTITUTION, AND THE RULE OF *UNITED STATES V. CRONIC*, 466 U.S. 648 (1984).**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by

specific reference.

Counsel was the contract public defender for Spalding County, Georgia.  As

a result of this contract, he represented an overwhelming number of  indigent

individuals charged with felony offenses each year.  In addition, he maintained a

thriving civil practice and took appointed capital cases.  Because of these

overwhelming obligations,, there was a breakdown in the adversarial process and

trial counsel was unable to be Mr. Pye's meaningful advocate prior to trial, during

trial, at sentencing, at motion for new trial, and on direct appeal as required by the

Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution,

106

the analogous provisions of the Georgia Constitution, and the rule of *United States v. Cronic*, 466 U.S. 648 (1984).

Counsel's role is to "ensure that the adversarial testing process works to procure a just result under the standards governing decisions." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  When confronted "with both the intricacies of the law and the advocacy of the public  prosecutor," *United States v. Ash*, 413 U.S. 300, 303 (1970), a defendant is entitled to counsel who will "bring to bear such  skill and knowledge as will render the trial a reliable testing process." *Strickland*, 466 U.S. at 688. This requires that "the lawyer not only possesses adequate skill and knowledge, but also that the lawyer has the time and resources to apply his skill and knowledge to the task of defending each of his individual clients." *State v. Peart*, 621 So.2d 780, 789 (La. 1993).  The constitutional right is violated when "counsel's performance as a whole," *United States v. Cronic*, 466 U.S. at 657 n.20, or through individual errors, *Strickland*, 466 U.S. at 687, falls below an objective standard of reasonableness.

In cases such as Mr. Pye's, the writ should issue without a showing of prejudice because failings by counsel amount to virtually no assistance whatsoever. *see Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee,"

and "when a defendant is deprived of . . . his attorney . . . during a critical stage in, at least, the prosecution of a capital offense, <u>reversal is automatic</u>.");  *McCoy v. Wainwright*, 804 F.2d 1196, 1198 (11th Cir. 1986).  Mr. Pye is entitled to relief without a showing of prejudice.

**CLAIM VII**

**PETITIONER IS MENTALLY RETARDED AND CATEGORICALLY EXEMPT FROM THE DEATH PENALTY UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AND *ATKINS V. VIRGINIA*, 536 U.S. 304 (2002), *COOPER V. OKLAHOMA*, 517 U.S. 348 (1996) AND RELATED PRECEDENT**

This claim is evidenced by the following facts:

All other allegations in this petition are incorporated into this claim by specific reference.

The Supreme Court has held that the Eighth Amendment categorically prohibits the execution of mentally retarded persons.  *Atkins v. Virginia*, 536 U.S. 304 (2002).  The state court's failure to find that Petitioner's execution is precluded by the virtue of his mental retardation is based upon multiple unreasonable determinations of the facts in light of the evidence, and is itself contrary to and an unreasonable application of *Atkins*.[27]  28 U.S.C. 2254(d)(1) and

---

[27]In Georgia, where a petitioner raises mental retardation for the first time in habeas corpus proceedings, the habeas court must make a determination as to

108

(2).  Accordingly, this Court should grant habeas relief and vacate his death sentence.

While the Supreme Court in *Atkins* prohibited the execution of all mentally retarded offenders, it left it to the states to formulate appropriate procedures, consistent with due process, for determining which offenders are in fact mentally retarded.  536 U.S. at 308.[28]  Thus, the relevant criteria are those adopted in Georgia both via statute and court opinion:  "The essential features of mental retardation are 1) significantly subaverage intellectual functioning, 2) resulting in or associated with impairments in adaptive behavior, and 3) manifestation of this impairment during the developmental period."  *Stripling v. State*, 261 Ga. 1, 4, 401 S.E.2d 500, 504 (1991); *see also* O.C.G.A. § 17-7-131(a)(3), (Georgia Code Definition of Mental Retardation).  This definition is consistent with the widely

---

whether the petitioner is mentally retarded.  *Turpin v. Hill*, 269 Ga. 302, 303, 498 S.E.2d 52-53 (1998).  Respondent's order states that Petitioner's claim of mentally retardation is procedurally defaulted because it was not raised at trial, and that Petitioner cannot show cause and prejudice, or a miscarriage of justice, to excuse the default.  As stated previously, state court findings of default are not subject to the provisions of 28 U.S.C. § 2254, and the determination of cause and prejudice is a federal question for this Court to review *de novo*.  *Macklin v. Singletary, supra*.  As shown by the evidence, there exists adequate cause and prejudice to excuse any default, and *de novo* review, and relief, are proper.

[28]The Georgia procedure, requiring individuals to prove they are mentally retarded beyond a reasonable doubt, does not comport with due process or the Eighth Amendment.  *See* section D, *infra*.

accepted diagnostic criteria employed by the American Psychiatric Association.

*See Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text rev'n

2000)("DSM-IV-TR"),  Resp. Ex. No. 94D at 1034.  *Stripling*, 261 Ga. at 4, 401

S.E.2d at 504; *see also Atkins v. Virginia*, 536 U.S. 304, 308 n.2 (2002)(citing to

the American Psychiatric Association definition of mental retardation found in the

DSM-IV-TR), *See also* American Association of Individuals with Developmental

Disabilities User's Guide (10th Ed. 2002) ("User's Guide").

The first criteria of the mental retardation test – significantly subaverage

intellectual functioning — is satisfied when an individual has a full scale IQ score

of "about 70 or below" on a standardized and individually administered

intelligence test.  *See* DSM-IV-TR, Resp. Ex. No. 94D at 1034.  There is a

measurement error of approximately five points on most IQ tests, so the DSM-IV-

TR recognizes that "it is possible to diagnose Mental Retardation in individuals

with IQs between 70 and 75 who exhibit significant deficits in adaptive

functioning."[29]  *See* DSM-IV-TR, Resp. Ex. No. 94D at 1034-35.

The second criterion, adaptive functioning, "refers to how effectively

individuals cope with common life demands."  *See* DSM-IV-TR, Resp. Ex. No.

94D at 1035.  Adaptive functioning can be measured by standardized scales, but

---

[29]"[A] Wechsler IQ of 70 is considered to represent a range of 65-75."
DSM-IV-TR.  Resp. Ex. No. 94D at 1034.

"consideration should be given to the suitability of the instrument" and to the individual's background and circumstances.  *Id.*  The DSM-IV-TR recommends that an examiner obtain evidence regarding an individual's adaptive functioning from one or more "reliable independent sources (e.g., teacher evaluation and education, developmental and medical history)."  *Id.*

Third, because mental retardation is a developmental disability, an individual must exhibit the first two criteria prior to the age of 18.  DSM-IV-TR, Resp. Ex. No. 94D at 1034.

Mental retardation is classified as ranging from "mild" to "profound." DSM-TR-IV, Resp. Ex. No. 94D at 1034.  Persons with IQ levels of 50-55 to approximately 70 are classified as mildly retarded.   People who are "mildly" mentally retarded are significantly impaired.  As recognized by the Supreme Court, mildly mentally retarded people constitute the vast majority of mentally retarded persons, and most of those who reach the point of sentencing in the criminal justice system.  *Penry v. Lynaugh*, 492 U.S. 302, 333 (1989)(citing ABA Standards for Criminal Justice 7-9.1, commentary at 460 (2d ed. 1980)), *See also* Resp. Ex. No. 90 at 135 (approximately "85 percent of the people with mental retardation fall in the mild mental retardation range.").

Mr. Pye suffers from mild mental retardation.  Specifically, the evidence in this case demonstrates that Mr. Pye 1) has significantly subaverage intellectual functioning, that is 2) associated with significant impairments in adaptive behavior, which 3) manifested during the developmental period.  Because Mr. Pye is mentally retarded, he cannot be executed.  Respondent's order signed by the state habeas court, writing that Petitioner did not meet his burden to prove mental retardation beyond a reasonable doubt, is contrary to and an unreasonable application of *Atkins*.[30]  *See* Section D *infra*.[31]

Prior to the state habeas corpus evidentiary hearing, four mental health experts examined Petitioner at the request of counsel: Dr. Jethro Toomer, Dr. Victioria Swanson, Roderick Pettis, M.D., and Dr. Hyman Eisenstein.  Each of these experts considered 1) the results of intellectual, academic and adaptive behavior testing, 2) the extensive background and social history information regarding Mr. Pye that was obtained from family, friends and schoolteachers, 3)

---

[30]Respondent's order credits the methodology and conclusions of Respondent's expert Glen King, Ph.d., J.D., which ignored accepted diagnostic criteria employed by the AAIDD, the APA and cited in *Atkins*.  The order is entitled to no deference under 2254(d).

[31]Trial counsel failed to investigate and raise any claims regarding Mr. Pye's mental health at trial, including mental retardation.  Mental retardation was raised in state habeas proceedings pursuant to *Turpin v. Hill*, 269 Ga. 302, 303, 498 S.E.2d 52-53 (1998).

the available school records, medical records and institutional records, and 4) the materials and testimony from Mr. Pye's trial.  Three of the four, Drs. Swanson, Pettis and Eisenstein, visited the home where Mr. Pye grew up and spoke with family members.  All four experts are esteemed professionals in their respective fields and maintain full-time clinical practices.

In particular, Dr. Victoria Swanson is uniquely qualified to render an opinion on whether Mr. Pye is mentally retarded. Dr. Swanson's career and daily clinical practice have been focused entirely in the field of mental retardation.  *See* Resp. Ex. No. 93D at 699 (Dr. Swanson's Curriculum Vitae),  Resp. Ex. No. 94A at 717-723; *see also United States v. Nelson*, 419 F.Supp.2d 891 (E.D. La. 2006)(describing Dr. Swanson's extensive experience working with mentally retarded individuals and finding her to be qualified as an expert in psychology, "with a particular expertise in diagnosing and treating mental retardation").  She is an expert in evaluating adaptive behavior, and for her master's thesis compared the Vineland Adaptive Behavior Scales to other measures for assessing the adaptive behavior component of mental retardation.  Resp. Ex. No. 93D at 700. She is a member of the national and local Chapters of the American Association on Intellectual and Developmental Disabilities ("AAIDD"), the definitive source for diagnostic and classification information concerning mental retardation, and a

member of the National Association of Qualified Mental Retardation

Professionals.  Resp. Ex. No. 94D at 699, 703.

After reviewing all the available evidence, Dr. Swanson and each of the

other mental health experts concluded that Mr. Pye is mentally retarded.

## A.    Mr. Pye Suffers from Significantly Subaverage Intellectual Functioning

Every expert to examine Petitioner – including Respondent's expert –

concur that Petitioner suffers from significantly subaverage intellectual

functioning.   "Significantly subaverage general intellectual functioning" is

defined in the DSM-IV-TR as follows:

> General intellectual functioning is defined by the intelligence quotient
> (IQ or IQ-equivalent) obtained by assessment with one or more of the
> standardized, individually administered intelligence tests (e.g.,
> Wechsler Intelligence Scales for Children, 3rd Edition; Stanford
> Binet, 4th Edition; Kaufman Assessment Battery for Children).
> Significantly subaverage intellectual functioning is defined as an IQ
> of about 70 or below (approximately 2 standard deviations below the
> mean).  It should be noted that there is a measurement error of
> approximately 5 points in assessing IQ, although it may vary from
> instrument to instrument (e.g., a Wechsler IQ of 70 is considered to
> represent a range of 65-75).  Thus, it is possible to diagnose mental
> retardation in individuals with IQs between 70 and 75 who exhibit
> significant deficits in adaptive behavior.

DSM-TR-IV, Resp. Ex. No. 94D at 1032-33.

In 2001, Mr. Pye was evaluated by Dr. Jethro Toomer.  Dr. Toomer is a

licensed psychologist, and an expert in the field of forensic psychology.   Resp.

114

Ex. No. 94C at 948;  Resp. Ex. No. 90 at 99.  Dr. Toomer administered the

Wechsler Adult Intelligence Scale - Third Edition (the "WAIS-III") to Mr. Pye and

found that he had a full scale IQ of 70, which meets the first prong for mental

retardation, significantly subaverage intellectual functioning.  Resp. Ex. No. 90 at

104-105, *See also* Resp. Ex. No. 90 at 103-104 (Dr. Toomer discussing the five

point standard error of measurement recognized in the DSM-IV with regard to the

WAIS-III, meaning an IQ score of 70 to 75, "with the cutoff being 75 using the

standard error of measurement plus or minus five."). S*ee also* Resp. Ex. No. 94B

at 904-914 (Dr. Toomer's test data).

Dr. Toomer's results on the WAIS-III were consistent with those on the

WAIS-III administered by the State's expert, Glen King, in 2008.  Dr. King

administered the WAIS-III, resulting in a full-scale IQ score of 68.  Resp. Ex. No.

92 at 377;  Resp. Ex. No.  129B at 10131 (Report of Dr. King), Resp. Ex. No.

129C at 10153 (WAIS-III score sheet).   Both Drs. Toomer and King noted that

Mr. Pye put forth his best efforts in the testing.  *See* Resp. Ex. No. 90 at 104; Resp.

Ex. No. 92 at 406-07.

In addition to the WAIS-III intelligence testing, both Drs. Toomer and King

administered the Wide Range Achievement Test ("WRAT"), which "is designed to

assess academic functioning in terms of three skill levels," those being reading,

writing and arithmetic.  Resp. Ex. No. 90 at 105.  The results showed that

Petitioner was reading at a sixth-grade level, spelling at a fifth-grade level, and his

arithmetic ability was at a sixth-grade level.  Resp. Ex. No.  90 at 106.  Dr. Toomer

testified that these scores were consistent with mild mental retardation.  *Id*.

Someone with mild mental retardation can achieve a fifth or sixth grade level of

functioning, "it is just that the level is not commensurate with their chronological

age."  Resp. Ex. No. 90 at 106-107, s*ee also* DSM-IV-TR, Resp. Ex. No. 94D at

1036 (persons with mild mental retardation "can acquire academic skills up to

approximately the sixth-grade level").

    In addition, Dr. Toomer reviewed Mr. Pye's school records, records from

the Department of Corrections, and the testing performed later by Dr. King.  Dr.

Toomer testified that all of these records and testing were consistent over time

with his own results and with mild mental retardation.  Resp. Ex. No. 90 at 107-

108, 111.

    Dr. King administered the fourth edition of the WRAT, which was current

in 2008.  His results on the WRAT-IV were consistent with those obtained on the

WRAT-III by Dr. Toomer.  They showed Mr. Pye's reading skills were at a 4.2

grade level, spelling at a 6.7 level, and arithmetic at a 5.4 grade level.  Resp. Ex.

No. 90 at 112; Resp. Ex. No. 129C at 10154 (Dr. King's WRAT-III testing

results), s*ee also* Resp. Ex. No. 92 at 382 (Dr. King explaining that because the tests showed Mr. Pye's reading ability to be at a 4.2 grade level, Mr. Pye could not read the instructions to the adaptive testing instrument he administered, the ABAS-II, which requires a sixth grade reading level).

The uncontroverted evidence before the state court showed that Petitioner has significantly subaverage intellectual functioning, and thus meets the first prong for mental retardation.[32]

## B.     Significant Deficits in Adaptive Behavior

The second prong of a mental retardation diagnosis is adaptive functioning, or "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background and community setting."  DSM-IV-TR,  Resp. Ex. No. 94D at 1035.  The DSM-IV-TR specifies that a person with adaptive deficits in at least two of the eleven specified skill areas meets the second criterion for mental retardation.  DSM-IV-TR, Resp. Ex. No. 94D at 1034.  All of the experts other than Respondent's concluded that Mr.  Pye exhibits significant deficits in communication, functional academic skills, self-care, use of community

---

[32]The Respondent's order repeatedly characterizes Mr. Pye as having "low to borderline" intellectual functioning.  This is contrary to *Atkins*.  "'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70."  *Atkins*, 536 U.S. at 308 n.3.

resources, social/interpersonal relationships, leisure, health, home living, and self-direction, Resp. Ex. No. 93D at 694, thus meeting the second prong of the definition of mental retardation.

### 1.     A Proper Retrospective Assessment Documented Mr. Pye's Adaptive Behavior Deficits

To assess an individual who is over the age of 18 for mental retardation, a retrospective diagnosis must be performed.  *See* AAIDD Manual at 95-96; AAIDD User's Guide, Resp. Ex. No. 94C at 983.  The AAIDD specifically recognizes that a retrospective diagnosis may be necessary to "evaluat[e] individuals involved in legal processes including . . . sentencing eligibility questions such as those related to the recent *Atkins* (2002) case."  *Id*.  Because people under 18 are "constitutionally ineligible for the death penalty...no clinician evaluating a person for purposes of an *Atkins* hearing will ever be evaluating the person prior to age 18."  *United States v. Hardy,* 762 F.Supp.2d 849, 880 (E.D.La. 2010).  Mr.  Pye was 41 years old at the time of the inquiry and a retrospective assessment was thus necessary.

A retrospective diagnosis requires, *inter alia*, careful examination of childhood records, anecdotal evidence from family members and others who knew the person during his formative years, and the administration of formal instruments to assess adaptive behavior.  *See* AAIDD User's Guide, Resp. Ex. No.

94C at 983-989 (listing guidelines for conducting a retrospective diagnosis).  "Any comprehensive evaluation of adaptive behavior should seek to corroborate information obtained on standardized measures from sources such as:  school records, employment history, social security administration records, medical records and interviews with respondents who know the individual well . . ."  Tasse, M., *Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases*, Applied Neuropsychology, 16, 2009, Resp. Ex. No. 96A at 1303.  "Specific guidelines" a clinician should follow when conducting a retrospective adaptive behavior assessment include "using multiple respondents and multiple contexts and assessing adaptive functioning within the general community and within the individual's age peers and cultural group." *Id*.  Dr. Victoria Swanson was the only expert in these proceedings with specialized experience in the field of intellectual disabilities and mental retardation.  *See Nelson,* 419 F.Supp.2d 891 (E.D.La. 2006).  Adhering to the guidelines for retrospective diagnoses, Dr. Swanson concluded that Petitioner exhibited significant deficits in adaptive behavior before the age of eighteen.

Dr. Swanson met individually with Mr. Pye's mother and two of his siblings, Pam Bland and Ricky Pye, and administered standardized adaptive behavior scales to each.   She specifically sought out Petitioner's former care-

119

givers because such individuals are "ideal respondents" in providing information about the subject's adaptive behavior.  Resp. Ex. No. 94A at 727-728; Resp. Ex. No. 90 at 135; Resp. Ex. No. 96A at 1302-1310.   She also reviewed school records, prison records, affidavits sworn by persons who knew Mr. Pye, the standardized testing Drs. Toomer and King performed, and the neuropsychological testing Dr. Eisenstein performed.

Dr. Swanson also met with Mr. Pye and conducted a mental status exam and then administered adaptive behavior probes.  Resp. Ex. No. 91A at 129;  Resp. Ex. No. 93D at 690.  These probes covered Mr. Pye's abilities and limitations regarding daily living skills.  Resp. Ex. No. 91A at 156-157.  Mr. Pye actually had to demonstrate whether he could count money, measure liquids or distance, tell time, use textual resources, and read dials on common household appliances. Resp. Ex. No. 91A at 161-168;  Resp. Ex. No. 93D at 689-694.  Dr. Swanson also tested Mr. Pye's ability to read and retain information.  *Id*. at 690.

Dr. Swanson found that Mr. Pye met the adaptive behavior criterion for a diagnosis of mental retardation.  She testified her results were consistent and her data convergent with Mr. Pye's school and other records, the affidavits of those who knew him during his youth, his social history, and other experts' evaluations and formal testing.  Resp. Ex. No. 91A at 174-176;  Resp. Ex. No. 93D at  694.

120

Her retrospective diagnosis accorded with the AAIDD's guidelines and the best practices of her profession.

### a.   Formal Instruments Measuring Adaptive Behavior to Three of Mr. Pye's Caregivers Revealed Significant Deficits

Dr. Swanson administered the ABAS-II to Petitioner's mother, Lolla Pye, utilizing the three sub-tests of the ABAS-II that make up the Conceptual composite scale:  functional academics, self-direction, use of community resources and communication.  Resp. Ex. No. 91A at 139; Resp. Ex. No. 93C at 652.[33]  Mrs. Pye could recall the time when Petitioner was beginning school, so she completed the conceptual sub-tests with respect to Petitioner's functioning at roughly 6.5 years of age.[34]  Resp. Ex. No. 91A at 139.

---

[33]The Respondent's order states that administering  "individual pieces of the test" is invalid.   Resp. Ex. No. 161 at 32.  This is an unreasonable determination of the facts in light of the evidence, as the handbook edited by the test's authors clearly states that such an administration *is* valid.  Oakland and Harrison, ABAS-II, Clinical Use and Interpretation, Resp. Ex. No. 95F at 1290.

[34] *See* Oakland and Harrison, ABAS-II, Clinical Use and Interpretation, Olley and Cox, Assessment of Adaptive Behavior in Adult Forensic Cases, Resp. Ex. No. 95F at 1291 ("If the examiner determines that the informant has the required information and can report consistently with regard to functioning at a certain date, that date should be considered the date of the defendant's functioning and may be recorded as 'Today's Date' on the ABAS-II rating form or other suitable location. Scoring should be carried out using that date....").  *See also* Vineland-II Manual, Resp. Ex. No. 95E at 1277, 1279 (same).

Dr. Swanson administered the Vineland-II to Pam Bland, Petitioner's older sister, who lived in her parents' home with her two small children and Mr. Pye for approximately two years when he was 16 years old, Resp. Ex. No. 91A at148, and to Ricky Pye, Petitioner's younger brother, who lived with Petitioner when Petitioner was 25 and nearby after that, and acted as a care provider.  While Ricky's Vineland-II did not address Petitioner's mental retardation prior to the age of eighteen, it provided evidence of deficits over time.  Resp. Ex. No. 93D at 684; Resp. Ex. No. 94A at 778-779.[35]

In all three test administrations, Dr. Swanson conducted semi-structured interviews where the examiner "asks general questions about the individual's activities followed by further probes to elicit more specific information," which helps control for bias in responses.  Vineland-II Expanded Interview Form

---

[35]Respondent's Order claims that Dr. Swanson's administration was "nonstandard and flawed" because family members are biased and because Ricky Pye was asked to provide information about Mr. Pye's functioning at the age of 25.  Resp. Ex. No. 161 at 30.  This is an unreasonable determination of the facts.  2254(d)(2).  The Vineland-II manual expressly states that this is the appropriate methodology when performing a retrospective assessment, Resp. Ex. No. 95E at 1277-1279, as does the handbook edited by the ABAS-II authors.  Resp. Ex. No. 95F at 1291. *See also Wiley v. Epps,* 625 F.3d 199, 217 (5th Cir. 2010) (finding "unpersuasive" the state's objections to using the Vineland and ABAS scales retrospectively). *United States v. Davis,* 611 F.Supp.2d 472 at 496 (D.Md. 2009) (ABAS-II properly administered to a half brother, who was asked about the defendant's behavior at age 13, and a former girlfriend, about adaptive functioning at age 27).

Manual, Resp. Ex. No. 95E at 1266.  *See also* ABAS-II Administration and Scoring Manual, Resp. Ex. No. 95A at 1106; Resp. Ex. No. 91A at 144; Resp. Ex. No. 94A at 782.  The Vineland authors *specifically suggest* this method of reducing response bias.  Resp. Ex. No. 95E at 1259.

The results revealed that Petitioner has had adaptive functioning deficits consistent with mild mental retardation since before age 18.  Resp. Ex. No. 95E at 145, 150, 153.  He scored more than two standard deviations below the mean in communication, daily living and socialization on Ricky and Pamela's Vineland-II assessments.  Resp. Ex. No. 93D at 684.  His score on Mrs. Pye's ABAS-II fell more than two standard deviations below the mean as well.

> **b.    Standardized Tests, Teacher Testimony, School Records and Direct Adaptive Probes Documented Petitioner's Adaptive Skills Deficits**

In the state court proceedings Petitioner presented records and testimony from family, teachers, school officials, police and prison guards relating to his youth.  This evidence corroborated the experts' findings regarding adaptive deficits.[36]  Petitioner's formal academic records and test scores also support the

---

[36]Corroborating information is crucial in conducting a retrospective evaluation: "No single information element or source is ever sufficient to diagnose [mild mental retardation], developmentally or during the adult years." *Reschly, Documenting the Developmental Origins of Mild Mental Retardation,* Applied Neuropsychology 16, 2009, Resp. Ex. No. 96A at 1356. *See also* Tasse, *supra,* Resp. Ex. No. 96A at 1303, 1309 ("best practice is to obtain adaptive behavior

conclusion that Petitioner is mentally retarded.  *See e.g.* Resp. Ex. No. 108A at 4655.

In fifth grade, Petitioner's school placed him in Title I, a special education program funded by the Elementary and Secondary Education Act, which targeted at-risk children.  Gwendolyn West, one of Mr. Pye's teachers in that program, reported that all the children in her class read at a second- or third-grade level. West remarked:  "[B]etween children with normal abilities and those with mental retardation...Willie falls on the mentally retarded side.  From my experience, Willie's abilities were *consistent with those of mentally retarded children.*" Resp. Ex. No. 108B at 4759 (emphasis added).  Petitioner "tried hard" but had to repeat seventh grade, and then took Title I English/reading when he finally entered eighth grade.  *Id*. at 4758.  Grover McIntyre, another teacher, noted that Petitioner was "promoted from grade to grade as a matter of course" and not because he had satisfied any academic criteria.  Resp. Ex. No. 108A at 4695.  Melissa Durrett taught Petitioner Title I math in the seventh grade. All of Durrett's students lagged two to five years behind their peers, Durrett reported.  Petitioner's scores in

information from multiple respondents and multiple sources in order to obtain a complete evaluation and identify areas of convergence").

Durett's class indicate that he worked at a third- or fourth-grade level.  Resp. Ex. No. 90 at 39-40.[37]

On the Iowa Test of Basic Skills, Petitioner scored in the first and second percentiles, meaning 99 percent of the population performed better on the test. Resp. Ex. No. 90 at 42.  Petitioner's academic records are consistent with mild mental retardation.[38]

Petitioner's employment history is also consistent with that of a person with mild mental retardation.  Resp. Ex. No. 91A at 168-68.  He lived with his parents and worked short-term (six- to nine-month) jobs to which family and friends referred him.  He worked part time and for cash.  Resp. Ex. No. 93C at 674, *see also* Resp. Ex. No. 91A at 169.  "All his jobs were menial, as would be expected

---

[37]Respondent's expert Dr. King opined that Petitioner's school records did not support a finding of mental retardation because they did not indicate that he was in special education.  There is no evidence that other special education services in Butts County existed at the time or that mildly mentally retarded children would not have been classified as anything other than Title I.  Dr. King had no knowledge of the Butts County school system and did not acknowledge the testimony of Petitioner's teachers. The Respondent's order crediting his opinion repeatedly ignores evidence that Mr. Pye "did not have the ability to learn on the level of an average child." *Holladay v. Allen*, 555 F.3d 1346, 1359 (11th Cir. 2009).  It is entitled to no deference under 2254(d).

[38]The Respondent's order credited Dr. King's attribution of Petitioner's increasingly poor school performance to absences.  This ignored teacher testimony and standardized achievement test scores and is an unreasonable determination of the facts.  Resp. Ex. No. 92 at 405.

125

for someone in the mildly mentally retarded range." *Holladay v. Allen*, 555 F.3d 1346 at 1361 (11th Cir. 2009). *See also id.* at 1359; *Wiley v. Epps*, 625 F.2d 199, 216 (5th Cir. 2010); *Thomas v. Allen*, 607 F.3d 749, 759 (11th Cir. 2010).

Dr. Swanson asked Mr. Pye to perform basic adaptive skills such as looking up items in a dictionary and telephone book, using a ruler and tape measure, identifying appropriate tools or household items for various tasks, etc. Resp. Ex. No. 91A at 156-157. She also tested his reading fluency and accuracy, and asked questions probing his ability to read dials, tell time and use currency. *See* 93D at 689-694. The results of her tests confirmed the standardized testing results, the lay witness observations, and Petitioner's school records; and they were consistent with adaptive behavior in the mild deficit range. Resp. Ex. No. 91A at 161; Resp. Ex. No. 93D at 690.

Dr. Swanson also reviewed letters written by Petitioner to his legal representatives and found them consistent with mental retardation. *See* Resp. Ex. No. 91A at 163-167. Petitioner informed Dr. Swanson that these letters took him days to produce, and were written and rewritten with the help of a dictionary and other inmates.

### c.    Other Factors Corroborate Adaptive Functioning Deficits

Dr. Roderick Pettis, the clinical psychiatrist who evaluated Petitioner and spoke with family members, concluded that Petitioner's slight stature and cognitive deficits suggested maternal alcohol use during pregnancy and inadequate nourishment as a young child. The presence of these factors led Dr. Pettis to strongly suspect that Petitioner suffered from organic brain damage. Resp. Ex. No. 91B at 318. Neuropsychologist Hyman Eisenstein confirmed that suspicion after administering a battery of neuropsychological tests to Petitioner. The results showed frontal lobe brain damage that negatively effects Petitioner's executive functioning. Resp. Ex. No. 91B at 327.[39] The tests also addressed academics, communication and comprehension. Resp. Ex. No. 91A at 175; *Id*. Resp. Ex. No. 93D at 680. The results showed adaptive functioning deficits and organic brain damage. Resp. Ex. No. 93D at 680.

---

[39]Dr. Pettis is the only medical doctor to testify before the state habeas court. He received his medical degree from Boston University and served as chief resident in psychiatry at Harvard Medical School, where he completed a fellowship in forensic and correctional psychiatry. Resp. Ex. No. 93A at 450-451.

C.   **The Respondent-Drafted State Court Order Rests Entirely on the Flawed Methodology and Unreliable Testimony of Respondent's Expert, Dr. King, and is due no deference under 2254(d)**

Respondent's order  asserting that Petitioner is not mentally retarded rests entirely on the testimony of Respondent's expert, Dr. King.[40]  Dr. King administered the WAIS-III, resulting in a full-scale IQ score of 68, thus meeting the first prong for mental retardation.  Dr. King's achievement testing was likewise consistent with a diagnosis of mental retardation, showing Mr. Pye's reading skills were at a fourth-grade, second month level, spelling at a sixth-grade, seven month level, and arithmetic at a fifth-grade, fourth month level.  Resp. Ex. No. 90 at 112;  Resp. Ex. No. 129C at 10154.   However, despite the fact Mr. Pye could not read the instructions to the adaptive testing instrument he administered, the ABAS-II, which requires a sixth grade reading level, Dr. King opined that  Mr. Pye is only **seriously impaired** in his adaptive functioning, and did not exhibit sufficient deficits to warrant a diagnosis of mental retardation.  Resp. Ex. No. 92 at 433-434.

---

[40]Courts evaluating *Atkins* claims have rejected Dr. King's views. *See Davis,* 611 F.Supp. 2d at 499-501 (rejecting conclusion of a clinician with "limited experience and training in the MR field" who concluded that adaptive behavior scale scores "have no validity" where reporters are asked to evaluate past rather than current behavior); *United States v. Nelson*, 419 F. Supp.2d 891, 895-903 (E.D. La. 2006) (rejecting opinion of expert who did not have special expertise in mental retardation and who relied on a self-reported ABAS-II score to support his finding that the defendant did not have significant deficits in adaptive behavior).

Dr. King's flawed methodology and unreliable results include, *inter alia*,

- administration of the ABAS-II directly to Mr. Pye, contrary to the recommendations of the test's author and the consensus in the profession on best practices in performing a retrospective assessment. *See* Resp. Ex. No. 94C at 960-963 (Affidavit of Dr. Thomas Oakland); Resp. Ex. No. 94C at 965-1022; Resp. Ex. No. 94D at 1023-1030 (AAIDD User's Guide); Resp. Ex. No. 94D at 1043-1065 (AAIDD handbook) and Resp. Ex. No. 95E at 1280-1282; Resp. Ex. No. 95F at 1283-1299 (ABAS-II Handbook).   All of these authorities advise that in conducting a retrospective assessment, the self-ratings version of the ABAS is inappropriate for 1) an incarcerated individual and 2) an individual who is low functioning.[41]   *All* respected authorities in the field reject King's  methodology.[42]   "None of the generally accepted scales of adaptive behavior rely on direct observation of the person nor upon his own self-report of what he is capable of doing."  *United States v. Smith*, 790 F.Supp.2d 482, 503 (E.D. Louisiana, 2011).

- King emphasized Mr. Pye's strengths in a certain area while completely ignoring directly relevant information that showed limitations.  This analysis is incorrect.  Mentally retarded persons inevitably have some strengths, but "[t]he assessment of adaptive functioning focuses upon deficits." *Davis*, 411 F. Supp. at 497.

- King illegitimately credited "adaptive behavior in the prison system" as indicative of high functioning adaptive behavior, when such behavior is not indicative of how the petitioner would have functioned in the community at large "which is the only relevant

---

[41]By Dr. King's own admission, Mr. Pye is low functioning.  Resp. Ex. No. 92 at 434.

[42]Respondent's order's painstaking description of how Dr. King administered the ABAS-II self-report to Mr. Pye (Resp. Ex. No. 161 at 25) is meaningless because the administration of this test instrument was itself illegitimate.

environment." *United States v. Smith*, 790 F.Supp.2d 482, 519 (E.D. La. 2011).

- King relied on the facts of the crime as indicative of good adaptive behavior, contrary to professional guidelines.  Resp. Ex. No. 94C at 988 (AAIDD User's Guide) ("Do not use past criminal behavior...to infer level of adaptive behavior or about having MR/ID")(emphasis added).[43]

- King stated Mr. Pye was not retarded because he acted as a caregiver by providing the victim with money and housing.  People with mental retardation "can marry, have children, converse using multi-syllable words, have a checking account and/or credit card, have a driver's license, and commit crimes." *Davis*, 611 F.Supp. at 501.[44]

Without Dr.  King's faulty and unreliable opinion regarding adaptive

functioning, all the evidence is that Petitioner is mentally retarded.[45]  The

---

[43]The Eleventh Circuit has noted that a mentally retarded habeas petitioner's "frequent and serious criminal history," which included two escape attempts, one successful, after which he "traveled extensively around the Southeast, staying in motels, trading and selling cars, and finding odd jobs," did not undermine a proper diagnosis of mental retardation.  *Holladay,* 555 F.3d at 1360.

[44]The Order quotes Dr. King to state that "Petitioner obtained a driver's license, which is also highly indicative of an individual who has adaptive skills." Resp. Ex. No. 161 at 28-29.

[45]King has been specifically discredited for identical methodology and conclusions in another Georgia habeas case. *See Hall v. Lewis*, 286 Ga. 676, 692 S.E.2d 580 (2009).  There the state habeas court found Dr. King "to be a 'hired gun' who lacked expertise in the field of mental retardation and whose opinion was a 'sham' premised on a repeated willingness to disregard the established standards of the psychological profession." *Hill v. Humphrey*, 662 F.3d 1335, 1376 (11th Cir. 2011)(Barkett, J., dissenting).  The court in *Lewis* found the petitioner had established mental retardation beyond a reasonable doubt, and the State did not appeal this finding.  King's sole experience working with mentally

Respondent-drafted state order stating otherwise is contrary to and an unreasonable application of *Atkins*, and an unreasonable determination of the facts.  2254(d)(1) and (2).

> **1.    Respondent's Order Finding that Dr. Swanson's Methods Are Flawed Is Unsupported by Any Authority and An Unreasonable Determination of the Facts in Light of the Record Evidence**

The ABAS-II Clinical Use and Interpretation Handbook, published in 2008, Resp. Ex. No. 95E at 1280-1282;  Resp. Ex. No. 95F 1283-1299, addresses the issues presented by *Atkins* cases and  specifically refutes the Respondent's order's criticisms of the retrospective assessment, particularly Dr. Swanson's choice to administer the ABAS-II to Mrs. Pye.  *Id.*

The order states that the Vineland Scales administered to Pam Bland and Ricky Pye are inaccurate because they diverge from their trial testimony.  Resp. Ex. No. 161 at 34-35.  This is an unreasonable determination of the facts.   Pam Bland's testimony that Mr. Pye willingly babysat her daughter is not mutually

---

retarded people was 100 hours of practicum he performed thirty-five (35) years ago – in 1970 – at a Florida institution as part of his graduate degree program. Dr. King has never published an article or paper on mental retardation and has done no research in the field of mental retardation.  Resp. Ex. No. 124A at 8472; Resp. Ex. No. 129B at 10100-10116.   He does not provide services to mentally retarded subjects.  Resp. Ex. No. 124A at 8485.  He has never attended a workshop or conference specifically on mental retardation.  Resp. Ex. No. 124A at 8462.  He attended a workshop where a half day was spent on *Atkins* issues "this last year or the year before."  *Id*. at 8464.

exclusive of her report to Dr. Swanson that she did not trust Mr. Pye to care for the child.  During cross-examination, Dr. Swanson explained that Ms. Bland sometimes asked Mr. Pye to entertain the children or to walk them to the store, but she did not leave them in his exclusive care because he would not know how to cook for them, attend to any medical needs, or otherwise protect their well-being. Resp. Ex. No. 91A at 197-198.

Similarly, the Respondent's order discredits Ricky Pye's Vineland assessment because he reported to Dr. Swanson that Petitioner sold drugs, albeit unsuccessfully, whereas he testified at trial that he had no idea whether Petitioner sold drugs.  The Order does not and cannot explain how this indicates that Ricky "was unable to present a clear and accurate retrospective picture of Petitioner and therefore was an inappropriate choice as a respondent for the Vineland II."  Resp. Ex. No. 161 at 36.

Finally, the Order states that Dr. Swanson should have scored two responses differently where Petitioner did not have access to the item or activity being questioned, such as using an automatic washing machine or a computer.  No authority is given.   Even if Dr. Swanson had awarded a point for the two questions, it would not have changed Mr. Pye's score of two standard deviations below the mean and his classification as mentally retarded.

Mr. Pye is mentally retarded beyond a reasonable doubt, and his execution would violate the Eighth and Fourteenth Amendments to the Federal Constitution. This Court should grant an evidentiary hearing and grant relief.

### D.     Georgia's Reasonable Doubt Standard for Determining Mental Retardation Violates the Eighth and Fourteenth Amendments

The United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), established that the United States Constitution bars the execution of mentally retarded persons like Mr. Pye.   Mr. Pye contends that the beyond-reasonable-doubt standard imposed by Georgia law violates the Fourteenth Amendment guarantee of due process in that determination, as well as the Eighth Amendment guarantee of a fair and reliable sentencing determination and protection from cruel and unusual punishment.  Consequently, this Court should impose a standard of proof that is lower than Georgia's reasonable doubt standard in determining whether Mr. Pye is mentally retarded.[46]

In *Atkins*, the United States Supreme Court "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences" consistent with the Due Process Clause of the Fourteenth

---

[46]While Petitioner contends that the "beyond a reasonable doubt" standard is unconstitutional, the evidence in this case shows he can meet even that unconstitutionally stringent standard, and the Respondent's order to the contrary is entitled to no deference from this Court.  28 U.S.C. §2254 (d)(1) and (2).

Amendment. *Atkins*, 536 U.S. at 317. "Even though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's ... due process jurisprudence." *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007). As a result, the rules that states develop to protect defendants' federal constitutional rights must pass muster under the Due Process Clause. *See, e.g.*, *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996); *Panetti v. Quarterman*, 661 U.S. 930, 949-950 (2007); *Addington v. Texas*, 441 U.S. 418 (1979); *Speiser v. Randall*, 357 U.S. 518 (1958).

In *Hill v. Humphrey*, 608 F.3d 1272 (11th Cir. 2010), a panel of the Eleventh Circuit found that Georgia's statutory reasonable doubt standard violated the Eighth Amendment. The *en banc* Eleventh Circuit vacated the panel decision and addressed the issue of whether pursuant to §2254(d)(1), the Georgia Supreme Court's decision upholding the reasonable doubt standard was contrary to clearly established law as announced in *Atkins*. *Hill v. Humphrey*, 662 F.3d 1335 (2011). The *en banc* court "d[id] not decide whether Georgia's burden of proof is constitutionally permissible but only that no decision of the United States Supreme Court clearly establishes that it is unconstitutional," and thus the court was "without authority to overturn the reasoned judgment of the State's highest court." *Hill*, 662 F.3d at 1360.

The Fourteenth Amendment prohibits the imposition of a burden of proof that allocates the risk of an erroneous decision in a way that violates "fundamental fairness."  *Cooper*, 517 U.S. at 355.  Under *Cooper*, the "beyond-a-reasonable-doubt" standard set out in O.C.G.A. § 17-7-131(c)(3) as applied to mentally retarded offenders violates due process.  It allocates the risk of an erroneous decision in a way that is fundamentally unfair in light of the evidentiary hurdles to proving mental retardation and the dire consequences of error for the offender.  In fact, Georgia is the only jurisdiction imposing the law's highest burden on offenders seeking to prove mental retardation; no other jurisdiction requires defendants to prove mental retardation beyond a reasonable doubt.[47]

---

[47] The evolving trend toward increased protections of mentally retarded capital offenders is clear.  *See Trop v. Dulles*, 356 U.S. 86, 100 (1958).  Among the 18 jurisdictions that statutorily banned execution of the mentally retarded *before Atkins*, most require defendants to prove mental retardation only by a preponderance of the evidence.  *See* Ark. Code Ann. § 5-4-618(c)§§; Conn. Gen. Stat. § 53a-46a§§; Md. Crim. Law §2-202(b)(2)(ii)§§; Mo. Rev. Stat. § 565.030.4(1)§§; Neb. Rev. Stat. Ann. § 28-105.01(4)§§; N.M. Stat. Ann. § 31-20A-2.1(c)§§; N.Y. Crim. Proc. Law § 400.27(12)(a)§§; N.C. Gen. Stat. § 15A-2005(c)§§; Tenn. Code Ann. § 39-13-203(c)§§; Wash Rev. Code Ann. § 10.95.030(2)§§.  Four states required "clear and convincing" proof of mental retardation (*see* Ariz. Rev. Stat. § 13-703.02(G)§§; Colo. Rev. Stat. § 18-1.3-1102(2)§§; Fla. Stat. Ann. § 921.137(4)§§; Ind. Code Ann. § 35-36-9-4(b)§§).  Indiana's higher burden of proof  was ruled unconstitutional in *Pruitt v. State*, 834 N.E.2d 90, 103 (Ind. 2005) ("[T]he implication of *Atkins* and *Cooper* is that the defendant's right not to be executed if mentally retarded outweighs the state's interest as a matter of federal constitutional law. We therefore hold that the state may not require proof of mental retardation by clear and convincing evidence.").  In three states (Kansas, Kentucky and South Dakota) and the federal government,

"The near-uniform application of a standard that is more protective of the

defendant's rights than [Georgia]'s [reasonable doubt] evidence rule supports [the]

conclusion that the heightened standard offends a principle of justice that is deeply

"'rooted in the traditions and conscience of our people.'"  *Cooper*, 116 S.Ct. at

1380.

The imposition of the beyond-reasonable-doubt standard implicates both

due process and Eighth Amendment concerns.  The death penalty has long been

deemed a qualitatively different punishment than a sentence of imprisonment, and

for this reason our justice system demands a heightened "need for reliability in the

determination that death is the appropriate punishment in a specific case."

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Ford v.*

---

the standard of proof is unclear.

Following the decision in *Atkins*, at least 16 additional states have adopted a
preponderance of the evidence standard: Ann.Cal.Penal Code § 1376(b)(3)§§ I.C.
§ 19-2515A(3)§§; 725 ILCS 5/114-15(b); *Bowling v. Commonwealth,* 163 S.W.3d
361, 382 (Ky. 2005); L.S.A-C.Cr.P. Art. 905.5.1(C)(1); *Chase v. State*, 873 So.2d
1013, 1029 (Miss 2004); N.R.S. 174.098; *State v. Jimenez*, 908 A.2d 181, 190
(N.J. 2006); *State v. Lott*, 779 N.E.2d 1011, 1015 (Ohio  2002); *Murphy v. State*,
54 P.3d 556, 568 (Okla. Crim.App. 2002) (overruled on other grounds);
*Commonwealth v. Mitchell,* 839 A.2d 202, 211 n. 8 (Pa. 2003); *Franklin v.
Maynard*, 588 S.E.2d 604, 606 (S.C. 2003); SDCL § 23A-27A-26.3§§; *Ex Parte
Briseno,* 135 S.W.3d 1, 12 (Tex Crim.App. 2004); U.C.A. 1953 § 77-15a-
104(11)(a)§§; Va. Code Ann. § 19.2-264.3:1.1(C)§§.

*Wainwright*, 477 U.S. 399, 411 (1986); *Beck v. Alabama*, 447 U.S. 625, 637-638 (1980).

As the Supreme Court more recently explained in *Kennedy v. Louisiana*, 554 U.S. 407 (2008), the long line of cases imposing due process restrictions on state capital sentencing procedures emphasize that because "death is different," the Constitution "require[s] that use of the death penalty be restrained ... In most cases justice is not better served by terminating the life of the perpetrator rather than confining him." *Kennedy*, 554 U.S. at 446-447.  The Georgia law violates this fundamental Constitutional principle of restraint because, as the panel majority in *Hill* stated, "Georgia holds that it is far better to erroneously execute a mentally retarded person than to erroneously impose a life sentence on one not mentally retarded." *Hill*, 608 F.3d at 1279.

The beyond-a-reasonable-doubt standard violates this fundamental principle because it renders death sentences unreliable where accused capital offenders pre sent strong evidence that they are mentally retarded yet fall short of proving their mental retardation beyond a reasonable doubt.  Such defendants, although they are more likely than not mentally retarded or are even clearly and convincingly mentally retarded, will invariably be subject to execution under Georgia's

standard.[48]  This Court simply cannot have confidence that death sentences so

imposed meet the Eighth Amendment's demand for heightened certainty that death

is the appropriate sentence in such cases.  Indeed, the Eighth Amendment

categorically proscribes the death penalty for mentally retarded offenders precisely

because they constitute a class already at "special risk" that "the death penalty will

be imposed in spite of factors which may call for a less severe penalty."  *Atkins*,

536 U.S. at 318-321.  The Supreme Court has found that the reasonable doubt

standard is virtually insurmountable where psychiatric determinations are at issue.

*See Addington v. Texas*, 441 U.S 418 (1979) (finding "the reasonable-doubt

standard is inappropriate in civil commitment proceedings because, given the

uncertainties of psychiatric diagnosis, it may impose a burden the state cannot

meet and thereby erect an unreasonable barrier to needed medical treatment."  *Id*.

at 430-31.  Because the beyond-reasonable-doubt standard adds to the already

heightened risk of wrongful execution, it cannot be applied.[49]

---

[48]In *Cooper,* the Supreme Court found that the due process clause prohibits the imposition of the "clear and convincing" standard on defendants in competency proceedings because it would invariably cause defendants, who are more likely than not incompetent, to stand trial nonetheless.  *Cooper*, 517 U.S. at 355-56.

[49]"[A] statute that . . . creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty" must fail because "[w]hen the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."

The resulting under-recognition of mental retardation compromises the defendants' constitutional interests.  In part for this reason, the *Atkins* Court held that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution."  *Atkins*, 536 U.S. at 321.  But *mildly* mentally retarded offenders, who make up the vast majority of mentally retarded persons in the justice system, face an even greater risk in this regard, and even more so when required to prove their condition beyond a reasonable doubt.  For the foregoing reasons, this Court should rule that the beyond-a-reasonable-doubt standard violates the Eighth and Fourteenth Amendments and adjudicate Mr. Pye's mental retardation claim under the preponderance of the evidence standard.

### 1.  The State Court Order Did Not Address This Issue

The state order drafted by Respondent did not explicitly address the issue of the constitutionality of the reasonable doubt standard, but concluded that Petitioner had not shown mental retardation beyond a reasonable doubt.  This Court should find that Respondent's Order is entitled to no deference under 2254(d), that Petitioner has established that he is mentally retarded under any standard and should grant relief.[50]

---

*Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

[50]In the alternative, because the beyond a reasonable doubt standard denied Petitioner a full and fair hearing in state court, this Court should grant an

## CLAIM VIII

## THE PROSECUTION EXERCISED ITS PEREMPTORY STRIKES IN A RACIALLY AND GENDER DISCRIMINATORY MANNER IN VIOLATION OF *BATSON V. KENTUCKY,* 476 U.S. 79 (1986), AND *J.E.B. V. ALABAMA,* 511U.S. 127 (1994).

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

*Batson v. Kentucky,* 476 U.S. 79 (1986), *Powers v. Ohio,* 499 U.S. 400 (1991), and *J.E.B. v. Alabama,* 511 U.S. 127 (1994), require that where a criminal defendant makes out a prima facie case that the prosecutor used his peremptory strikes in a discriminatory fashion, the burden shifts to the prosecutor to "come forward with a neutral explanation" for the strikes. *Batson,* 476 U.S. at 97. That explanation must be "related to the particular case to be tried" and must be "clear and specific" as well as "legitimate." *Id.* at 98, and n. 20.

In the instant case, the prosecutor impermissibly struck a disproportionate number of jurors based on racial and/or gender bias. Petitioner was tried by a jury

---

evidentiary hearing at which Petitioner may present evidence and rebut the state court's finding he is not mentally retarded with clear and convincing evidence. *See, e.g., Hill*, 662 F.3d at 1364 (Tjoflat, J., specially concurring).

140

composed of 11 white jurors and one African American juror, though jurors were chosen from a venire which was 23% African American.  The prosecutor used 66% of his peremptory challenges to strike African American jurors, and disproportionately used his strikes against African America men so that the seated jurors did not include even one African-American man.  The prosecutor used his strikes against African American jurors at a rate roughly three times that at which he used strikes against white jurors.  Furthermore, the only African American juror seated by the prosecution was demographically identical to the victim in the case.  As a result of the prosecutor's discriminatory use of strikes, the defense challenged the pattern of striking under *Batson* at the close of jury selection.  Resp. Ex. No. 10B at 866-867.

The prosecutor's explanations for his strikes were pretextual and not race-neutral.  *Id.* at 867-871.  Furthermore, the trial court failed to perform a comparative analysis of the proffered reasons for striking African American jurors with those white jurors not struck in order to determine whether purposeful discrimination was apparent from the record.  *Snyder v. Louisiana,* 552 U.S. 472 (2008).   Nor did the trial court permit defense counsel an opportunity to make a showing that the prosecutor failed to strike white jurors who had expressed similar

141

views and/or exhibited similar characteristics as the African American jurors who were struck.[51]

In denying relief upon Petitioner's claim under *Batson* and *J.E.B.,* the Georgia Supreme Court failed to reasonably apply those decisions, and made factual determinations that were plainly unreasonable in light of the trial record before it.  *See Pye,* 505 S.E.2d at 9.  Consequently, the decision of the Georgia Supreme Court does not constrain this Court's power to grant relief under 28 U.S.C. §2254(d).

## CLAIM IX

**THE TRIAL COURT UNCONSTITUTIONALLY LIMITED THE SCOPE OF VOIR DIRE AND FAILED TO CONFIRM THAT PROSPECTIVE JURORS WERE "LIFE-QUALIFIED" PURSUANT TO *MORGAN V. ILLINOIS,* 504 U.S. 719 (1992) AND FAILED TO ASCERTAIN WHETHER EACH JUROR COULD CONSIDER MITIGATING CIRCUMSTANCES.**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

---

[51]To the extent that trial counsel unreasonably failed to make an adequate showing of purposeful discrimination in response to the prosecutor's proffered explanation, he performed deficiently and Petitioner was prejudiced thereby.

Mr. Pye was denied his rights to a fair and impartial jury, due process, equal protection, a fair trial and a reliable determination of punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments when the trial court failed to ask prospective jurors if they could give consideration to mitigating evidence and whether they would automatically vote for the death penalty if Mr. Pye was convicted of malice murder. *Morgan v. Illinois,* 504 U.S. 719 (1992); *Witherspoon v. Illinois,* 391 U.S. 510 (1968); *Woodson v. North Carolina,* 428 U.S. 280 (1976); *Penry v. Johnson,* 532 U.S. 782 (2001).

In the context of a capital case, if a juror is unwilling to consider mitigating evidence before deciding upon a sentence or is convinced that the death penalty is the only appropriate punishment for murder, he or she is unfit to serve. *Morgan,* 504 U.S. at 729 ("a juror who would automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do...If even one such juror is empaneled and the death sentence is returned, the State is disentitled to execute the sentence.").

The court in this case inquired of each prospective juror whether they were conscientiously opposed to the death penalty, but the court did not ask whether jurors would vote to impose the death penalty in all cases of murder, nor did the

143

court ask whether jurors could fairly consider mitigating evidence. The court did not make these inquiries even in the face of indicia from a given juror that they were inclined to impose death for all murders, for instance, when the juror quoted an eye for an eye language. *See, e.g.,* Resp. Ex. No. 8B at 390.

Furthermore, when defense counsel attempted to ask these questions himself, the trial court sustained an objection by the prosecutor, finding that defense counsel's question "invaded the province of the court." *See, e.g.,* Resp. Ex. No. 9A at 524. Thus, the jury was chosen without full knowledge of which jurors were impaired in their ability to consider a sentence of life imprisonment, or to fairly weigh mitigating circumstances. An important and necessary component of the rule that jurors must be impartial is that before the jury is empaneled, prospective jurors must be asked whether they could comply with the bedrock requirements of capital sentencing. "Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered nugatory and meaningless..." *Morgan, supra,* at 733-34.

The decision of the Georgia Supreme Court that these deficiencies in the voir dire process were harmless[52] is both contrary to and an unreasonable application of

---

[52]To the extent that the Georgia Supreme Court held that the claim was not reachable because trial counsel failed to move the trial court to include such

*Morgan,* 504 U.S. at 733, and of *Lockett v. Ohio,* 438 U.S. 586 (1978), *Woodson v. North Carolina,* 428 U.S. 280 (1976) and their progeny.  This Court must grant relief.

**CLAIM X**

**THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS BY EXCUSING FOR CAUSE JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT EXCLUSION UNDER *WITHERSPOON V. ILLINOIS*, 391 U.S. 510 (1968).**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The trial court violated Petitioner's rights under the Fifth, Eighth and Fourteenth Amendments by excusing for cause potential jurors whose views on the death penalty were not extreme enough to warrant exclusion.[53]  A capital defendant's right to an impartial jury prohibits the exclusion of venire members

---

questions and/or failed to pose the questions himself, trial counsel was ineffective in failing to do so and Petitioner was prejudiced thereby.

[53]To the extent that trial counsel failed to object to the excusal of such jurors at trial or preserve this issue on appeal, he rendered ineffective assistance of counsel and Petitioner was prejudiced thereby.

"simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).  To permit the exclusion for cause of prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members.  It "stack[s] the deck against the [defendant]." *Gray v. Mississippi*, 481 U.S. 648, 658 (1987) (*quoting, Witherspoon*, 391 U.S. at 523).

The exclusion of venire members based on their views concerning the death penalty must be limited to those who are "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose "attitude toward the death penalty would prevent them from making an impartial decision on the question of guilt." *Witherspoon*, 391 U.S. at 523.  "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McGree*, 476 U.S. 162, 176 (1986).

When a trial court misapplies *Witherspoon*, and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence cannot stand. *Davis v. Georgia*, 429 U.S. 122 (1976) (per curiam).  Because the trial court improperly excused for cause venire members who were qualified to be seated as

146

jurors under *Witherspoon*, 391 U.S. at 523, Petitioner was denied his constitutional

right to a fair trial and impartial jury.

## CLAIM XI

### JUROR MISCONDUCT VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS, TRIAL BY A FAIR AND IMPARTIAL JURY, AND A RELIABLE DETERMINATION OF PUNISHMENT

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by

specific reference.

Petitioner has a right to a trial by a fair and impartial jury.  U.S. Const.

Amends. VI; XIV; *Duncan v. Louisiana,* 391 U.S. 145,149 (1968); *Irvin v. Dowd,*

366 U.S. 717, 722 (1961).  This right is jeopardized when a jury's verdict is

affected by external evidence or undue influence. *Turner v. Louisiana*, 379 U.S.

466, 472 (1965) ("requirement that a jury's verdict must be based upon the

evidence developed at the trial goes to the fundamental integrity of all that is

embraced in the constitutional concept of trial by jury."); *see also Remmer v.*

*United States*, 347 U.S. 227, 229 (1954) ("the integrity of jury proceedings must

not be jeopardized by unauthorized invasions."); *Crawford v. Head*, 311 F.3d 1288, 1333 (11th Cir. 2002).

But for undue influence and external matters that were brought to bear upon Petitioner's jurors, he would not have been sentenced to death.  Such misconduct included, but was not limited to, discussing the case after being admonished not to discuss it, improperly considering matters extraneous to the trial, possessing improper racial attitudes which infected the deliberations of the jury, giving false or misleading responses during voir dire, possessing improper biases which infected their deliberations, being improperly exposed to the prejudicial opinions of third parties, improperly communicating with third parties, improperly communicating with jury bailiffs, improperly communicating ex parte with the trial judge, improperly prejudging the guilt/innocence and penalty phases of Petitioner's trial, improperly preparing a statement or speech during deliberations, improperly making a statement during the rendering of verdicts, improperly involving alternates during the deliberation, improperly deliberating on the sentence during the guilt/innocence deliberations, and compromising on the verdict.  *See e.g., Turner v. Louisiana*, 379 U.S. 466 (1965); *Rushen v. Spain*, 464 U.S. 114 (1983). *Spencer v. Georgia*, 500 U.S. 960 (1991) (Kennedy, J., concurring in denial of

certiorari); *McCleskey v. Kemp*. 481 U.S. 279 (1987); *Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989).

Petitioner's rights were further violated when a prospective juror who was purportedly related to the victim was permitted to serve as an alternate juror and expressed his views to the other jurors. Early in the voir dire process, juror panel member Alvin Yarbrough announced to other venire members that he was the victim's cousin. Resp. Ex. No. 10B at 875. Yarbrough was eventually selected as an alternate juror, and the two prospective jurors to whom he made the statement were seated as jurors. *Id*. Later, when questioned by the court, Yarbrough denied that he was related to the victim, *Id.* at 876, and testified that he claimed to be related to the victim simply because they shared the same last name. *Id.* at 877. The trial court took Yarbrough at his word and allowed him to remain an alternate without conducting any further investigation. The court did not interview the other jurors to determine if they had heard or been affected by Yarbrough's initial statement.

Someone who is related to the victim is not qualified to sit as a juror in Georgia. O.C.G.A. §15-12-163(b)(4). In this case, although the court learned that Yarbrough had told at least some jurors that he was related to the victim, the court conducted no more than a cursory inquiry into the matter. Because this inquiry was

149

wholly insufficient to determine whether Yarbrough was telling the truth to the other jurors or to the court, and because the presence on the jury of someone who claimed to be related to the victim rendered Mr. Pye's trial fundamentally unfair and violated his right to due process, his convictions and sentence should be set aside and he should be granted a new trial.

The state habeas court ruled that most subparts of Petitioner's juror misconduct claim were procedurally defaulted, and failed to analyze whether there was cause and prejudice to overcome the default.  While Georgia has a general rule that an available claim must be raised on direct appeal, it has created a specific exception for juror misconduct claims.  In *Todd v. Turpin*, 268 Ga. 820, 493 S.E.2d 900 (1997), the Georgia Supreme Court held that while there is technically a procedural default for not raising a juror misconduct claim on appeal, such a claim only has to be raised on direct appeal if there exists "evidence that would have alerted trial or appellate counsel to the fact that jury misconduct or improper jury deliberations occurred at trial."  *Id*. at 907.  In other words, cause to excuse the default exists if counsel were not aware of evidence that would indicate the jury misconduct occurred or had no reason to suspect misconduct.  In the instant case, there was no reason for trial counsel to suspect misconduct.  Thus, in holding

Petitioner's claim to be defaulted, the state court failed to follow its own firmly established rule.

On the other hand, should this Court find that trial/appellate counsel knew or had reason to suspect misconduct, then counsel had an obligation to investigate the claim by conducting interviews with the jurors and a concomitant obligation to present evidence in support of the claim at the motion for new trial stage and on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). Their failure to perform the required investigation would constitute ineffective assistance of counsel, and consequently, cause to excuse the default. Because Petitioner is entitled to relief on his juror misconduct claim, he has thereby shown "prejudice" flowing from trial counsel's failure to present the claim and thus, prejudice flowing from the default. *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001).

To the extent that the Georgia Supreme Court addressed the misconduct committed by alternate juror Alvin Yarbrough, that resolution was contrary to and an unreasonable application of federal law, and was based upon multiple unreasonable factual determinations. Accordingly, this Court should review and reverse the ruling of the Georgia courts.

## CLAIM XII

**PETITIONER WAS DENIED DUE PROCESS, A
FUNDAMENTALLY FAIR TRIAL, AND RELIABLE
CAPITAL SENTENCING PROCEEDING BY
IMPROPER AND PREJUDICIAL ACTIONS AND
BIAS OF THE TRIAL JUDGE**.

The trial court judge had a documented history of racial bias and other animus against Spalding County defendants which infected Petitioner's trial and rendered the trial fundamentally unfair and Petitioner's death sentence unconstitutionally procured. *McCleskey v. Kemp*, 481 U.S. 279 (1987). During the course of the trial, the judge made several improper comments and took several improper actions. These include, but were not limited to, failing to inquire into obvious conflicts of interest between Petitioner and trial counsel, failing to assign new counsel or inquire into trial counsel's inaction following Petitioner's complaints regarding counsel's representation, speaking with jurors about the case off the record and outside the presence of counsel and the defendant, precluding trial counsel from mounting a defense, making improper and extrajudicial comments throughout the trial of the case, improperly limiting the scope of voir dire and permitting the prosecutor to introduce evidence of Petitioner's prior convictions during the guilt phase of trial.

152

The trial court's animus and bias against Petitioner denied Petitioner his rights to a fair trial and reliable sentencing under the Sixth, Eighth and Fourteenth Amendments. *Bracy v. Gramley,* 520 U.S. 899, 904-905 (1997); *McCleskey v. Kemp*, 481 U.S. at 279; *Jordan v. Commonwealth,* 225 U.S. 167, 176 (1912). The state courts incorrectly ruled that this claim was procedurally defaulted and failed to analyze whether sufficient cause and prejudice exists to overcome the default.

## CLAIM XIII

### GEORGIA'S UNIFIED APPEAL PROCEDURE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

On its face and as applied to Mr. Pye's case, O.C.G.A. §17-10-36 (the Unified Appeal Procedure) denied Mr. Pye his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.[54] The Unified Appeal Procedure, (hereinafter, "UAP"), requires the trial court to hold "conferences" with the

_____

[54]To the extent that trial counsel failed to object at trial or preserve this issue on appeal, counsel rendered ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

153

defendant, defense counsel and the prosecutor at various stages throughout the course of a capital case. At each conference, the court makes inquiries of counsel as to whether the defense will raise various issues at that particular stage of the proceeding, and further inquires of the defendant as to whether he waived issues which have been discussed and not raised. The prosecutor is present at each conference. For the reasons set forth below, this procedure violates the above enumerated rights of a defendant, and did so in Mr. Pye's case.

The UAP violates important due process considerations in the following respects: First, it upsets the balance of power between the State and the accused in the adversarial system by forcing the defense throughout the proceedings to disclose strategy and tactics. The net effect is to confer the benefit upon the State of learning at various junctures of the case the intentions of the defense without itself having to disclose any information.

The UAP also violates a defendant's right to silence. When represented by counsel, a criminal defendant enjoys the right to be heard through counsel. Under the UAP, this right is not honored, as repeated inquiries are made of the defendant about strategy and satisfaction with counsel. Throughout the pretrial proceedings and Mr. Pye's trial, the Court repeatedly inquired of him as to his satisfaction with his attorney.

The UAP violates the right to counsel in at least three respects.  The process of regularly asking counsel what issues he or she will raise necessarily results in a disclosure of counsel's trial strategy in violation of the work product privilege. This occurred continually during Mr. Pye's trial.  The Court made repeated and detailed inquires of counsel's intended course of action at every stage of the pre-trial, trial and post-trial proceedings.

Second, the procedure requires the defendant at each conference to inform the Court whether he or she is satisfied with the services of counsel.  The assessment of whether counsel is serving effectively during trial is an impossible task to impose upon a lay person, particularly a lay person under the stress of a capital prosecution.  The trial court repeatedly inquired of Mr. Pye whether he was satisfied with counsel's services and explicitly imposed upon him an affirmative duty to identify any deficiencies of counsel and bring them to the Court's attention. Neither the trial court nor the Unified Appeal procedure provided Mr. Pye with independent counsel to assist in making this judgment.

Third, the procedure thrusts the Court directly into the attorney-client relationship and requires counsel to advise the defendant of issues which have little, if any, relevance to the case, and which take away from time better spent on

155

relevant issues.  The trial court repeatedly asked Mr. Pye to comment upon the quality of the attorney-client relationship.

The UAP also denies a capital defendant his right to equal protection under the law.  For no rational reason, the UAP imposes the above-cited costs upon the capital defendant and not other criminal defendants.

Because of the many costs imposed upon the capital defendant by the UAP, the reliability of the trial and sentencing hearing is diminished to the point that Mr. Pye was denied a fundamentally fair proceeding.  Because Mr. Pye was tried, convicted, and sentenced pursuant to this procedure, relief from his unconstitutional conviction and sentence is appropriate.

The state habeas court ruled that Petitioner's claim regarding the UAP was procedurally defaulted, and failed to analyze whether there was cause and prejudice to overcome the default.  To the extent that there exists any procedural bar to Petitioner's claim, trial/appellate counsel's ineffective representation in failing to preserve and argue the claim provides sufficient cause and prejudice to overcome the default.  *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989).  Relief is appropriate.

## CLAIM XIV

**PETITIONER'S SENTENCE WAS ARBITRARILY IMPOSED, IS DISPROPORTIONATE AND IS EXCESSIVE, IN VIOLATION OF THE EIGHTH AMENDMENT'S PROHIBITION ON CRUEL AND UNUSUAL PUNISHMENT.**

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

Petitioner's sentence is violative of the Eighth Amendment's prohibition on cruel and unusual punishments because it is both a disproportionately severe response to his crime and because it was arbitrarily imposed and imposed upon the basis of impermissible factors, including race and geography.  Furthermore, the death penalty is disproportionately severe in light of his personal moral culpability.  In examining Petitioner's sentence on direct review, the Georgia Supreme Court abdicated its statutory and constitutional duty to guard against the imposition of arbitrary and excessive death sentences.  In so doing, the court not only permitted Petitioner's death sentence to stand despite being unconstitutionally severe, but the court's actions called into question the constitutionality of the entire Georgia sentencing schema under *Gregg v. Georgia,* 428 U.S. 153 (1976) and O.C.G.A. § 17-10-30 et seq.

157

## A.      The Death Penalty is Arbitrarily Applied in Georgia

Petitioner's uniquely severe punishment is the result of a Georgia death penalty process which provides no uniform standards for differentiating those few cases so heinous that the jury should be permitted to consider the death penalty from those that are not.  Georgia has 159 counties grouped into 49 judicial circuits. These circuits are further administratively grouped into 10 judicial districts.  Each circuit has an elected District Attorney, and it is this prosecutor who makes the decision whether to seek the death penalty in any given case within that district.

Georgia law, however, provides no standards to guide this decision.  Instead, the prosecutor in each circuit makes this decision on his or her own, according to unwritten and widely varying standards or according to no standards at all.  Unlike most states, Georgia has an exceptionally broad definition of murder.  *See* O.C.G.A. § 16-5-1 (defining murder as causing the death of another with "malice aforethought, either express or implied or caus[ing] the death of another human being.").  There is no crime of "capital murder" in Georgia as there is in other states, and Georgia does not have second and third degree murder.  Just one of ten statutory aggravating circumstances must be present in order to render a crime within this broad category of murder a death eligible offense.  *See* O.C.G.A. § 17-10-30(b)(1)-(b)(10).  These factors are expansive and do little to narrow the field;

158

nearly all murders entail at least one of these circumstances.  *See e.g.* O.C.G.A. §

17-10-30(b)(listing as aggravating circumstances such factors as "the offense . .

.was committed while the offender was engaged in the commission of [another

murder, kidnapping or armed robbery] or aggravated battery, or the offense of

murder was committed while the offender was engaged in the commission of

burglary or arson in the first degree," and "the offense . . .was outrageously or

wantonly vile, horrible or inhumane in that it involved torture, depravity of mind,

or an aggravated battery to the victim.")  In short, Georgia prosecutors can seek the

death penalty in virtually any murder case.  Yet in practice, they do not seek death

in the overwhelming number of cases.

The result is that whether a person charged with murder will face the death

penalty depends largely on arbitrary factors such as the county in which the crime

occurred, the quality of court-appointed counsel, and, even more disturbingly, the

race of the victim.  In Mr. Pye's case, the lack of uniform standards permitted a

number of impermissible considerations to be injected into the decision to seek

death.

When fundamental rights are involved, the Equal Protection Clause of the

Fourteenth Amendment requires that there be "uniform" and "specific" standards to

prevent the arbitrary and disparate treatment of similarly situated people.  *Bush v.*

*Gore*, 531 U.S. 98 (2000). In *Bush v. Gore*, the Supreme Court was confronted with an opinion by the Florida Supreme Court that did not set forth uniform standards in its opinion ordering a recount. The Supreme Court held that such a recount would not respect the "equal dignity owed to each voter." *Id.* at 104. The Georgia death penalty system concerns a right even more fundamental than the right to vote - the right to life. As was true in the Florida recount, Georgia's lack of statewide standards to guide prosecutors in determining which cases warrant seeking the death penalty inevitably leads to the disparate treatment of similarly situated people accused of potentially capital offenses.

Due process and equal protection require that the method of deciding which defendants may face the death penalty be subject to at least as much scrutiny as the process of counting votes. The need for equitable treatment when the State seeks to deprive a citizen of his life outweighs any benefit to unbridled prosecutorial discretion. *See Bush*, 531 U.S. at 104-05 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

160

**B.    Petitioner's Sentence is Excessive and Disproportionate to the Sentence Generally Imposed Upon Similarly Situation Georgia Murderers**.

"[T]he State does not respect human dignity when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others.  Indeed, the very words, 'cruel and unusual punishments' imply condemnation of the arbitrary infliction of severe punishments." *Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J. concurring).  Georgia criminal defendants more culpable than Petitioner are routinely given a sentence less than death.  Moreover, society has reached a consensus that crimes in the class of offenses into which Mr. Pye's falls are not crimes warranting application of the death penalty.  Its use in Mr. Pye's case is thus wholly arbitrary. *Id*.  By virtue of both the societal consensus and its arbitrary nature, his death sentence is excessive in proportion to the crime for which he stands convicted.  If offenders possessed of equal and greater degrees of culpability are routinely sentenced to lesser punishments than death, it is plain that a lesser punishment is sufficient to serve society's legitimate penal interest.   Mr. Pye's execution would serve no other purpose than the wanton and unnecessary infliction of pain prohibited by the Eighth Amendment. *Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368 (1982).  His death sentence cannot stand.

Petitioner is constitutionally entitled to be sentenced in a manner consistent

161

with the treatment of similarly situated offenders. *Furman,* 408 U.S. 238. In the years since Petitioner's arrest, there has been an average of more than 560 murders each year. *Georgia Bureau of Investigation, Statewide Profile of Reported Index Crimes, 1980 – 2004.* A considerable percentage of these murders were the unplanned killing of an intimate during a domestic dispute, yet as will be revealed almost uniformly these crimes do not result in imposition of the death penalty.

Petitioner's death sentence is not only greater than the typical sentence imposed in such cases, but qualitatively different:

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Gardner v. Florida*, 430 U.S. 349, 357 (1977). Because of this categorical difference, murder alone is not constitutionally sufficient to warrant the use of the death penalty; "this most irrevocable of sanctions should be reserved for a small number of extreme cases." *Gregg* 428 U.S. at 182. Crimes for which the offender is executed must fall within that narrow class of murders more horrid than others. When the crime falls outside this core class of the most abhorrent murders, a death sentence cannot

be carried out.  O.C.G.A.§ 17-10-35(c)(3).  *Enmund v. Florida,* 458 U.S. 782, 798 (1982).

The Eighth Amendment also requires that punishment serve a legitimate end. If a lesser punishment is able to satisfy society's legitimate interests, execution becomes nothing more than the "pointless and needless extinction of life" which is "patently excessive," violating both the Eighth Amendment and Georgia law. *Furman*, 408 U.S. at 312  (White, J. concurring).  Given the consistency with which lesser sentences than death are utilized to punish conduct far more vile than Petitioner's and in light of the unrebutted testimony that Petitioner poses no continuing threat while incarcerated, a sentence less than death would suffice to serve society's legitimate penal interest.

### C.   The Provisions of 2254(d) Do Not Apply To This Court's Review of The Claim

The Georgia Supreme Court is charged with the task of reviewing *every* death sentence imposed in the Superior Courts of the state.  O.C.G.A. § 17-10-35. The court is required not only to review the lower court proceedings for error, but must assure that "the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor" as well as determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar

cases, considering both the crime and the defendant." O.C.G.A. §17-10-35(c)(1), (3). Specifically, the Court must focus on "how prior sentencers have responded to acts similar to those committed by the defendant whose case is being reviewed" and to set aside death sentences that are out of line with sentences imposed for similar crimes. *Terrell v. State*, 276 Ga. 34, 40, 572 S.E.2d 595, 601 (2002). Thorough proportionality review pursuant to these provisions is fundamental to the constitutionality of Georgia's death penalty scheme. *Gregg v. Georgia*, 428 U.S. 153, 205-6, 96 S.Ct. 2909, 2940 (1976). Without this safeguard, there is an untenable – and unconstitutional – risk that some aberrant death sentences will be imposed. *Furman*, 408 U.S. at 274 (1972) (Brennan, J.); *Id.* at 248, 2731 (Douglas, J.); *Id.*, at 309-10, 2762 (Stewart, J.); *Id.*, at 312, 2764 (White, J). However, it is now clear that the Georgia Supreme Court has abdicated its responsibility for carrying out a meaningful proportionality review, both generally and in this case specifically. Thus, the proportionality review conducted by the Georgia Supreme Court on direct review was perfunctory, and entitled to no deference by this Court. In the alternative, that Court's determination was contrary to and an unreasonable application of *Gregg* and its progeny.

Furthermore, as a result of the prosecutorial misconduct described in Claims I and II, and the ineffective assistance provided by Petitioner's trial counsel

164

described in Claim IV, *supra,* the Georgia Supreme Court was without the facts

and evidence necessary to properly evaluate Petitioner's moral culpability and the

circumstances of his case relative to that of other Georgia murder cases. Thus,

Petitioner's instant proportionality claim differs from that presented to the Georgia

Supreme Court in material ways, and this Court is not bound to defer to that

decision. Instead, the state habeas court, upon being presented with that evidence

had an obligation to perform a second proportionality review. The state habeas

court, however, found that the claim was non-cognizable in those proceedings and

declined to resolve the claim. This Court must now perform the proportionality

review to which Petitioner is entitled *de novo* and order relief from Petitioner's

unconstitutional death sentence.

## CLAIM XV

### EXECUTION BY LETHAL INJECTION IS CRUEL AND UNUSUAL PUNISHMENT, AND VIOLATES MR. PYE'S RIGHTS PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by

specific reference.

165

As Georgia's protocols and procedures for executing prisoners by lethal injection are inconsistent with the evolving standards of decency that mark the progress of a maturing society, they constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. *Trop v. Dulles*, 356 U.S. 86 (1958).

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). It also forbids methods of execution that pose substantial risks for serious harm to the prisoner. *Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also in re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death. . ."). The prohibition against "serious" harm includes a prohibition against punishments that cause a "foreseeable risk [of] gratuitous and unnecessary pain." *Hill v. McDonough*, 547 U.S. 573, 580 (2006); *Farmer v. Brennan*, 511 U.S. 825, 842, 847 (1994) (stating that the Eighth Amendment is violated by  prison officials when they know of a risk of serious harm and proceed without taking reasonable measures to abate the risk).

A plurality of the Supreme Court of the United States has held that a petitioner can prevail in a challenge to lethal injection as a method of execution if he demonstrates "a substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35,

50, 1534 (2008).  Since *Baze*, the Court has also indicated that the legality of the method of obtaining lethal injections drugs is relevant to this inquiry.  *Brewer v. Landrigan*, 131 S.Ct. 445 (2010), citing *Baze*, 553 U.S. at 50.

Petitioner respectfully asserts that the protocols and procedures for executing a prisoner by lethal injection as adopted by the Georgia Department of Corrections are unconstitutionally defective in numerous regards, including, *inter alia*, that they include inadequate safeguards to ensure the efficacy of the substances that it will use to end his life.

In March of 2011, the Drug Enforcement Administration seized Georgia's entire stock of sodium thiopental after learning that the GDC had illegally imported it.  Georgia has also repeatedly and abruptly altered its lethal injection procedures, once changing its protocol on the very eve of an execution because it realized that its supply of a lethal injection drug had expired some two weeks earlier.

Georgia recently declared that it will adhere to its current one-drug execution protocol -- which calls for a lethal injection of pentobarbital, a barbiturate and controlled substance -- despite the fact that no FDA-approved supply of pentobarbital is available for use in judicial executions, as its sole manufacturer prohibits its sale for that purpose.  Indeed, Georgia's only means of obtaining pentobarbital is to have it manufactured by a compounding pharmacy – a process

167

that it not approved or regulated by the FDA.  Accordingly, there are significant

risks that the pentobarbital Georgia acquires will be illegally-obtained and unsafe

for use in judicial executions.

In March of this year, the Georgia Legislature adopted a measure that makes

all information about the nature and origin of Georgia's lethal injection drugs a

"confidential state secret."  *See* O.C.G.A. § 42-5-36(d).  This action follows a

series of missteps for the Georgia Department of Corrections ("the GDC") as it

attempted to obtain drugs for use in lethal injections despite widespread shortages.

The measure took effect on July 1, 2013 and on July 3, the State obtained an

execution warrant for Warren Hill.  Mr. Hill filed an emergency motion for a

preliminary injunction in Fulton County Superior Court, contesting the state's

move to execute him while keeping secret the basic information regarding the

protocols and provenance of the drug the State planned to use.  The Fulton County

court granted the injunction, noting that neither the plaintiff nor the general public

had sufficient information with which to measure the safety of the drug that would

be used to execute Mr. Hill, as there was insufficient information regarding how it

was compounded.  *See Hill v. Owens, et. al.*, No. 2013-CV-233771, at 3.  The

Court wrote that by classifying information regarding the source of the drugs used

in lethal injection as a "confidential state secret," the statute foreclosed the

168

plaintiff's opportunity to bring a claim under the Eighth Amendment relating to a possible risk of harm, and thus unconstitutionally undermined Mr. Hill's due process rights by limiting his access to the courts.  The court also found the statute to be unconstitutionally broad, and issued a stay until such time as it could rule on the merits of Mr. Hill's complaint seeking Declaratory Judgment.

Mr. Pye asserts that O.C.G.A. § 42-5-36(d) is unconstitutional.  Mr. Pye further asserts that Georgia's protocols and procedures do not contain the safeguards necessary to ensure that the drug(s) Georgia will use to execute him will not violate the protections of the Eighth Amendment, and that the personnel administering the lethal chemicals do so without mutilating his body and causing him conscious suffering or a lingering death.  These protocols and procedures also fail to establish minimum qualifications required of the personnel performing the procedure.  The procedure accordingly carries a grave risk of errors that would result in the unnecessary infliction of conscious suffering and severe physical and psychological pain upon the dying prisoner, and falls short of the requirements of the Eighth Amendment.

Mr. Pye has challenged the lethal injection protocol in Georgia since the inception of his state habeas proceedings.  The state habeas court found this claim non-cognizable and held in the alternative that, based upon *Baze*, the claim was

169

"without merit."  State Habeas Order at 13.  Mr. Pye respectfully submits that this refusal by the state courts to grant relief for this claim is contrary to or an unreasonable application of Supreme Court authority. While the Supreme Court in *Baze* relied upon specifically enumerated safeguards of the Kentucky procedures to find that a substantial risk of harm was not present in that state's administration of lethal injection, the Court refrained from automatically deeming constitutional the procedures of other states, stressing that only "[a] state with a lethal injection protocol substantially similar to the protocol we upheld today would not create a risk that meets this standard." *Baze*, 553 U.S. at 61. Georgia protocol and procedures bear no resemblance to those of Kentucky and lack many of the safeguards upon which that Court based its ruling.  Due to O.C.G.A. § 42-5-36(d), Mr. Pye cannot even point to the specific origin or method of manufacture of the drugs which will be used in his execution.  As Georgia's protocols and procedures differ substantially from those found constitutional by the Supreme Court in *Baze*, that case cannot be used to preclude a finding by this Court that death by lethal injection in the State of Georgia violates both the Eighth and Fourteenth Amendments.  Accordingly, the state court's decision is entitled to no special treatment pursuant to §2254(d).

To the extent that Mr. Pye's appellate counsel failed to raise this claim on direct appeal or research, brief and argue it effectively, they provided ineffective assistance.

As Georgia's use of lethal injection as a method of execution is inconsistent with the evolving standards of decency that mark the progress of a maturing society, it constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. *Trop v. Dulles*, 356 U.S. 86 (1958).   Habeas relief should follow.

## CLAIM XVI

### THE CUMULATIVE EFFECT OF THE MANY ERRORS IN PETITIONER'S CAPITAL TRIAL DENIED HIM DUE PROCESS, A FAIR TRIAL AND A RELIABLE DETERMINATION OF PUNISHMENT

This claim is evidenced by the following facts:

All other allegations in this Petition are incorporated into this claim by specific reference.

The State of Georgia does not recognize the cumulative error rule. *Jenkins v. State*, 491 S.E.2d 54 (1997).  However, the federal courts have recognized a need for cumulative error review. *Ford v. Schofield*, 488 F. Supp. 2d 1258, 1368-69 (N.D. Ga. 2007).  The Eleventh Circuit has stated that courts "must consider the

171

cumulative effect of [each incident] and determine whether, viewing the trial as a whole, [the Petitioner] received a fair trial as is [his] due under our Constitution." *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004).  When the cumulative impact of each of the many constitutional violations which occurred at Petitioner's trial is considered, it is impossible to conclude that he was provided a fair trial, that is a trial which comports with the mandates of the U.S. Constitution.  The Georgia state courts failed to consider the cumulative effect of the Constitutional violations at both phases of Petitioner's trial was unconstitutional.  Therefore the provisions of 2254(d) do not apply to this Court's review of the claim.  Mr. Pye respectfully requests that this Court grant him the requested relief and order the new trial to which he is entitled.

## V.   <u>CONCLUSION</u>

For all of the reasons stated above, Petitioner prays that this Court:

1.   Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

2.   Conduct a hearing at which proof may be offered concerning the allegations of this petition;

3.   Allow discovery pursuant to Rule 6, Rules Governing Section 2254 Cases in the United States District Courts;

4.    Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in this petition;

5.    Allow Petitioner to again amend this petition following discovery;

6.    Allow Petitioner a reasonable opportunity to brief the issues of law raised by this Petition;

7.    Grant such other relief as may be appropriate.

Respectfully submitted this 12th day of November, 2013.

/s/ Gretchen M. Stork
Gretchen M. Stork
Ga Bar No. 685555

/s/ S. Jill Benton
S. Jill Benton
Ga. Bar No. 053659

FEDERAL DEFENDER PROGRAM, INC.
101 Marietta St NW, Suite 1500
Atlanta, GA 30303
T. 404-688-7530
gretchen_stork@fd.org
jill_benton@fd.org

COUNSEL FOR PETITIONER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIE JAMES PYE | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 3:13-CV-119-TCB |
| | ) | |
| BRUCE CHATMAN, Warden, | ) | Capital Habeas Corpus |
| Georgia Diagnostic Prison, | ) | |
| Respondent. | ) | |
| _____ | ) | |

## **CERTIFICATE OF SERVICE AND TYPEFACE**

I certify that I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to counsel for Respondent.

I further certify that this pleading was produced using a Times New Roman 14 point font in accordance with Local Rules.

Dated: This the 12th day of November, 2013.

*/s/ S. Jill Benton*